William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
TONNEVOLD REEFER 7 KS, A/K/A,
TONNEVOLD REEFER 4 KS, A/K/A, AND
O.T TONNEVOLD AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTWIND MARITIME, S.A.,

                              Plaintiff,

          -against-

TONNEVOLD REEFER 7 KS,
a/k/a TONNEVOLD REEFER 2 KS,
a/k/a TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                              Defendant.

08 Civ. 3292 (HB)

**DECLARATION OF
JAN SIGVART WALLE IN
SUPPORT OF DEFENDANT'S
MOTION FOR COUNTER-
SECURITY PURSUANT TO
SUPPLEMENTAL RULE E(7)**

I, Jan Sigvart Walle, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. §1746 that the following is true and correct:

1.    I am Senior Vice President of Shipping at O.T. Tonnevold AS ("Tonnevold"). I make this Declaration in support of Tonnevold's Motion for Counter-security against Plaintiff Eastwind Maritime, S.A. ("Eastwind").

2.      As Senior Vice President, I was directly involved with chartering for the *M/V Thorgull* ("*Thorgull*" or "Vessel").

## The Charter

3.      On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a time charter of the *Thorgull* with ECo Shipping Ltd. ("ECo") for a period of about twelve months, which charter was extended by the agreement of the parties until December 20, 2005. On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a pool agreement with ECo to include the *Thorgull*.

4.      On or about December 20, 2005, a successor to Tonnevold Reefer 4 KS, Tonnevold Reefer 7 KS, entered into a charter with ECo for charter of the *Thorgull* for a period of about twelve months (the "Charter"). At the same time, Tonnevold Reefer 7 KS and ECo entered into a new pooling agreement with respect to the Vessel, named "ECo 2002 Pool Agreement" ("Pooling Agreement 02"). Both the Charter and the Pooling Agreement 02 were executed by Mr. Charles T. ("Toby") Moors, Vice President of ECo Shipping. A true and accurate copy of the Charter and Pooling Agreement 02 are annexed as Exhibit 1.

5.      Pursuant to the Charter and while in the employ of ECo, the *Thorgull* performed a voyage from Los Palmas, Canary Islands to Tarifa, Spain from August 7 – September 18, 2006. During the voyage, the *Thorgull*, under the control of ECo and Eastwind, received for on-carriage recently-caught redfish from at least seven fishing vessels at sea.

6.      All of the vessels from which the *Thorgull* received transshipments had been blacklisted by North East Atlantic Fisheries Commission ("NEAFC") and Northwest

Atlantic Fisheries Organization ("NAFO") for activity that had contravened the NEAFC and NAFO rules and regulations.

7.      In receiving redfish for on-carriage for the blacklisted vessels, ECo violated the NEAFC regulations, specifically Article 44 of the NEAFC Scheme of Control and Enforcement ("NEAFC Enforcement"), which prohibited such on-carriage of certain protected fish species, such as redfish.

8.      The NEAFC is a Regional Fisheries Management Organization ("RFMO") that exists to conserve and manage the fishery resources of the northeast region of the Atlantic Ocean. The NAFO is another RFMO that exists to protect the fishery resources in a contiguous area, the northwest Atlantic Ocean.

9.      This violation of the NEAFC rules and regulations is illegal activity in breach of Charter Clause 15, which requires that ECo and Eastwind employ the Vessel in "lawful trades."

10.     As a result of the breach, NEAFC placed the *Thorgull* on its blacklist on November 17, 2006 and NAFO placed the *Thorgull* on its blacklist on February 23, 2007.

11.     Through the diligent efforts of Tonnevold, the *Thorgull* was removed from the NEAFC blacklist on November 16, 2007, approximately one year after it was placed on the list, and from the NAFO blacklist thereafter.

12.     As a result of the blacklisting of the Vessel, Tonnevold was unable to charter the vessel at market rate. In order to mitigate the damages caused by ECo's breach of the Charter, its alter-ego Eastwind agreed to charter the *Thorgull* while the Vessel was blacklisted.

13.    On December 6, 2006, ECo, through Eastwind, and Tonnevold entered into a charter for a period of "about 60 days" as part of ECo and Eastwind's agreement to employ the *Thorgull* during the period it was blacklisted ("Mitigating Charter"). The Mitigating Charter is annexed as Exhibit 2.

14.    There were three single-page addenda to the Mitigating Charter; Addendum Number 1 is dated February 13, 2007, Addendum Number 2 is dated April 19, 2007, and Addendum Number 3 is dated July 19, 2007. All three addenda incorporate by reference the terms of the Mitigating Charter except revising *inter alia*, delivery, cargo, and hire information for the Vessel and identify Eastwind (acting on behalf of ECo), as Charterers, and Tonnevold, as Owners.

**ECo and Eastwind are Alter-egos**

15.    In early 2006, Mr. Moors, acting on behalf of the interests of ECo and Eastwind, indicated to Tonnevold that the Pooling Agreement 02 would end because there were too few ships remaining in the pool and running the pool in New York resulted in high administrative accounting costs.

16.    Mr. Moors affirmed to Tonnevold that the *Thorgull*, while leaving the Pooling Agreement 02, would be chartered by Eastwind, on behalf of ECo, in an effort to keep the Vessel working even during the blacklist period. The email exchanges between Tonnevold and Mr. Moors addressing the Pooling Agreement 02 are annexed as Exhibit 3.

17.    On or about July 12, 2007, Paul Capkanis, of Eastwind Transport, Ltd., on behalf of ECo, reaffirmed to Tonnevold Eastwind's continued intent to employ the *Thorgull* in a

third addendum to the Mitigating Charter, continuing thereafter until the Vessel was de-listed by the NEAFC.

18.    Tonnevold's communications with ECo and Eastwind concerning the original charter in 2000, the breached Charter, the Mitigating Charter and addenda to that Charter have all involved the same personnel, utilizing the same contact information for both entities, including identical mailing addresses, email addresses with the "Eastwind Group," facsimile numbers and telephone numbers.

19.    On the Eastwind website, http://www.eastwindgroup.com, an Eastwind entity has a New York address of 444 Madison Avenue, Suite 200, New York, New York. Plaintiff Eastwind interchanges itself and other members of the "Eastwind Group" in its Verified Complaint, noting Eastwind operates "from the offices of the "Eastwind Group," when in fact the website describes Eastwind Maritime Inc. as the chief management office.  No less than eight "Eastwind" entities are listed on the Eastwind website, none of them being Eastwind Maritime S.A.

20.    The New York State Department of State website lists ECo's address as 444 Madison Avenue, Suite 200, New York, the same address as Eastwind.  Copies of both the Eastwind website noting the Madison Avenue address and the Department of State website noting the ECo address are annexed as Exhibit 4.

21.    Dun & Bradstreet and the New York State Department of State website list John Kousi as the president and chief executive officer of both Eastwind and ECo.  A true and correct copy of this information is annexed as Exhibit 5.

22.    Both the Charter and the Pooling Agreement 02 were executed by Mr.

Moors as "Vice-President" on behalf of ECo shipping.  Mr. Moors has also been identified as

Vice-President of Eastwind on Internet websites.

23.    The alter-ego relationship between ECo and the Eastwind Group is

confirmed in notice provision for Pooling Agreement 02, which states:

> any notices under this agreement may be delivered by mail, electronic mail, telex,
> or facsimile:
> ECo or the Pool, to
> c/o Eastwind Transport Ltd.
> 444 Madison Avenue
> Suite 200
> New York, NY 10022
> Facsimile: (212) 838-8439
> Telex:  420111 EWINDNY
> Email: eastwind@eastwindgroup.com

The address designated for ECo and Eastwind Transport Ltd. is the same address and facsimile

listed for Eastwind, as referenced in Exhibit 1.

**Tonnevold Damages**

27.  As a result of the blacklisting and the ECo and Eastwind breach of the

Charter,  Tonnevold has suffered damages in the amount of $836,601.22, as set forth below:

a.    Tonnevold made diligent efforts to have the *Thorgull* removed

from the NEAFC and NAFO blacklists.  The efforts to remove the Thorgull from the blacklists

cost Tonnevold a total of $20,500 as a result of meetings and travel expenses on the part of

Tonnevold employees when negotiating with the international organizations.

b.    Tonnevold has been unable to charter the *Thorgull* on the market

and, instead, has been chartering it to Eastwind on a series of voyages at below market rate.  The

loss of revenue while under the charter to Eastwind from January 1, 2007 – September 11, 2007 was $227,940.01.

   c. Despite Tonnevold's diligent efforts to charter the *Thorgull*, the vessel was unemployed during September 12 - November 28, 2007, while the Vessel remained blacklisted. Tonnevold's damages while the Vessel was unemployed was $424,129.21.

   d. As a result of the blacklisting, Tonnevold also suffered damages due to additional expenses incurred in operating the Vessel amounting to a total of $164,032.00, including $147,157.00 for the incremental expenses that Tonnevold incurred as the result of the vessel not trading in its usual trade pattern. The incremental expenses are for crew travel, consumables, and lubricants. The remaining $16,875 in losses is for the transportation of spare parts from Halifax to Alexandria, Egypt, due to the *Thorgull* not being permitted to enter the port at Halifax because it had been placed on the NEAFC blacklist.

   28. Tonnevold has filed for arbitration in accordance with the arbitration provisions contained in all of the Vessel charters described herein.

Executed this 18th day of April, 2008 at Sandefjord, Norway.

Jan Sigvart Walle

7

**EXHIBIT 1**



# ECo
## SHIPPING

# ECOTIME 99 – PART I

### Issued in January 1999

| | | | |
|---|---|---|---|
| **1. Date** <br> ~~22~~ December, 2005 <br> 20 | | **4. Charterers** <br> ECo Shipping Ltd. <br> 80 Broad Street <br> Monrovia, Liberia | |
| **2. Vessel** <br> M/V Thorgull | | | |
| **3. Owners** <br> Tonnevold Reefer 7 KS <br> c/o O.T. Tonnevold <br> Grimstad, Norway | | **7. Vessel's present position** <br> At Sea. | |
| | | **8. Place or range of delivery** <br> See ECo ~~99~~ Pool Agreement, 22 December, 2005 <br> Clause 4. *2002* | |
| **5. Charter period** <br> Twelve months (12) <br> Plus/minus 30 days in Charterers' option. | | **9. Time of delivery** <br> 22 - 25 December, 2005 | |
| **6. Trading limits** <br> Within IWL excluding N. Korea, Finland, Laos, Cambodia. | | **10. Cancelling date** <br> N/A | |
| | | **11. Place or range of redelivery** <br> Worldwide. <br> See ECo ~~99~~ Pool Agreement 22 Dec. 2005 Clause 6. <br> *2002* | |
| **12. Delivery notices** <br> N/A | | **13. Redelivery notices** <br> See ECo ~~99~~ Pool Agreement Clause 3. <br> *2002* | |
| **14. Quantity of fuel on delivery** <br> A. IFO max:        min: <br> B. MDO max:        min: | | **16. Fuel price (if fixed price agreed, see clause 9)** <br> Delivery IFO : As per ECo ~~99~~ *2002* <br> Pool Agreement 22 December, 2005 | |
| **15. Quantity of fuel on redelivery (see Clause 9)** <br> A. IFO max:        min: <br> B. MDO max:        min: | | A. Delivery MDO : <br> B. Redelivery IFO : <br> C. Redelivery MDO : | |

212 838 3578 TO 90114737258899    P.02

2005  3:54 PM FR EASTWIND-ECO

**Vessel's Descriptions (As per attached)**

A. Flag : Liberia    B. Year/Month of building:  1983/02    C. Call sign:    E L T U 4

D. Official reg. number:  10601    E. Telex system/number    Immarsat A - 1260746    F. Trade factor:    REEFER
Immarsta C - 463677710

**18. Class**
A. Hull:    NK    B. Machinery:  NK    C. Ice:  N/A

D. Certificate for temp.    E. USDA-equipment    F. USDA-certificate    G. Live Car Certificate
between: - 25 /-32 Cel·    Yes  X  No    Yes    No  X    Yes    No X

**19. Vessel's dimensions**

| | | | |
|---|---|---|---|
| Length over all   145.58 | metres | Draft on full DW summer freeboard:    6765 | |
| | | Higher/closed shelter    N/A | metres |
| Beam moulded    17,80 | metres | Lower/open shelter    N/A | metres |
| Draft, ballast    4.45 | metres | Draft, banana laden    5,84 | metres |

**20. Tonnage**
higher / lower
A. Gross:  6127  /    B. Panama:  6784 GRT / 5184 NRT    C. Deadweight all told in Mtons on
summer freeboard:  6324.5
D. Net:    2699  /    E. Suez    6329,47 GRT / 5070.78 NRT

**21. Quantity of stores and freshwater not exceeding**    **22. Operational bunker capacity in cbm) 85 % (CBM)**
Stores   320   mt

IFO 380  902.6 / IFO 180 216.4    MDO: 1149.9

**23. Main engines, speed and consumption**
Bunker viscosity:    Makers    :    MITSUI B&W
IFO 180 CST    Type    :    8L45GFCA
BHP/MCR :   7890 PS
At RPM    :    175 RPM

| Ordinary nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. Mtons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. Mtons |
| Full DWT | 17.5 | | | 17.0 | | | 15.5 | | |
| Full banana cargo | 17.5 | | | 17.0 | | | 15.5 | | |
| Ballast | 17.5 | | | 17.0 | | | 15.5 | | |

| Low speed nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons |
| Full DWT | | | | | | | | | |
| Full banana cargo | | | | | | | | | |
| Ballast | | | | | | | | | |

**24. Auxiliary engines**
Bunker viscosity/blend in percent:    180 CST

| Consumption at sea | Consumption in port |
|---|---|
| Min   1.6    and max    4.1    MTons per 24 hours | Min    1.6    and max    3.3    MTons per 24 hours |

DEC 20 2005  3:54 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.03

## 25. Cargo holds and decks

A. Compartments furnished with elevator hatches:
 N/A

B. Number of sideports each side:
 Port:    4        Starboard:
 Deck:    A        Deck:
 Clear opening:  2.05 x 2.05 meters

C. Type of tween deck and weather deck hatch covers:
 Weather deck   - End rolling type
 Tween deck     - Folding type

D. Type of gratings:   Wooden Daiken
 - thickness/material:  42 mm/Apiton Plywood
 - permissible weight of fork lift + cargo:   5.0   Mtons

E. All gratings flush?     Yes    X    No
 -    if no, describe:

F. Container capacity:
 on weather deck:    N/A   TEU
 in holds:           N/A   TEU
 Lashing material for         containers     N/A

G. Reefer container capacity with plug'in sets:
 on weather deck:    N/A   TEU

H. Size of hatches (weather deck, hatch opening L x W)

| Hatch No 1 | 7.03 | x | 5.32 | metres |
|---|---|---|---|---|
| Hatch No 2 | 7.03 | x | 5.32 | metres |
| Hatch No 3 | 7.03 | x | 5.32 | metres |
| Hatch No 4 | 7.03 | x | 5.32 | metres |
| Hatch No 5 | | x | - | metres |

I. Engine room between holds No. 4 and STERN

J. Permanent side shorings
 Yes   X   No

K. Number of separately insulated compartments:
 8

L. Number of compartments with separate cooling units:
 8

---

CBFT, minimum deck height (in meters) and deck area (in sqm)

| | Hatch No 5 | | Hatch No 4 | | Hatch No 3 | | Hatch No 2 | | Hatch No 1 | |
|---|---|---|---|---|---|---|---|---|---|---|
| H | | | 1716 | | 1716 | | 1716 | | 1850 | |
| | | | 1.30 | 37.40 | 1.30 | 37.40 | 1.30 | 37.40 | 1.34 | 37.40 |
| FC | | | | | | | | | | |
| A | | | 20,738 | | 28,813 | | 28,135 | | 30,201 | |
| | | | 2.18 | 344.50 | 2.21 | 334.90 | 2.21 | 324.20 | 2.25 | 243.80 |
| B | | | 28,188 | | 28,464 | | 26,571 | | 16,372 | |
| | | | 2.19 | 331.20 | 2.17 | 339.30 | 2.17 | 311.80 | 2.17 | 175.60 |
| C | | | 25,607 | | 27,676 | | 24,229 | | 12,127 | |
| | | | 2.21 | 283.30 | 2.21 | 328.90 | 2.17 | 278.70 | 2.21 | 128.30 |
| D | | | | | | | | | | |
| E | | | | | | | | | | |
| T | | | 85,249 | | 86,669 | | 80,651 | | 60,550 | |
| | | | | 959.0 | | 1003.10 | | 914.7 | | 547.7 |

H = Hatch coaming      FC = Forecastle      T = Total

Note: HORIZONTAL INSULATION to be marked with DOUBLE LINE

CBFT   BALE
-----------------------
min deck   Deck area
height

GRAND TOTAL
-----------------------
CBFT        313,122
Deck area   3,424.5

| 26. Cargo gear | 27. Refrigeration and ventilation |
|---|---|
| A. Number of cranes: N/A<br>SWL in MTons: | A. Vessel has Tobson or Ductless ventilation system<br>DUCTLESS |
| | B.- Air is circulated upwards or downwards:<br>UPWARDS |
| B. Number of derricks: 8<br>SWL in MTons: 5.0 | B. Hatch coamings are ventilated<br>Yes X     No ☐ |
| C. Union purchase capacity in MTons: 3.5 | C. Number of air circulations per hour: 90 / 45 |
| D. Other type of gear: N/A<br>Lifting capacity: | D. Number of fresh air renewals per hour: 4 / 1.5 |
| | E. Ozone generators<br>Yes X     No ☐ |
| | F. Refrigeration capacity (0°C evaporation<br>temperature and 30°C cooling water temperature)<br>kcal/hr: 330,000 Kcal/hr |

| 28. Passengers     NONE | 29. Meals, telegrams, entertainment etc (state, if agreed,<br>lump sum per month) |
|---|---|
| Number of berths:     Price per day: | USD 800 |

30. **Hire payment in US dollars** (state, mode and place of payment; also beneficiary and bank account no.)
Bank Name : See ECo Pool Agreement 22 December, 2005
                                             20

Sparebanken Rogaland. Bjersted Terrasse 1. 4007 Stavanger, Norway. Att : Jonas Ytreland.
Telefax : 47 51 53 54 67

USD Account No. 3185.05.33922

31. **Remarks:**

In the event of a default by ECo in the performance of its obligations under
this Charter-Party that shall not have been cured within a reasonable period,
the owners may unilaterally terminate this Charter-Party and withdraw the
vessel from ECo's service without economic penalty arising from the
withdrawal.

Owners to pay a commission of 1.25 % to Orion Shipping AS, Oslo on net payments from the Pool.

It is mutually agreed that this contract shall be performed subject to the terms
and conditions contained in this Charter, which shall include Part I as well as
Part II.

Signature for the Owners          Signature for ECo Shipping Ltd.

# ECO
## SHIPPING

### ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002

(The "ECo 2002 Pool Agreement")

**AGREEMENT** between **ECo Shipping Ltd.,** a Liberian corporation established in 1996 by Cool Carriers AB and Eastwind Transport Ltd. ("ECo Ltd."), and Tonnevold Reefer 7 KS, a Norwegian corporation ("Shipowner").

**WHEREAS,** Shipowner wishes to contribute one or more handy-size refrigerated transport vessels under its ownership or disponent ownership (the "Vessel" or "Vessels") to a pool of similar vessels under the commercial management of ECo Ltd. (the "Pool"); and

**WHEREAS,** ECo Ltd. is prepared to employ the Vessel or Vessels in the Pool on terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual promises of the parties contained herein, it is AGREED as follows:

1.    The Vessel or Vessels to be contributed by Shipowner to the Pool are listed in Exhibit A hereto. Shipowner warrants to ECo that it is the owner or disponent owner of the Vessel or Vessels. All ships contributed to the Pool by any owner will be refrigerated transport vessels of cargo capacity between approximately 250,000 and 350,000 cubic feet.

2.    ECo Ltd. will at any time, upon request, advise Shipowner of the complete current list of all ships in the Pool. Shipowner undertakes to identify to ECo Ltd. prior to signing this Agreement each refrigerated vessel of 250/350,000 cubic feet owned, chartered in, or otherwise commercially controlled by Shipowner or by any other shareholder, parent, subsidiary, or affiliate of Shipowner ("Competing Vessel") and to advise ECo Ltd. when any such Competing Vessel is either added or deleted.

3.    Each Vessel entering the Pool will do so by being time-chartered to ECo Ltd. in accordance with the provisions of the ECoTime 99 charter party attached hereto as Exhibit B. A Vessel may enter the Pool at any time and will thereupon be chartered to the Pool for a period of twelve months

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002 -thorgull.doc

Page 1 of 8

# ECO
## SHIPPING

plus or minus 30 days at ECo's option. The charter will at the conclusion of any 12-month period be automatically extended for a further 12 months, with the extension period to commence on the anniversary of the original date of delivery of the Vessel to ECo Ltd., unless written notice of redelivery is given by either party to the other not later than forty-five (45) days prior to completion of the current 12-month period.

4.    Conditions under which each Vessel will be delivered to ECo Ltd. and entered in the Pool include the following:

a)    The place of delivery of the Vessel to ECo Ltd. may not be less favorable geographically than the Malta/Elbe 1 range or Osaka Bay. If the Vessel is in a less favorable position, it must be brought to an equivalent geographical position before entry unless the parties agree on a "ballast penalty" amount or other compensatory arrangements. If the Vessel is delivered to the Pool in a more favorable geographical position that above, a ballast bonus payable to the Shipowner will be calculated and agreed, based on assessing ship's time at current spot market rates and including bunker costs appropriate for the region.

b)    ECo Ltd. will, for the account of the Pool, purchase the bunkers on board at the time of delivery of a Vessel at current Platt's Oilgram prices prevailing at the nearest main bunkering port. When the Vessel is eventually redelivered by ECo Ltd. to the Shipowner, the Shipowner will purchase the bunkers then remaining on board at the then current Platt's Oilgram prices at the nearest main bunkering port.

c)    Shipowner will pay to ECo Ltd. (not for account of the Pool), in respect of each entered vessel, a nonrefundable management fee of $25,000 per year of entry in the Pool, payable annually in advance. The first year's fee will be assessed at the time of the Vessel's initial entry into the Pool and will be offset against any payments owed by the Pool to the Shipowner for bunkers or ballast bonus. Subsequent annual management fees will be assessed in five equal installments by withholding from the Vessel's share of Pool earnings distributed during the first five calendar months of each year of entry.



ECO
SHIPPING

d) During the period of a Vessel's entry in the Pool, Shipowner will be responsible for crewing and insuring the Vessel and for all aspects of technical management.. The Vessel will at all times be entered in an internationally accepted Protection and Indemnity Club and will have an ITF Blue Card or other equivalent arrangements enabling her to trade world-wide.

5. Notwithstanding the 12-month period of the Vessel's charter to ECo Ltd., Shipowner may at its election at any time, upon sixty (60) days' written notice, withdraw the Vessel from the Pool and terminate the charter to ECo Ltd. subject to the following conditions:

    a) The premature withdrawal must be occasioned by either

        (i) in the case of a Vessel owned by Shipowner or any affiliate of Shipowner, the sale of the Vessel to an unrelated party; or

        (ii) in the case of a vessel chartered to Shipowner from an unrelated party, the termination of the charter party in accordance with its terms.

    b) If the Vessel has been specifically fixed on employment beyond the expiration of the 60-day notice period, ECo Ltd. will attempt in good faith to substitute a different ship in order to free the Vessel, with any additional expense incurred by the Pool to be reimbursed by the Shipowner. If, however, substitution proves to be impossible or impractical, then the Vessel must remain in the Pool (perhaps with a different owner) at least until completion of the said fixed employment.

    c) If the premature withdrawal of the Vessel occurs at a time when the total expected spot market earnings of the Vessel from the date of withdrawal to the next 12-month anniversary date exceed the expected earnings of the Vessel as a Pool member during that time interval, then at the time of withdrawal the Shipowner will pay to the Pool the expected earnings differential resulting therefrom. ECo Ltd.'s computation of the earnings differential amount will be discussed fully with Shipowner, and a reputable shipbroker may be engaged as

ECO
SHIPPING

advisor if either party so requests, with the cost thereof to be shared equally
between the Pool and Shipowner.  In the event of failure to reach agreement,
ECo Ltd.'s determination of the earnings differential amount will be conclusive
and binding.  If the premature withdrawal of the vessel occurs at a time that is
economically favorable to the Pool, no earnings differential payment will be due
to Shipowner from the Pool.

6.    When any Vessel withdraws from the Pool and is redelivered to Shipowner by
ECo Ltd., whether at the end of a 12-month period or prematurely, if she is redelivered in a
geographical position more favorable than the Malta/Elbe 1 range or Osaka Bay, a redelivery
bonus payable by the Shipowner to the Pool will be calculated and agreed, based on assessing
ship's time at current spot market rates and including bunker costs appropriate for the region.  A
Vessel may not be redelivered in an unfavorable geographical position unless the parties agree on
a "positional penalty payment" to Shipowner or other compensatory arrangement.

7.    Each Vessel in the Pool will at all times have a Weighting Factor assigned to it that
reflects its capacity, by reason of its physical and performance characteristics, to generate a greater or
lesser level of earnings relative to other similar tonnage.   The initial Weighting Factor of each of the
Vessels will be as set forth in Exhibit A.   Shipowner warrants the accuracy of the physical and
performance characteristics of the Vessels submitted to ECo Ltd. for use in calculating their Weighting
Factors.  Weighting Factors of all Vessels in the Pool will be reviewed and reset periodically, not less often
than once per year, to reflect observed changes in performance characteristics and relative revenue-
generating capacity.  ECo Ltd. will normally use the computational algorithms developed by Cool Carriers
AB for the purpose of calculating Weighting Factors but reserves the right to adopt other fair and
reasonable methods for doing so.  If a Vessel is found to under perform with respect to her speed,
bunker consumption, or other characteristics submitted by Shipowner and used in calculating the Vessel's
Weighting Factor, then Shipowner will be liable for speed/consumption or other performance penalties
computed in accordance with the normal practices of the industry.  These penalties will be due and



## ECO
### SHIPPING

payable, via deduction from Pool distributions, until such time as the Vessel's Weighting Factor will have been revised to correctly reflect the Vessel's performance characteristics.

8.    The Pool will be managed and operated in the name of "ECo Shipping Ltd" or "Reefership Ltd" by personnel seconded to ECo Ltd. by Eastwind Transport Ltd. and LaauritzenCool AB., and by any other persons that may reasonably be engaged for management or operational purposes. Eastwind Transport Ltd. will serve as overall Administrator of the Pool.

9.    The Vessels, and all other ships in the Pool, will be employed on voyage charters, contracts of affreightment, time charters, or other commercial arrangements with the objective of maximizing the total Net Voyage Earnings of all Pool vessels, denominated in U.S. dollars. In the event the Pool realizes any revenues in other currencies, they will be converted to U.S. dollars as soon as possible. All cash held by the Pool will be invested in U.S. Dollar money market funds. "Net Voyage Earnings" means the sum of all charter hire income, freights, demurrage, ballast bonuses, and all other revenues earned by the Pool vessels, less the total of their bunker costs, canal tolls, stevedoring costs, port charges, agency fees and expenses, brokerage and booking commissions, dispatch, and any other voyage costs, including cargo-handling material and any liability insurance for the Pool's account. The foregoing notwithstanding, no vessel will be time chartered out or otherwise specifically committed for a period of more than 12 months unless either ECo Ltd. will have a right of substitution or the approval of the Shipowner will have been obtained in advance.

10.    From time to time ECo Ltd. may also charter in ships from the market on a voyage or time-charter basis, provided that the total of all chartered-in tonnage, measured in cubic feet, will never be permitted to exceed 25% of the total cubic capacity of all Pool vessels. Earnings (or losses) accrued by all chartered-in vessels will be added to (or subtracted from) the overall Pool earnings available for distribution to the Pool Vessels.

11.    In any calendar month the total earnings of the Pool will equal the total Net Voyage Earnings of the Pool vessels as defined above, plus or minus earnings or losses on chartered-in vessels, less allowable overhead expenses of the Pool.

DEC 20 2005  3:56 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.10



**SHIPPING**

a)    The earnings of each Pool Vessel in a given month will be calculated in accordance with standard percentage-of-completion rules, in which the earnings on a voyage that takes place during two or more calendar months will be allocated to those months in proportion to the numbers of days of the voyage's total duration that fall in those months.  At the end of a month, the earnings for that month on a voyage in progress will be calculated using the best available estimates of voyage duration and total earnings; thereafter, the earnings will be corrected retroactively when final results are known.

b)    Allowable overhead expenses include the salary, benefits, and general office cost allocations of all personnel working on behalf of the Pool, plus travel expenses, audit fees, and other reasonable out-of-pocket expenses incurred on behalf of the Pool.  Total personnel and out-of-pocket costs will be estimated for each calendar year in January, with one-twelfth (1/12) of the calculated annual amount being charged against Pool earnings in each month.  After the end of a year, out-of-pocket costs actually incurred for the account of the Pool will be computed, with the difference between budgeted and actual costs being assessed against or rebated to, as the case may be, the vessels that were in the Pool during the year on a pro-rated basis.  No such adjustment will be made in the case of personnel costs.

12.    Net earnings of the Pool in any calendar month will be allocated to the vessels that were entered in the Pool at any time during that month in proportion to (a) the cubic capacities of those vessels, (b) their weighting factors, and (c) the fractional numbers of days during the month when the vessels were on hire to the Pool, as defined in the ECoTime 99 charter party. As an example, if the Pool included only two ships, namely, Vessel X of capacity 300,000 cubic feet, weighting factor 0.90, and 30.0 on-hire days during a given month and Vessel Y with 275,000 cubic feet, weighting factor 1.10, and 29.0 on-hire days, then the earnings allocation for that month would be calculated as follows:

DEC 20 2005  3:56 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.11

# ECO
### SHIPPING

| | | | | |
|---|---|---|---|---|
| Vessel X "claim" = | 300,000 x 0.90 x 30.0 | = | 8,100,000 | |
| Vessel Y "claim" = | 275,000 x 1.10 x 29.0 | = | 8,772,500 | |

Share of the month's Pool earnings allocated to Vessel X =
8,100,000/(8,100,000 + 8,772,500)    =    48.007%

Share of the month's Pool earnings allocated to Vessel Y =
8,772,500/(8,100,000 + 8,772,500)    =    51.993%

This method of calculation is employed in all circumstances, including in months when a vessel may have entered the Pool during the last day or two.

13.    Each vessel in the Pool during any month is entitled eventually to receive cash distributions equal to the earnings allocated to her during that month. All Pool earnings net of allowable overhead expenses and annual management fees will be distributed eventually to Pool vessels; ECo Ltd. itself will not be left with any earnings (or losses) other than the annual management fees.

14.    Total earnings of the Pool and the earnings shares allocated to the various Pool vessels for each calendar month will be determined and reported monthly in arrears by ECo Ltd., normally within eight days after the end of the month in question. At about the same time., insofar as permitted by availability of funds (in light of anticipated revenues and expenses), the earnings of the month just ended will be distributed in cash to the (disponent) owners of the various Pool vessels. If the funds available in the Pool following any month of operation are insufficient for the distribution of 100% of that month's earnings, then such lesser percentage of earnings will be distributed to the owners of the vessels *pro rata* as ECo Ltd. determines to be prudent, considering the Pool's projected cash income and obligations; and in such case the undistributed balance of the Pool's earnings for that month will be distributed in the following month. However, at no time will the Pool distribute cash in excess of the total amount of the as-yet-undistributed Pool earnings.

15.    Following the end of each month, ECo Ltd. will prepare and submit to Shipowner financial and operational reports showing, *inter alia*, the voyages performed by the Vessels, earnings therefrom, total Pool earnings, share thereof to be distributed to each Vessel, and related financial information. At the end of each calendar year, in addition to its own year-end reporting ECo Ltd. will arrange for an audit

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION
AGREEMENT 2002 -thorgull.doc
Page 7 of 9



of the Pool's performance and results to be performed at the Pool's expense by a competent internationally recognized auditing firm, with a copy of the audit report to be furnished to Shipowner as soon as available. All of the foregoing information reported to Shipowner will be treated as confidential.

16.    Any notices under this agreement may be delivered by mail, electronic mail, telex, or facsimile:

a)    if to ECo Ltd. or the Pool, to

c/o Eastwind Transport Ltd.
444 Madison Avenue
Suite 200
New York, NY 10022
Facsimile:        (212) 838-8439
Telex:            420111 EWINDNY
E-Mail:           eastwind@eastwindgroup.com

(b)    if to Shipowner, to:

Tonnevold Reefer 7KS
c/- O.T. Tonnevold
Grimstad, Norway

Facsimile: +47 37 25 88 99
E-Mail: post@ott.no

17.    In case of any conflict between the provisions of this ECo Pool Vessel Contribution Agreement and the provisions of the ECoTime 99 charter party, the provisions of this Agreement will prevail. In case of any dispute between the parties, a good faith attempt to settle it shall be made by a meeting of the senior officials controlling the parties. Should such good faith attempt fail to achieve success, the parties shall each appoint a qualified arbitrator, and the two arbitrators so appointed shall jointly select a third, and the dispute shall be finally resolved by the panel of three so chosen by arbitration in New York City, New York. Any decision of the arbitrators shall be binding on both parties. The law of New York shall govern this Agreement.

DEC 20 2005  3:56 PM FR EASTWIND-ECO     212 838 3578 TO 90114737258899     P.13



**IN WITNESS WHEREOF,** the parties hereto have each executed this document below at the places and

dates indicated.

ECo SHIPPING LTD.                                    TONNEVOLD REEFER 7KS

By: _Charles T. Moors_                               By: _____
Name:                                                Name: _JAN OLAF TØNNEVOLD_

Title: _Vice President_                              Title: _DIRECTOR_

Date: _20 December 2005_                             Date: _21. DECEMBER 2005_

                                                     By: _____

                                                     NAME: _LEIF LAUVÅS_

                                                     TITLE: _DIRECTOR_

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION
AGREEMENT 2002 -thorguil.doc
Page 9 of 9

# EXHIBIT 2



| 1. Shipbroker | **BIMCO UNIFORM TIME-CHARTER** |
| ORION SHIPPING AS<br>Strandveien 50<br>N 1366 Lysaker<br>Norway | **(AS REVISED 2001)**<br>**CODE NAME: "BALTIME 1939"**<br>PART I |
|  | 2. Place and date of Charter<br>Oslo 6th Dec. 2006 |

| 3. Owners/Place of business<br>Tønnevold Reefer 7 KS<br>Grimstad, Norway | 4. Charterers/Place of business<br>Eco Shipping Ltd<br>80 Broad Street<br>Monrovia, Liberia |
| 5. Vessel's Name<br>MV "Thorgull" | 6. GT/NT<br>See Clause 50 |
| 7. Class<br>See Clause 50 | 8. Indicated brake horse power (bhp)<br> |
| 9. Total tons d. w. (abt.) on summer freeboard<br>Se Clause 50 | 10. Cubic feet grain/bale capacity<br>See Clause 50 |
| 11. Permanent bunkers (abt.)<br>See Clause 50 | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of<br>See Clause 50 |
| 13. Present position<br>Trading | 14. Period of hire (Cl. 1)<br>About 60 days |
| 15. Port of delivery (Cl. 1)<br>Dop Buenavista, Colombia, ATDNSHINC | 16. Time of delivery (Cl. 1)<br>15th December, 2006 or on completion present voyage |

| 17. (a) Trade limits (Cl. 2)<br>Always afloat always within IWL excluding Russia, Israel, Cuba and Turkey, Europe, Medit, USA and Canada. War and warlike zones and areas excluded by UN resolutions |
| (b) Cargo exclusions specially agreed<br>All cargoes ultimately destined to Iraq or other UN sanctioned countries. Fish that is catched illegally or illegal to trade.<br>Charterers and Shippers to provide sufficient fenders for transshipment |

| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5)<br>See Clause 40 | 19. Charter hire (Cl. 6)<br>USC 87 pe cbf/30 days inclot, payable every 30 days in advance.<br>Hire from 15th Feb to be USC 120 / 30 days. |
| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)<br>See Clause 47 |  |
| 21. Place or range of re-delivery (Cl. 7)<br>Redel dop 1 gsp Nigeria, ATDNSHINC | 22. Cancelling date (Cl. 21)<br>15th December, 2006 (See box 16) |
| 23. Dispute resolution (state 22(A), 22(B) or 22(C), if 22(C) agreed Place of Arbitration must be stated) (Cl. 22) | 24. Brokerage commission and to whom payable (Cl. 24)<br><br>1,25 % commission to Orion Shipping A/S |

| 25. Numbers of additional clauses covering special provisions, if agreed<br>Clauses 25 to 60 as attached |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

Issued 1909; Amended 1911; 1912; 1920; 1939; 1950; 1974; and 2001

Printed by BIMCO's idea

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

| *(continued)* | "BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER | PART I |
|---|---|---|
| Signature (Owners) | Signature (Charterers) | |

WORKING COPY

WORKING COPY

This document is a computer generated VOLCOA form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

It is agreed between the party mentioned in Box 3 as Owners 1
of the Vessel named in Box 5 of the gross/net tonnage 2
indicated in Box 6, classed as stated in Box 7 and of indicated 3
brake horse power (bhp) as stated in Box 8, carrying about 4
the number of tons deadweight indicated in Box 9 on 5
summer freeboard inclusive of bunkers, stores and 6
provisions, having as per builder's plan a cubic-feet grain/ 7
bale capacity as stated in Box 10, exclusive of permanent 8
bunkers, which contain about the number of tons stated in 9
Box 11, and fully loaded capable of steaming about the 10
number of knots indicated in Box 12 in good weather and 11
smooth water on a consumption of about the number of 12
tons fuel oil stated in Box 12, now in position as stated in 13
Box 13 and the party mentioned as Charterers in Box 4, as 14
follows: 15

1.  Period/Port of Delivery/Time of Delivery 16
    The Owners let, and the Charterers hire the Vessel for a 17
    period of the number of calendar months indicated in 18
    Box 14 from the time (not a Sunday or a legal Holiday 19
    unless taken over) the Vessel is delivered and placed at 20
    the disposal of the Charterers between 9 a.m. and 6 21
    p.m., or between 9 a.m. and 2 p.m. if on Saturday, at the 22
    port stated in Box 15 in such available berth where she 23
    can safely lie always afloat, as the Charterers may direct, 24
    the Vessel being in every way fitted for ordinary cargo 25
    service. The Vessel shall be delivered at the time 26
    indicated in Box 16. 27

2.  Trade 28
    The Vessel shall be employed in lawful trades for the 29
    carriage of lawful merchandise only between safe ports 30
    or places where the Vessel can safely lie always afloat 31
    within the limits stated in Box 17. No live stock nor 32
    injurious, inflammable or dangerous goods (such as 33
    acids, explosives, calcium carbide, ferro silicon, 34
    naphtha, motor spirit, tar, or any of their products) shall 35
    be shipped. 36

3.  Owners' Obligations See Clause 30 37
    The Owners shall provide and pay for all provisions and 38
    Wages, for insurance of the Vessel, for all deck and 39
    Engine-room stores and maintain her in a thoroughly 40
    efficient state in hull and machinery during service. The 41
    Owners shall provide winchmen from the crew to 42
    operate the Vessel's cargo handling gear, unless the 43
    crew's employment conditions or local union or port 44
    regulations prohibit this, in which case qualified shore- 45
    winchmen shall be provided and paid for by the 46
    Charterers. 47

4.  Charterers' Obligations 48
    The Charterers shall provide and pay for all fuel oil, port 49
    charges, pilotages (whether compulsory or not), canal 50
    steersmen, boatage, lights, tug-assistance, consular 51
    charges (except those pertaining to the Master, officers 52
    and crew), canal, dock and other dues and charges, 53
    including any foreign general municipality or state taxes, 54
    also all dock, harbour and tonnage dues at the ports of 55
    delivery and re-delivery (unless incurred through cargo 56
    carried before delivery or after re-delivery), agencies, 57
    commissions, also shall arrange and pay for loading, 58
    trimming, stowing (including dunnage and shifting 59
    boards, excepting any already on board), unloading, 60
    weighing, tallying and delivery of cargoes, surveys on 61
    hatches, meals supplied to officials and men in their 62
    service and all other charges and expenses whatsoever 63
    including detention and expenses through quarantine 64
    (including cost of fumigation and disinfection). All ropes, 65
    slings and special runners actually used for loading 66
    and discharging and any special gear, including special 67

ropes and chains required by the custom of the port for 68
mooring shall be for the Charterers' account. The Vessel 69
shall be fitted with winches, derricks, wheels and or- 70
dinary runners capable of handling lifts up to 2.5 tons. 71

5.  Bunkers See Clause 40 72
    The Charterers at port of delivery and the Owners at port 73
    of re-delivery shall take over and pay for all fuel oil 74
    remaining in the Vessel's bunkers at current price at the 75
    respective ports. The Vessel shall be re-delivered with 76
    not less than the number of tons and not exceeding the 77
    number of tons of fuel oil in the Vessel's bunkers stated 78
    in Box 18. 79

6.  Hire 80
    The Charterers shall pay as hire the rate stated in Box 81
    19 per 30 days, commencing in accordance with Clause 82
    1 until her re-delivery to the Owners. 83
    Payment of hire shall be made in cash, in the currency 84
    stated in Box 20, without discount, every 30 days, in 85
    advance, and in the manner prescribed in Box 20. In 86
    default of payment the Owners shall have the right of 87
    withdrawing the Vessel from the service of the Charterers, 88
    without noting any protest and without interference by 89
    any court or any other formality whatsoever and without 90
    prejudice to any claim the Owners may otherwise have 91
    on the Charterers under the Charter. 92

7.  Re-delivery 93
    The Vessel shall be re-delivered on the expiration of the 94
    Charter in the same good order as when delivered to 95
    the Charterers (fair wear and tear excepted) at an ice- 96
    free port in the Charterers' option at the place or within 97
    the range stated in Box 21, between 9 a.m. and 6 p.m. 98
    and 9 a.m. and 2 p.m. on Saturday, but the day of re- 99
    delivery shall not be a Sunday or legal Holiday. 100
    The Charterers shall give the Owners not less than ten five 101
    days' notice at which port and on about which day the 102
    Vessel will be re-delivered. Should the Vessel be ordered 103
    on a voyage by which the Charter period will be exceeded 104
    the Charterers shall have the use of the Vessel to enable 105
    them to complete the voyage, provided it could be 106
    reasonably calculated that the voyage would allow 107
    redelivery about the time fixed for the termination of the 108
    Charter, but for any time exceeding the termination date 109
    the Charterers shall pay the market rate if higher than 110
    the rate stipulated herein. 111

8.  Cargo Space 112
    The whole reach and burthen of the Vessel, including 113
    lawful deck-capacity shall be at the Charterers' disposal, 114
    reserving proper and sufficient space for the Vessel's 115
    Master, officers, crew, tackle, apparel, furniture, 116
    provisions and stores. 117

9.  Master 118
    The Master shall prosecute all voyages with the utmost 119
    despatch and shall render customary assistance with 120
    the Vessel's crew. The Master shall be under the orders 121
    of the Charterers as regards employment, agency, or 122
    other arrangements. The Charterers shall indemnify the 123
    Owners against all consequences or liabilities arising 124
    from the Master, officers or Agents signing Bills of Lading 125
    or other documents or otherwise complying with such 126
    orders, as well as from any irregularity in the Vessel's 127
    papers or for overcarrying goods. The Owners shall not 128
    be responsible for shortage, mixture, marks, nor for 129
    Number of pieces or packages, nor for damage to or 130
    claims on cargo caused by bad stowage or otherwise. If 131
    the Charterers have reason to be dissatisfied with the 132
    conduct of the Master or any officer, the Owners, on 133
    receiving particulars of the complaint, promptly to 134

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

investigate the matter, and, if necessary and practicable, 135
to make a change in the appointments. 136

**10. Directions and Logs** 137
The Charterers shall furnish the Master with all 138
instructions and sailing directions and the Master shall 139
keep full and correct logs accessible to the Charterers 140
or their Agents. 141

**11. Suspension of Hire etc.** 142
(A) In the event of drydocking or other necessary 143
measures to maintain the efficiency of the Vessel, 144
deficiency of men or Owners' stores, breakdown of 145
machinery, damage to hull or other accident, either 146
hindering or preventing the working of the Vessel and 147
continuing for more than ~~twenty-four~~ four consecutive 148
hours,
no hire shall be paid in respect of any time lost thereby 149
during the period in which the Vessel is unable to perform 150
the service immediately required. Any hire paid in 151
advance shall be adjusted accordingly. 152
(B) In the event of the Vessel being driven into port or to 153
anchorage through stress of weather, trading to shallow 154
harbours or to rivers or ports with bars or suffering an 155
accident to her cargo, any detention of the Vessel and/or 156
expenses resulting from such detention shall be for the 157
Charterers' account even if such detention and/or 158
expenses, or the cause by reason of which either is 159
incurred, be due to, or be contributed to by, the 160
negligence of the Owners' servants. 161

**12. Responsibility and Exemption** 162
The Owners only shall be responsible for delay in 163
delivery of the Vessel or for delay during the currency of 164
the Charter and for loss or damage to goods onboard, if 165
such delay or loss has been caused by want of due 166
diligence on the part of the Owners or their Manager in 167
making the Vessel seaworthy and fitted for the voyage 168
or any other personal act or omission or default of the 169
Owners or their Manager. The Owners shall not be 170
responsible in any other case nor for damage or delay 171
whatsoever and howsoever caused even if caused by 172
the neglect or default of their servants. The Owners shall 173
not be liable for loss or damage arising or resulting 174
from strikes, lock-outs or stoppage or restraint of labour 175
(including the Master, officers or crew) whether partial 176
or general. The Charterers shall be responsible for loss 177
or damage caused to the Vessel or to the Owners by 178
goods being loaded contrary to the terms of the Charter 179
or by improper or careless bunkering or loading, stowing 180
or discharging of goods or any other improper or 181
negligent act on their part or that of their servants. 182

**13. Advances** 183
The Charterers or their Agents shall advance to the 184
Master, if required, necessary funds for ordinary 185
disbursements for the Vessel's account at any port. The 186
Charterers not to be responsible for application of such
funds,
charging only interest at ~~6~~ 2 per cent. p.a., such advances 187
shall be deducted from hire. 188

**14. Excluded Ports** 189
The Vessel shall not be ordered to nor bound to enter: 190
(A) any place where fever or epidemics are prevalent or 191
to which the Master, officers and crew by law are not 192
bound to follow the Vessel; 193
(B) any ice-bound place or any place where lights, 194
lightships, marks and buoys are or are likely to be 195
withdrawn by reason of ice on the Vessel's arrival or 196
where there is risk that ordinarily the Vessel will not be 197
able on account of ice to reach the place or to get out 198

after having completed loading or discharging. The 199
Vessel shall not be obliged to force ice. If on account of 200
ice the Master considers it dangerous to remain at the 201
loading or discharging place for fear of the Vessel being 202
frozen in and/or damaged, he has liberty to sail to a 203
convenient open place and await the Charterers' fresh 204
instructions. Unforeseen detention through any of above 205
causes shall be for the Charterers' account. 206

**15. Loss of Vessel** 207
Should the Vessel be lost or missing, hire shall cease 208
from the date when she was lost. If the date of loss 209
cannot be ascertained half hire shall be paid from the 210
date the Vessel was last reported until the calculated 211
date of arrival at the destination. Any hire paid in advance 212
shall be adjusted accordingly. 213

**16. Overtime** 214
The Vessel shall work day and night if required. ~~The 215
Charterers shall refund the Owners their outlays for all 216
overtime paid to officers and crew according to the hours 217
and rates stated in the Vessel's articles.~~ Officers and Crews 218
overtime always to be for Owners account.

**17. Lien** 219
The Owners shall have a lien upon all cargoes and 220
sub-freights belonging to the Time-Charterers and any 221
Bill of Lading freight for all claims under this Charter, 222
and the Charterers shall have a lien on the Vessel for all 223
moneys paid in advance and not earned. 224

**18. Salvage** 225
All salvage and assistance to other vessels shall be for 226
the Owners' and the Charterers' equal benefit after 227
deducting the Master's, officers' and crew's proportion 228
and all legal and other expenses including hire paid 229
under the charter for time lost in the salvage, also repairs 230
of damage and fuel oil consumed. The Charterers shall 231
be bound by all measures taken by the Owners in order 232
to secure payment of salvage and to fix its amount. 233

**19. Sublet** 234
The Charterers shall have the option of subletting the 235
Vessel, giving due notice to the Owners, but the original 236
Charterers shall always remain responsible to the 237
Owners for due performance of the Charter. 238

**20. War ("Conwartime 1993")** 239
(A) For the purpose of this Clause, the words: 240
(i) "Owners" shall include the shipowners, bareboat 241
charterers, disponent owners, managers or other 242
operators who are charged with the management of the 243
Vessel, and the Master; and 244
(ii) "War Risks" shall include any war (whether actual or 245
threatened), act of war, civil war, hostilities, revolution, 246
rebellion, civil commotion, warlike operations, the laying 247
of mines (whether actual or reported), acts of piracy, 248
acts of terrorists, acts of hostility or malicious damage, 249
blockades (whether imposed against all vessels or 250
imposed selectively against vessels of certain flags or 251
ownership, or against certain cargoes or crews or 252
otherwise howsoever), by any person, body, terrorist or 253
political group, or the Government of any state 254
whatsoever, which, in the reasonable judgement of the 255
Master and/or the Owners, may be dangerous or are 256
likely to be or to become dangerous to the Vessel, her 257
cargo, crew or other persons on board the Vessel. 258
(B) The Vessel, unless the written consent of the Owners 259
be first obtained, shall not be ordered to or required to 260
continue to or through, any port, place, area or zone 261
(whether of land or sea), or any waterway or canal, where 262
it appears that the Vessel, her cargo, crew or other 263
persons on board the Vessel, in the reasonable 264

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

judgement of the Master and/or the Owners, may be, or 265
are likely to be, exposed to War Risks. Should the Vessel 266
be within any such place as aforesaid, which only 267
becomes dangerous, or is likely to be or to become 268
dangerous, after her entry into it, she shall be at liberty 269
to leave it. 270
(C) The Vessel shall not be required to load contraband 271
cargo, or to pass through any blockade, whether such 272
blockade be imposed on all vessels, or is imposed 273
selectively in any way whatsoever against vessels of 274
certain flags or ownership, or against certain cargoes 275
or crews or otherwise howsoever, or to proceed to an 276
area where she shall be subject, or is likely to be subject 277
to a belligerent's right of search and/or confiscation. 278
(D) (i) The Owners may effect war risks insurance in 279
respect of the Hull and Machinery of the Vessel and their 280
other interests (including, but not limited to, loss of 281
earnings and detention, the crew and their Protection 282
and Indemnity Risks), and the premiums and/or calls 283
therefor shall be for their account. 284
(ii) If the Underwriters of such insurance should require 285
payment of premiums and/or calls because, pursuant 286
to the Charterers' orders, the Vessel is within, or is due 287
to enter and remain within, any area or areas which are 288
specified by such Underwriters as being subject to 289
additional premiums because of War Risks, then such 290
premiums and/or calls shall be reimbursed by the 291
Charterers to the Owners at the same time as the next 292
payment of hire is due. 293
(E) If the Owners become liable under the terms of 294
employment to pay to the crew any bonus or additional 295
wages in respect of sailing into an area which is 296
dangerous in the manner defined by the said terms, 297
then such bonus or additional wages shall be re- 298
imbursed to the Owners by the Charterers at the same 299
time as the next payment of hire is due. 300
(F) The Vessel shall have liberty:- 301
(i) to comply with all orders, directions, recom- 302
mendations or advice as to departure, arrival, routes, 303
sailing in convoy, ports of call, stoppages, destinations, 304
discharge of cargo, delivery, or in any other way 305
whatsoever, which are given by the Government of the 306
Nation under whose flag the Vessel sails, or other 307
Government to whose laws the Owners are subject, or 308
any other Government, body or group whatsoever acting 309
with the power to compel compliance with their orders 310
or directions; 311
(ii) to comply with the order, directions or recom- 312
mendations of any war risks underwriters who have the 313
authority to give the same under the terms of the war 314
risks insurance; 315
(iii) to comply with the terms of any resolution of the 316
Security Council of the United Nations, any directives of 317
the European Community, the effective orders of any 318
other Supranational body which has the right to issue 319
and give the same, and with national laws aimed at 320
enforcing the same to which the Owners are subject, 321
and to obey the orders and directions of those who are 322
charged with their enforcement; 323
(iv) to divert and discharge at any other port any cargo or 324
part thereof which may render the Vessel liable to 325
confiscation as a contraband carrier; 326
(v) to divert and call at any other port to change the crew 327
or any part thereof or other persons on board the Vessel 328
when there is reason to believe that they may be subject 329
to internment, imprisonment or other sanctions. 330
(G) If in accordance with their rights under the foregoing 331
provisions of this Clause, the Owners shall refuse to 332
proceed to the loading or discharging ports, or any one 333

or more of them, they shall immediately inform the 334
Charterers. No cargo shall be discharged at any 335
alternative port without first giving the Charterers notice 336
of the Owners' intention to do so and requesting them 337
to nominate a safe port for such discharge. Failing such 338
nomination by the Charterers within 48 hours of the 339
receipt of such notice and request, the Owners may 340
discharge the cargo at any safe port of their own choice. 341
(H) If in compliance with any of the provisions of sub- 342
clauses (B) to (G) of this Clause anything is done or not 343
done, such shall not be deemed a deviation, but shall 344
be considered as due fulfilment of this Charter. 345

21. Cancelling 346
Should the Vessel not be delivered by the date indicated 347
in Box 22, the Charterers shall have the option of 348
cancelling. If the Vessel cannot be delivered by the 349
cancelling date, the Charterers, if required, shall declare 350
within 48 hours after receiving notice thereof whether 351
they cancel or will take delivery of the Vessel. 352

22. Dispute Resolution 353
*) (A) This Charter shall be governed by and construed in 354
accordance with English law and any dispute arising 355
out of or in connection with this Charter shall be referred 356
to arbitration in London in accordance with the Arbitration 357
Act 1996 or any statutory modification or re-enactment 358
thereof save to the extent necessary to give effect to the 359
provisions of this Clause. 360
The arbitration shall be conducted in accordance with 361
the London Maritime Arbitrators Association (LMAA) 362
Terms current at the time when the arbitration 363
proceedings are commenced. 364
The reference shall be to three arbitrators. A party 365
wishing to refer a dispute to arbitration shall appoint its 366
arbitrator and send notice of such appointment in writing 367
to the other party requiring the other party to appoint its 368
own arbitrator within 14 calendar days of that notice and 369
stating that it will appoint its arbitrator as sole arbitrator 370
unless the other party appoints its own arbitrator and 371
gives notice that it has done so within the 14 days 372
specified. If the other party does not appoint its own 373
arbitrator and give notice that it has done so within the 374
14 days specified, the party referring a dispute to 375
arbitration may, without the requirement of any further 376
prior notice to the other party, appoint its arbitrator as 377
sole arbitrator and shall advise the other party 378
accordingly. The award of a sole arbitrator shall be 379
binding on both parties as if he had been appointed by 380
agreement. 381
Nothing herein shall prevent the parties agreeing in 382
writing to vary these provisions to provide for the 383
appointment of a sole arbitrator. 384
In cases where neither the claim nor any counterclaim 385
exceeds the sum of US$50,000 (or such other sum as 386
the parties may agree) the arbitration shall be conducted 387
in accordance with the LMAA Small Claims Procedure 388
current at the time when the arbitration proceedings are 389
commenced. 390
*) (B) This Charter shall be governed by and construed in 391
accordance with Title 9 of the United States Code and 392
the Maritime Law of the United States and any dispute 393
arising out of or in connection with this Contract shall 394
be referred to three persons at New York, one to be 395
appointed by each of the parties hereto, and the third by 396
the two so chosen; their decision or that of any two of 397
them shall be final, and for the purposes of enforcing 398
any award, judgement may be entered on an award by 399
any court of competent jurisdiction. The proceedings 400
shall be conducted in accordance with the rules of the 401

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "BALTIME 1939" Uniform Time-Charter (as revised 2001)

Society of Maritime Arbitrators, Inc. — 402
In cases where neither the claim nor any counterclaim — 403
exceeds the sum of US$50,000 (or such other sum as — 404
the parties may agree) the arbitration shall be conducted — 405
in accordance with the Shortened Arbitration Procedure — 406
of the Society of Maritime Arbitrators, Inc. current at the — 407
time when the arbitration proceedings are commenced. — 408
(C) This Charter shall be governed by and construed in — 409
accordance with the laws of the place mutually agreed — 410
by the parties and any dispute arising out of or in — 411
connection with this Charter shall be referred to — 412
arbitration at a mutually agreed place, subject to the — 413
procedures applicable there. — 414
(D) Notwithstanding (A), (B) or (C) above, the parties — 415
may agree at any time to refer to mediation any difference — 416
and/or dispute arising out of or in connection with this — 417
Charter. — 418
In the case of a dispute in respect of which arbitration — 419
has been commenced under (A), (B) or (C) above, the — 420
following shall apply:- — 421
(i) Either party may at any time and from time to time — 422
elect to refer the dispute or part of the dispute to — 423
mediation by service on the other party of a written notice — 424
(the "Mediation Notice") calling on the other party to agree — 425
to mediation. — 426
(ii) The other party shall thereupon within 14 calendar — 427
days of receipt of the Mediation Notice confirm that they — 428
agree to mediation, in which case the parties shall — 429
thereafter agree a mediator within a further 14 calendar — 430
days, failing which on the application of either party a — 431
mediator will be appointed promptly by the Arbitration — 432
Tribunal ("the Tribunal") or such person as the Tribunal — 433
may designate for that purpose. The mediation shall — 434
be conducted in such place and in accordance with such — 435
procedure and on such terms as the parties may agree — 436
or, in the event of disagreement, as may be set by the — 437
mediator. — 438
(iii) If the other party does not agree to mediate, that fact — 439
may be brought to the attention of the Tribunal and may — 440
be taken into account by the Tribunal when allocating — 441
the costs of the arbitration as between the parties. — 442
(iv) The mediation shall not affect the right of either party — 443

to seek such relief or take such steps as it considers — 444
necessary to protect its interest. — 445
(v) Either party may advise the Tribunal that they have — 446
agreed to mediation. The arbitration procedure shall — 447
continue during the conduct of the mediation but the — 448
Tribunal may take the mediation timetable into account — 449
when setting the timetable for steps in the arbitration. — 450
(vi) Unless otherwise agreed or specified in the — 451
mediation terms, each party shall bear its own costs — 452
incurred in the mediation and the parties shall share — 453
equally the mediator's costs and expenses. — 454
(vii) The mediation process shall be without prejudice — 455
and confidential and no information or documents — 456
disclosed during it shall be revealed to the Tribunal — 457
except to the extent that they are disclosable under the — 458
law and procedure governing the arbitration. — 459
(Note: The parties should be aware that the mediation — 460
process may not necessarily interrupt time limits.) — 461
(E) If Box 28 in Part I is not appropriately filled in, sub- — 462
clause (A) of this Clause shall apply. Sub-clause (D) — 463
shall apply in all cases. — 464
* (A), (B) and (C) are alternatives; indicate alternative — 465
agreed in Box 23. — 466

**23. General Average** — 467
General Average shall be settled according to York/ — 468
Antwerp Rules, 1994 and any subsequent modification — 469
thereof. Hire shall not contribute to General Average. — 470

**24. Commission** — 471
The Owners shall pay a commission at the rate stated — 472
in Box 24 to the party mentioned in Box 24 on any hire — 473
paid under the Charter, but in no case less than is — 474
necessary to cover the actual expenses of the Brokers — 475
and a reasonable fee for their work. If the full hire is not — 476
paid owing to breach of Charter by either of the parties — 477
the party liable therefor shall indemnify the Brokers — 478
against their loss of commission. Should the parties — 479
agree to cancel the Charter, the Owners shall indemnify — 480
the Brokers against any loss of commission but in such — 481
case the commission not to exceed the brokerage — 482
on one year's hire. — 483

WORKING COPY

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# RIDER TO CHARTER PARTY
# FOR M/V "THORGULL" CP 6TH. DECEMBER 2006

## CL. 25 DRY DOCKING

No dry docking during time charter period except in case of emergency.

## CL.26 ITF

The officers and crew of the vessel are to be covered for the duration of this Charter Party by a bona fide trade union agreement.

Loss of time may be considered as off-hire and extra expenses incurred as a result of any action stemming from crew or union problems shall be for Owners account.

## CL.27 VESSEL INSURANCE

The Charteres to insure vessel for liability to hull and forward copy of the policy  to Owners.
**H & M value:  7,5 Mill.**

## Cl.28 STEVEDORE DAMAGE

Stevedore damages caused to the vessel or her fittings to be settled directly between the Master/Owners and the Stevedores. Charteres to be kept immediately advised of ocurance of such event. Should the Master/Owners not be able to obtain agreement with the Stevedores causing the damage, Charteres to remain ultimately responsible, but only as far as they have been kept advised as above or as soon as practiable possible.

## CL.29 SUSPENSION  OF HIRE

Should the vessel be put back, whilst on voyage, by reason of an accident to ship or onboard injury or sickness to the crew, the hire shall be suspended from the time of the vessel's putting back until she is again in the same position and voyage resumed therefrom. Bunkers spent during that period to be for Owners account, as well as other extra expenses.

## CL.30 VESSEL'S CREW/MASTER INSTRUCTIONS:

Vessel's Crew/Master instructions:

- Raising and lowering derricks and preparation of loading / discharge and

to operate derricks/cranes in loading resp. discharge - if permitted by
shore regulations - otherwise shore labour to be for Charteres account.
- Opening and closing of hatches in preparation for loading and discharging
  and intermediate ones for cargo protection, if necessary, proveded local
  regulation allow.
- Vessel's crew to lash/secure and tally
- Supervision of loading and/or discharging
- Maintaining power while loading/discharging and care of winches
- Shifting ship during loading/discharging and shifting berth
- Docking and undocking
- Assistance during bunkering
- Master to provide for Chrts daily tally and cargo plan
- Owners/Vessel to place atleast 1 representative for tallying during
  loading and discharging operations


## CL.31 LASHING MATERIALS

All lashing material, as onboard incl. airbags + pipes/pistols to be put at Charteres free
disposal.
Owners may invoice for airbags, etc that may be damaged during the period of the
charter.


## Cl.32 VESSEL'S HOLDS

The Owners agree that vessel on delivery shall have clean and dry holds,
and free from any smell to Charterers / Suveyors satisfaction. Charterers
to redeliver vessel in same condition, but have the option of redelivery the vessel before
cleaning of holds paying a lumpsum o USD 1.800 to the Owners.

Charterers to pay USD 1100,- for hold cleaning per discharge.

## CL.33  DISABLE GEAR

In the event of any disabled crane or running gear or insufficient power to drive same,
Charteres have the right to deduct hire for the period the vessel is unable to work on a
prorata basis, and to deduct standby charges, if any as per voucher.


## CL.34  VESSEL'S CERTIFICATES

The Owners confirm that the vessel has full certificates to operate within the trading
limits and warrant to maintain the in force during this charter.

3    *Rider to M/V THORGULLr 6TH DEC. 2006*

## CL.35  LIGHTERING APPARATURE

The vessel to supply lightering apparature for night work, whenever required by the Charteres or their port agents.

## Cl.36  OPENING / CLOSING OF HATCHES

The crew to open and close hatches, whenever required by Charteres or their port agents, free of expence, provided permitted by local regulations.

## CL.37  VESSEL'S COMMUNICATION EQUIPMENT

The vessel's radiostation and communication equipment to be at Charteres disposal day and night, Sundays and holidays. Charteres to pay **USD 700/30** days for communication and representation.

## CL.38 WAR RISK INSURANCE

Basis war risk for Owners account, any additional war risk on vessel/crew to be for Charterers account.

## Cl.39  MASTER'S SUPERVISION AND REPORTING

The Master shall supervise stowage of the cargo thoroughly and let one of his officers control all loading, handling, stowage, and discharging operation, and he shall furnish the Charteres, when required, with stowageplan. The Master also to fill in vouage reports and other ordinary reports, as may be required by the Charteres.

## CL.40 BUNKERS

Bunkers basis same/same.
On redelivery Charterers have the option to redeliver the vessel with the same quantity as on delivery. Any differences in quantity on redelivery to be paid basis the price ruling at the closest bunker port to redelivery.

Vessel to be delivered with full bunkers.

Owners agree to arrange for bunkering on Charteres behalf during the t/c contract if required. Bunkering to be closely coordinated between Owners/Charters and Master . Bunker requirements always in Masters descretion/judgement.

### CL.41 TRADING TO USA

When USA as a trading area following clauses are included (as attached): C-TPAT clause, US Custom 24 HRS clause, US Security clause, USA bunker clause

### CL.42 TRANSHIPMENT CLAUSE

Charteres have the right to perform transhipment of cargo at the open sea and/or in the roads of ports, alongside motherships and/or ( at Charteres option) alongside fishing trawlers, always in close cooperation between Master of the reefer vessel and Master of the mothershio/fishing trawler , and always weather and conditions permitting, whereas:

A: if transhipment performed alongside mothership:

aa)Master of the reefer vessel is obliged to agree with Master of the mothership the time and manner of mooring operation.
ab)The mothership is to carry a sufficient number of pneumatic rubber fenders enabling safe mooring of the reefer vessel alongside the mothership.
ac)If,in the judgement of the Master of the reefer vessel . the weather/sea conditions have become, or are threatening to become within a short time dangerous for the safety of the reefer vessel , Master of the reefer vessel may, and is obliged to, always in mutual agreement with Master of the mothership, unmoor alongside the mothership as quickly as compatible with safety, and in such event Master of the mothership is to render all necessary assistance.

B: if transipment performed alongside fishing trawler :

ba) The time and manner of mooring/unmooring operation shall be decided upon by Master of the reefer vessel.
bb)Charteres are to furnish the reefer vessel (against Master's receipt in writing) with a sufficient number of pneumatic rubber fenders enabling the reefer vessel and the fishing trawler to safely moor and lie alongside each other.
Master of the reefer vessel is to exercise utmost diligence in protecting the feners from Loss. All fenders as supplied by Charteres to the reefer vessel shall remain the Property of Charteres and shall be returned to the at any time during the currency of this Charter Party (on demand) but latest on redelivery of the reefer vessel from this Charter. Owners not to be held responsible for fair and tear of the fenders.
bc)The reefer vessel is to carry on board mooring ropes necessary for safe mooring of trawlers alongside the reefer vessel at open sea. Charteres shall have free use of such ropes, and shall not be held responsible for fair wear and tear thereof.
bd)If, in the judgement of the Master of the reefer vessel, the weather/sea conditions have become, or are threatening to become within a short time dangerous for the safety, of the reefer vessel and or fishing trawler, Master of the reefer vessel is to order the trawler to inmoor from alongside the reefer vessel as quickly as compatible with

safety and in such event the crew of the reefer vessel is to render all necessary assistance in unmooring the trawler.

be)The reefer vessel is to provide her own crew for handling onboard the reefer vessel mooring ropes for the fishing trawler.
Each party bears under all circumstances their own damages, incl. consequential Damages suffered by the vessel and crew during the period of such transhipment incl. movement for approaching, holding together and detaching of two vessels, and shall not make any claim against the other party. It is however understood such damages of the vessel should be covered by their own hull insurance respectively. Any additional insurance premium, if required for such transhipment operation to be for Charters account .

### CL.43  INSTRUCTIONS

The Master to follow Charters instructions as far as these are not in contradiction to the law, failing which, Charters have the right to keep Owners responsible for the eventual fault of the Master

### CL.44 REPRESENTATION

Charterers to pay USD 10,00/ day for victualling for Charteres      representative. Representation on Charteres behalf  see Clause 37.

### CL.45 SUPERCARGO

The Charters have the right to place a representative onboard during the charter. Charteres to arrange for necessary insurance and no claim to be passed to Owners.

### CL.46 HIRE PAYMENT

The hire is payable every 30 days in advance, less Charters outlays for Owners account ( as approved by Owners) and commission to Owners' bankers, however last payment of hire to be adjusted to expected date of redelivery.

### CL.47 OWNERS BANKING DETAILS

Tønnevold Reefer 7 KS
Postbox 115
4891 Grimstad

6        *Rider to M/V THORGULLr 6TH DEC. 2006*

Bank:
Sparebank 1 Sr-Bank
Postbox 114
4065 Stavanger
Norway
Account Nr: 3185.05.33922
Swift: SPRONO22

### CL.48 CLAIMS & ARREST

Should the vessel by any reason of cargo claim, be arrested or otherwise detained, it is clearly agreed between the Owners and the Charteres, that the Owners in the first instance and without delay, directly or via their P and I Club must arrange, as soon as possible, circumstances permitting , the release of the vessel by putting up sufficient required guarantees.

### CL.49 VESSEL P&I

The Owners confirm that the vessel is covered by a first class P and I Club for the duration of this Charterparty.
P&I club:. Gard

### CL.50 VESSEL DESCRIPTION

As per attachement.

### CL.51 TEMPERATURE

Temperature – as per vessels description – above

### CL.52 SCHEDULE

Charterers to keep Owners currently informed of vessel's schedule and name of agents each port, who also to attend to Owners/vessel's matter at no additional cost.
Any extraordinary agency function to be agreed directly between Owners and agents or Owners option to appoint a husbandry agent.

### CL.53 ADDITIONAL CLAUSES

It is understood that the New Jason Clause, New Both-to-Blame Collision Clause, London Reefer Clause are to form part of this C/P

### CL.54 WATCHMEN

Compulsory watchmen to be for Charterers account.

### CL.55 BUNKER QUALITY

Bunker quality cl. – as per vessel's description

### CL.56 OPTIONS

Deleted.

### CL.57 P & C CLAUSE

This contract to be kept strictly private and confidential

### CL.58 HATCH SEALING CLAUSE

Charterers have the right to order the master to seal the hatches and access ways to the cargo compartments. Master of the vessel to report the seal numbers to Charterers along with the load report and or discharge report.

In case master or crew need to gain access to the cargo spaces and or any of the sealed spaces the master is to report to Charterers the time, date and reason for this access. The master is then to report to Charterers the time and date that the seals were replaced.

Access ways/point to the reefer equipment are for practical reasons not to be sealed - since the crew need to have regular access to these spaces.

Charterers are to supply owners with suitable sealing equipment - suitability in master's discretion - or owners will supply sealing equipment at Charterers expense.

### CL. 59 Fuel Sulphur Content Clause for Time Charter Parties

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the vessel is trading within that zone. The Charterers shall indemnify, defend and hold

8        *Rider to M/V THORGULLr 6TH DEC. 2006*

harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## CL. 60 ISPS/MTSA CLAUSE FOR TIMECHARTER AND OTHER ADDITIONAL CLAUSES.

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

> *"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

9      *Rider to M/V THORGULLr 6TH DEC. 2006*

## U.S. Customs 24 Hours Rule Clause for Time Charter Parties

(a) If loading cargo destined for the US or passing
through US ports in transit, the Charterers shall:

> (i) Provide all necessary information, upon request by the Owners, to the
> Owners and/or their agents to enable them to submit a timely and accurate
> cargo declaration directly to the US Customs; or

> (ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent
> amendments thereto, submit a cargo declaration directly to the US Customs and
> provide the Owners with a copy thereof.

In all circumstances, the cargo declaration must be
submitted to the US Customs latest 24 hours in
advance of loading.

(b) The Charterers assume liability for and shall
indemnify, defend and hold harmless the Owners
against any loss and/or damage whatsoever
(including consequential loss and/or damage) and
any expenses, fines, penalties and all other claims
of whatsoever nature, including but not limited to
legal costs, arising from the Charterers' failure to
comply with the provisions of sub-clause (a).

(c) If the Vessel is detained, attached, seized or
arrested as a result of the Charterers' failure to
comply with the provisions of sub-clause (a), the
Charterers shall provide a bond or other security to
ensure the prompt release of the Vessel.
Notwithstanding any other provision in this Charter
Party to the contrary, the Vessel shall remain on
hire.

### USA Bunkering Clause

Owners certify that the vessel is and will remain so throughout the duration of this
charter, eligible for bunkering privileges in the United States of America and its
territories and possessions, under all present and United States Laws and/or
regulations and is not, nor will be restricted, as to bunkering at any other countries or
port of call during this charter.

## U.S. Security Clause for Voyage Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

*Reporting*
The Vessel or its agents shall report and send all notices as required to obtain entry and exit clearances from the relevant U.S. authorities.
Any delay caused by the failure to so report shall be for the Owners' account, unless such failure to report is caused by or attributable to the Charterers or their representatives or agents including but not limited to the shipper and/or receiver of the cargo.

*Clearances*
Unless caused by the Owners' negligence, any delay suffered or time lost in obtaining the entry and exit clearances from the relevant U.S. authorities shall count as laytime or time on demurrage.

*Expenses*
Any expenses or additional fees relating to the cargo, even if levied against the Vessel, that arise out of security measures imposed at the loading and/or discharging port and/or any other port to which the Charterers order the Vessel, shall be for the Charterers' account.

*Notice of Readiness*
Notwithstanding anything to the contrary contained in this Charter Party the Vessel shall be entitled to tender Notice of Readiness whether cleared for entry or not by any relevant U.S. authority.

## U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service.
The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.
The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

11      *Rider to M/V THORGULLr 6TH DEC. 2006*

**VESSEL'S DETAILS**

\*\*\*\*\*\*\*\*\*

# EXHIBIT 3

-----Original Message-----
From: reefer@orion-shipping.com [mailto:reefer@orion-shipping.com]
Sent: 25. januar 2007 14:41
To: OTT Ship
Subject: thorunn + thorgull - eco

TO..: "O.T.TØNNEVOLD AS"
FROM: ORION SHIPPING AS
DATE: 25-JAN-2007 14:41
MSG.: 96719

pål/morten

fyg foll sent toby today:

re. thorunn/thorgull - closing of eco pool
--
understand you are putting the last work into the final accounts and
the statements which hope will include a summary of the last 6 months
and the pool earnings. last one rcvd by tonnevold is from july last
year.

the results from decmber was a little dissapointing. throunn made a
trip to klaipeda and she and thorgull were at that time the only
vessels in the pool right?), so would excpect more to be credited to
owners during december than what they rcvd.

pls comment

thks + rgds

----------------------------------------------------------------------
---
Email: reefer@orion-shipping.com
web: http://www.orion-shipping.com
Phone: +47 67 83 89 89 - Fax: +47 67 10 88 52

Espen C. Harr    Mob: +47 901 23 305
Morten Saetre    Mob: +47 995 13 000
Peter Oeyen       Mob: +47 907 75 739

**From:** Moors, Toby [mailto:tmoors@eastwindgroup.com]
**Sent:** 19. april 2006 14:32
**To:** Pål Aimar Sørensen
**Cc:** Jan Walle
**Subject:** RE: ECo pool furure??

Jan - Paul / Toby

I have the spreadsheets - I will send them shortly - needed to review them last night

The offhire for Thorgull is correct - vessel lost time in Moin waiting for the Deck generator

Working on the format for a revised Pool - it is complex as I intend to bring in all our smaller ships, including those outside the current pool (we have charterered some more ships on period  and bought 3 more in last 12 months).

On t/c , as advised as few weeks ago, the rate we would 'safely' want to charter in order to not risk losing money would probably be lower than 'acceptable' to the various Owners in your K/s - especially as the Dec / Jan / Feb months were pretty poor in the market. So, I prefer the pool idea as it spreads risk and the entire group of ships gain from the 12 month charters and the COAs we have inhouse (which may not involve ships like Thorgull / Thorunn.

I hope to have the skeleton together by the end of the week - when is your next Board meeting as a deadline ?

Thanks
T

Toby Moors
Eastwind New York

**From:** Jan Walle
**Sent:** 31. mai 2006 14:17
**To:** 'Moors, Toby'
**Cc:** OTT Ship
**Subject:** Eco pool future

Hi Toby,

We are still missing promised input from you regarding future pool opportunities.
I need latest next week what you can offer regarding future deployment for Thorgull and Thorunn.

Please let this mail be my last remainder.

Best Regards

Jan Walle
Senior Vice President
Shipping Division
O.T.Tønnevold AS
Direct line: +47 37 25 88 72
Mobile: +47 90 03 18 95
Fax: +47 37 25 88 99
E-Mail: jw@ott.no

**From:** Moors, Toby [mailto:tmoors@eastwindgroup.com]
**Sent:** 24. februar 2006 21:34
**To:** Jan Walle
**Subject:** RE: Thorunn, Thorgull

Jan / Toby

Sorry for slow reply, basically been traveling since we met in our office.

1. I am trying to keep and ECO model running, either in it's current form (which is quite a lot of work here for just two remaining 3rd party ships)
2. Small pool (honestly) may not work from your perspective - a group of C class ships running without any period charter support means they are extremely exposed to spot market and bunker exposures.
3. T/c option - discussing further .

Will get back to you over next week.

Brgds
Toby

Toby Moors
EW / RS New York

**From:** Jan Walle [mailto:jw@ott.no]
**Sent:** Wednesday, February 22, 2006 9:51 AM
**To:** Moors, Toby
**Subject:** Thorunn, Thorgull

Hi Toby,

Thank you very much for your hospitality , discussions and the reefer introduction you did for me.
I hope the snow situasjon is under control in New York. I saw a picture of a man skiing on Manhatten, do you still have a lot of snow ?

Regarding business, I am waiting for your proposal for the possible future deployment of our reefers.

-    Is ECO still a possibility ?
-    How would a small pool look like ?
-    Is the 68 cent plus profit split still an option ?

At last, if you can indicate what type of business we can propose that is not in competition with Knut, that would be great.


**Best Regards**

**Jan Walle**
**Senior Vice President**
**Shipping Division**
**O.T.Tønnevold AS**
**Direct line: +47 37 25 88 72**
**Mobile: +47 90 03 18 95**
**Fax: +47 37 25 88 99**

# EXHIBIT 4



| Eastwind Home | Eastwind Group | Eastwind Fleet | About Us | Contacts | Photo Gallery |



## Eastwind Group

- Founded in 1987
- Own/Operate 119 Ships (Dec 2007)

### Operating Segments:

- **Containers**

- **Dry Bulkers**

- **Reefers/Freezers**

- **Tankers**

---

| News: | Principal Operating Companies/Affiliates |
|---|---|

**News:**

- **October 2007:** EWB orders four new 35,000 Dwt bulkers from Shanghaiguan

- **September 2007**:  Eastwind purchases Silver Wind, 17,000 Dwt tanker

- **August 2007:** Eastwind contracts Cosco for tanker conversions.

- **August 2007:** EWB orders four new Lakers from Shanghaiguan

- **July 2007:** Eastwind affiliate EWB buys four containerships from Maersk

- **May 2007:**  Chiquita sells Great White Fleet to Eastwind/NYKLauCool

- **May 2007:**  Eastwind orders four new Lakers from Shanghaiguan

**Principal Operating Companies/Affiliates**

- **Atlantic Wind Pool Ltd.**

- **Eastwind Maritime S.A.**

- **Eastwind Transport Ltd.**

- **Eastwind (Hellas) S.A.**

- **EWB Ltd.**

- **Eastwind Ltd.**

- **Eurus Containers Carriers Ltd.**

- **EW Carriers (UK) Ltd.**

- **EW Shipmanagent Ltd.**

- **Eystrasalt LLC.**

- **Kura Shipping Ltd.**

## Eastwind Management Offices

### Eastwind Maritime Inc.
444 Madison Avenue, Suite 200
New York, NY 10022
Phone: +1-212-838-1113
Fax: +1-212-838-8439
Eastwind@eastwindgroup.com



### Eastwind Ltd.
Nippon Press Center Bldg, 6th Fl
2-2-1 Uchisaiwaicho
Chiyoda-ku, Tokyo 100-0011, Japan
Phone: +81-3-5511-7071
Fax: +81-3-5511-7081
ewl@ewltokyo.co.jp



## Eastwind Commercial Offices

### Eastwind Carriers (UK) Ltd.
Third Floor
3 Southwark Street
London SE1 1RQ
England
Phone: +44-0-207-403-5986
Fax: +1-866-767-1761
tankers@eastwindgroup.com

### Eastwind Agency Ltd
Nippon PressCenter Bldg. 6thFL
2-2-1- Uchisaiwaicho
100-0011 Tokyo, Japan
Phone: +81-3-5251-5188
Fax: +81-3-5251-5088
sam_shirai@eastwind-agency.co.jp

### Eastwind AB
PO Box 10055
100 55 Stockholm, Sweden
Phone: +46-8-753-6720
Fax: +46-8-622-6624
reefers@eastwindgroup.com

### Eurus Container Carriers Ltd.
444 Madison Avenue, Suite 200
New York, NY 10022
Phone: +1-212-838-1113
Fax: +1-212-838-8439
Eastwind@eastwindgroup.com

### Eastwind Transport Ltd.
Suite 904, East Wing,
ZhongRongHengRui International Plaza,
No.620 ZhangYang Road, PuDong,
Shanghai, China 200122
Phone: +86-21-5062-0011
Fax: +86-21-5836-2448

### ProBulk Carriers Ltd.
444 Madison Avenue
New York, NY 10022
Phone: +1-212-980-1150
Fax: +1-212-486-0123
procarriers@eastwindgroup.com



|  | ew-china@hotmail.com |  |
|---|---|---|
| **Eastwind Joint Venture Offices** | | |
| **Smart Crewing Ltd.**<br>Kaliningrad, Russia, 236000<br>20, Ozerova Street, 3rd Floor<br>Phone: +4-012-916-864<br>smartcrewing@qazinter.net | **Multiship Agencia Maritima**<br>Rua Dr. Sampaio Viana, 253<br>Suite 64<br>04004-000 SÃO PAULO<br>BRAZIL<br>Phone: +55-11-3884 5583<br>Fax: +55-11-3051 2085<br>ship@multiship.com.br |  |
| **Eastwind Ship Managers' Offices** | | |
| **Eastwind Shipmanagement Pte. Ltd.**<br>1 Maritime Square<br>Hex10-21 Harbourfront Centre<br>Singapore 099253<br>Tel: +65-6-273-3100<br>Fax: +65-6-272-9497<br>corporate@ewsmplspore.com.sg | **Norbulk Shipping UK Ltd.**<br>Norbulk House<br>68 Glassford Street<br>Glasgow G1 1UP<br>Phone: +44-141-552-3000<br>Fax: +44-141-559-5250<br>mail@norbulkshipping.com | **Eastwind Hellas S.A.**<br>6 Skouze Street<br>Piraeus 18536 Greece<br>Phone: +30-1-42-92-485/9<br>Fax: +30-1-42-92-493<br>mail@eastwindhellas.gr |
| **Eastwind Shipmanagement Pte. Ltd.**<br>Shanghai Representative Office<br>Suite 904, East Wing, ZhongRongHengRui<br>International Plaza, No.620 ZhangYang Road,<br>PuDong, Shanghai, China 200122<br>Phone: +86-21-5062-0011<br>Fax: +86-21-5836-2448<br>ewsmshanghai@126.com | **Diamond Ship Management N.V**<br>The Lofthouse<br>Oude Leeuwennui 7-11<br>B-2000 Antwerp Belguim<br>Phone: +32-3-293 6167<br>Fax: +32-3-293 6576<br>Technical@DiamondShip.Be | **Korea Marine Ltd.**<br>Marine Bldg. 4th Floor<br>#84-5, 4-KA Chungang-Dong<br>Chung-Ku, Pusan 600-014,<br>Korea<br>Phone: +82-51-462-1746<br>Fax: +82-51-463-9041<br>kml@komarine.co.kr |

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: ECO SHIPPING LTD.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ECO SHIPPING LTD. |
| **Initial DOS Filing Date:** | APRIL 04, 2001 |
| **County:** | NEW YORK |
| **Jurisdiction:** | DELAWARE |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
JOHN D KOUSI
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Principal Executive Office**
ECO SHIPPING LTD.
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT 5

# NYS Department of State

## Division of Corporations

**Entity Information**

Selected Entity Name: ECO SHIPPING LTD.

Selected Entity Status Information

**Current Entity Name:** ECO SHIPPING LTD.
**Initial DOS Filing Date:** APRIL 04, 2001
**County:** NEW YORK
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
JOHN D KOUSI
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Principal Executive Office**
ECO SHIPPING LTD.
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Home | About Us | myManta NEW | FAQ | View Cart

Login:

Not a member? Learn more.



**Free Subscription to Media & Marketing**

**COMPANIES:** U.S., U.S. Public, Australia, Canada, U.K., Worldwide

**RESOURCES:** Jobs, Market Research, News , Vendor Quotes, Free Magazines

Enter U.S. Company Name    

**BUSINESS CENTERS:** Travel, Small Biz, Career

Company Profiles > Find Companies > New York, NY > Consumer Products & Services > Passenger Car Leasing > Water Transportation Services, NEC > Chartering of commercial boats > Eastwind Maritime S A Inc Company Profile

# Eastwind Maritime S A Inc

444 Madison Ave Ste 200, New York, NY 10022-6983, United States  (Map) (Add Company Info)
**Phone:** (212) 838-1113
**SIC:** Water Transportation Services, NEC
**Line of Business:** Water Transport Services Oil/Gas Exploration Services Natural Gas Liquids Production

Ads by Google

Freight Forwarding Find Customs Brokers & Freight Forwarding Services on Business.com

Freight Shipping Compare rates on freight shipping from the world's leading providers.

Freight Forwarding Freight Forwarding list Guide to Freight Forwarding

The ads are not affiliated with Eastwind Maritime S A Inc

Add Company To List
Add/View Note
Add Contact
View Contacts
Edit Company Profile
Set Company Alert
>> go to myManta

**Find** Jobs in New York, NY

### Detailed Eastwind Maritime S A Inc Company Profile
This company profile is for the private company Eastwind Maritime S A Inc, located in New York, NY. Eastwind Maritime S A Inc's line of business is water transport services oil/gas exploration services natural gas liquids production.

### Company Profile: Eastwind Maritime S A Inc

**Year Started:** 1987
**State of Incorporation:** N/A
**URL:** N/A
**Location Type:** Single Location
**Stock Symbol:** N/A
**Stock Exchange:** N/A
**Also Does Business As:** N/A
**NAICS:** N/A
**SIC #Code:** 4499
**Est. Annual Sales:** $4,100,000
**Est. Employees:** 65
**Est. Employees at Location:** 50
**Contact Name:** John D Kousi
**Contact Title:** President

*Data above provided by D&B.*

**Freight Forwarding**
Find Customs Brokers & Freight Forwarding Services on Business.com
www.business.com

**Freight Shipping**
Compare rates on freight shipping from the world's leading providers.
the-freightshipping.net

Ads by Google

**Additional Eastwind Maritime S A Inc Company Information**

**Have some information to add about Eastwind Maritime S A Inc?**

Manta allows *you* to make additions and corrections to the information available for the *Eastwind Maritime S A Inc* company profile. »Learn More

**Add Company Information**

**Set Company Alert**

Stay in the know. Sign up to receive email alert notification when new information about Eastwind Maritime S A Inc is available.

**Set Company Alert**

**Looking for reports & articles on Eastwind Maritime S A Inc?**

Manta also provides financial reports, credit reports, news articles, and market research reports on Eastwind Maritime S A Inc.

**View Reports & Articles**

Copyright 2007 Dun and Bradstreet, Inc. All Rights Reserved.



www.rfpathways.com
Ads by Google

**Find** reports and articles on Eastwind Maritime S A Inc

**Find other** Eastwind Maritime S A Inc **companies**

More Companies in:
This Industry
New York, NY

Privacy Policy | Refund Policy | Contact Us | Advertise | Local Ads | Terms & Conditions | Site Map | Manta Partners

Copyright © 2008, ECNext, Inc. All Rights Reserved.