William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANTS
TONNEVOLD REEFER 7 KS,
TONNEVOLD REEFER 4 KS, AND
O.T TONNEVOLD AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTWIND MARITIME, S.A.,

                Plaintiff,

-against-

TONNEVOLD REEFER 7 KS,
a/k/a TONNEVOLD REEFER 2 KS,
a/k/a TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                Defendant.

08 Civ. 3292 (HB)

**TONNEVOLD'S MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR COUNTERSECURITY**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1
STATEMENT OF FACTS ............................................................................................................2
   THE CHARTER............................................................................................................................2
   ECO AND EASTWIND ARE ALTER-EGOS ..................................................................................4
   TONNEVOLD DAMAGES ............................................................................................................7
ARGUMENT...................................................................................................................................8
POINT I  TONNEVOLD IS ENTITLED TO FULL COUNTER-SECURITY FOR ITS COUNTER-CLAIM ....................................................................................................................8
   A.   TONNEVOLD HAS SET FORTH A WELL-PLEADED COUNTER-CLAIM AND INTRODUCED AMPLE EVIDENCE IN SUPPORT OF ITS ALLEGATIONS AGAINST EASTWIND ......................................................................................................................8
      1.   Tonnevold's counter-claim is well-pled..............................................................9
      2.   Tonnevold's counter-claim meets the transaction and occurrence requirement........................................................................................................14
   B.   FULL COUNTER-SECURITY IS APPROPRIATE IN THIS CASE....................................................15
CONCLUSION..............................................................................................................................16

# TABLE OF AUTHORITIES

## CASES

*Fesco Ocean Management v. High Seas Shipping,*
   No. 06 Civ. 1055 (NRB), 2007 WL 766115 (S.D.N.Y. Mar. 12, 2007)................................12

*Incas & Monterey Printing & Packaging Ltd. v. M/V Sang Jin,*
   747 F.2d 958 (5th Cir. 1984) ...........................................................................................14

*Pancoast Trading S.A. v. Eurograni S.R.L,*
   No. 07 Civ. 8581, 2008 WL 190376 (S.D.N.Y. Jan. 22, 2008)..........................................9

*Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.,*
   56 F.3d 394 (2d Cir. 1995)..................................................................................................9

*SPL Shipping Ltd. v. Gujarat Cheminex Ltd.,*
   No. 06 Civ. 15375 (KMK), 2007 WL 831810 (S.D.N.Y. Mar. 15, 2007) ........................11

*Sea-Terminals Inc. v. Independent Container Lines, Ltd.,*
   No. 89 Civ. 6931, 1990 WL 130766 (S.D.N.Y. Sept. 4, 1990).........................................14

*Ullises Shipping Corp. v. Fal Shipping Co.,*
   415 F. Supp. 2d 318 (S.D.N.Y. 2006)...............................................................................12

*United States v. Aquavella,*
   615 F.2d 12 (2d Cir. 1980)................................................................................................15

*Voyager Shipholding Corp. v. Hanjin Shipping Co., Ltd.,*
   No. 07 Civ. 11123, 2008 WL 400923 (S.D.N.Y. Feb. 13, 2008) ......................10, 14, 15

*Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty. Ltd.,*
   No. 07 Civ. 5798 (CM), 2007 WL 2872477 (S.D.N.Y. Oct. 1, 2007) .............................12

## STATUTES

Rule E(7) of the Supplemental Rules for Admiralty or Maritime Claims and Asset
   Forfeiture Actions ....................................................................................*1, 2, 8, 9, 14, 15, 16*

Federal Rules of Civil Procedure 13(a) ...................................................................................14

Defendants, Tonnevold Reefer 7 KS, Tonnevold Reefer 4 KS, and O.T. Tonnevold AS ("Tonnevold"[1]), respectfully submit this Memorandum of Law in support of their motion requesting an Order, pursuant to Rule E(7) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, directing that Plaintiff Eastwind Maritime A.S. ("Eastwind"), the alter-ego of non-party ECo Shipping Ltd. ("ECo"), provide counter-security on Tonnevold's counter-claims.

## PRELIMINARY STATEMENT

Tonnevold is entitled to full counter-security for its $836,601.22 counter-claim. Tonnevold suffered substantial damages because of ECo and Eastwind's imprudent handling of Tonnevold's vessel, the *M/V Thorgull* ("*Thorgull*" or "Vessel"), while under charter. Specifically, the *Thorgull* was blacklisted by two international maritime organizations because it received transhipments of the protected fish species redfish, from at least seven vessels that were themselves blacklisted. Recognizing this error, and that the *Thorgull* could not be chartered at market rate while blacklisted, ECo and Eastwind sought to mitigate Tonnevold's losses by having Eastwind become the new charterer of the Vessel during the blacklist period. All of Tonnevold's damages are a result of the blacklisting, including *inter alia*, monies expended to remove the Vessel from blacklists, chartering of the *Thorgull* at below-market rate to ECo and Eastwind, and losses when the Vessel was unemployed while on the respective blacklists.

Tonnevold's well-pled counterclaim, along with the declaration of a Tonnevold representative intimately familiar with the ECo and Eastwind blacklisting incident, the inter-related corporate practices between the entities and the damages suffered by Tonnevold,

---

[1] Tonnevold Reefer 2 KS is a limited partnership having nothing to do with the vessel at issue here. A clerical error resulted in the inclusion of the name "Tonnevold Reefer 2 KS" on addenda to a December 6, 2006 charter party, as owner of the vessel at issue. The correct name of the entity owning the vessel at issue is Tonnevold Reefer 7 KS. "Tonnevold OT" is not a duly organized business entity, but is an informal reference for the entity O.T. Tonnevold AS.

1

submitted in support of this motion, all support the granting of counter-security in aid of Tonnevold's on-going arbitration.

To date, Eastwind has attached $176,913.93 (out of an attachment order totaling $452,616.48), of Tonnevold's in connection with its Verified Complaint which states, *inter alia*, that Tonnevold owes Eastwind monies under a third addendum to a charter. In fact, the addendum is a by-product of the Vessel being blacklisted and Eco and Eastwind's efforts to mitigate the damages owed to the Vesssel's owner, Tonnevold. Tonnevold's damages include losses suffered from the below-market third addendum, and others. As such, Tonnevold is entitled to all of its damages and should not be limited to the damages claimed by Eastwind or the monies attached to date, as plaintiffs often argue in opposition to counter-security. Courts within this District have recognized that Supplemental Rule E(7) does not limit counter-security requests in such a manner and Tonnevold's request should not be limited here.

## STATEMENT OF FACTS

The allegations in Eastwind's complaint, and Tonnevold's counter-claim, arise from the same underlying dispute, stemming from charter agreements entered into between ECo, Eastwind and Tonnevold for the chartering of the *Thorgull*. Counter-claim, ¶¶ 3-14; Declaration of Jan S. Walle dated April 18, 2008 ("Walle Dec.") (filed herewith).

### The Charter

On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a time charter of the *Thorgull* with ECo for a period of about twelve months, which charter was extended by the agreement of the parties until December 20, 2005. On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a pool agreement with ECo to include the *Thorgull*. (Counter-claim ¶ 37; Walle Dec. ¶ 3).

2

On or about December 20, 2005, a successor to Tonnevold Reefer 4 KS, Tonnevold Reefer 7 KS, entered into a charter with ECo for charter of the *Thorgull* for a period of about twelve months (the "Charter"). At the same time, Tonnevold Reefer 7 KS and ECo entered into a new pooling agreement with respect to the Vessel, named "ECo 2002 Pool Agreement" ("Pooling Agreement 02"). Both the Charter and the Pooling Agreement 02 were executed by Mr. Charles T. ("Toby") Moors, Vice President of ECo Shipping. (*Id.* ¶ 38; *Id.* ¶ 4).

Pursuant to the Charter and while in the employ of ECo, the *Thorgull* performed a voyage from Los Palmas, Canary Islands to Tarifa, Spain from August 7 – September 18, 2006. During the voyage, the *Thorgull*, under the control of ECo and Eastwind, received for on-carriage recently-caught redfish from at least seven fishing vessels at sea. (*Id.* ¶ 39; *Id.* ¶ 5).

All of the vessels from which the *Thorgull* received transshipments had been blacklisted by North East Atlantic Fisheries Commission ("NEAFC") and Northwest Atlantic Fisheries Organization ("NAFO") for activity that had contravened the NEAFC and NAFO rules and regulations. In receiving redfish for on-carriage for the blacklisted vessels, ECo violated the NEAFC regulations, specifically Article 44 of the NEAFC Scheme of Control and Enforcement ("NEAFC Enforcement"), which prohibited such on-carriage of certain protected fish species, such as redfish. (*Id.* ¶¶ 40-41; *Id.* ¶¶ 6-7).

The NEAFC is a Regional Fisheries Management Organization ("RFMO") that exists to conserve and manage the fishery resources of the northeast region of the Atlantic Ocean. The NAFO is another RFMO that exists to protect the fishery resources in a contiguous area, the northwest Atlantic Ocean. This violation of the NEAFC rules and regulations is illegal activity in breach of Charter Clause 15, which requires that ECo and Eastwind employ the Vessel in "lawful trades." As a result of the breach, NEAFC placed the *Thorgull* on the blacklist on

3

November 17, 2006 and NAFO placed the *Thorgull* in its blacklist on February 23, 2007. Through the diligent efforts of Tonnevold, the *Thorgull* was removed from the NEAFC blacklist on November 16, 2007, approximately one year after it was placed on the list, and from the NAFO blacklist thereafter. (*Id.* ¶¶ 42-44; *Id.* ¶¶ 8-11).

As a result of the blacklisting of the Vessel, Tonnevold was unable to charter the Vessel at market rate. In order to mitigate the damages caused by ECo's breach of the Charter, its alter-ego Eastwind agreed to charter the *Thorgull* while the Vessel was blacklisted. On December 6, 2006, ECo, through its alter-ego Eastwind, and Tonnevold entered into a charter for a period of "about 60 days" as part of ECo and Eastwind's agreement to employ the *Thorgull* during the period it was blacklisted, the Mitigating Charter. (*Id.* ¶¶ 46-47; *Id.* ¶¶ 12-13).

There were three single-page addenda to the Mitigating Charter; Addendum Number 1 is dated February 13, 2007, Addendum Number 2 is dated April 19, 2007, and Addendum Number 3 is dated July 19, 2007. All three addenda incorporate by reference the terms of the Mitigating Charter except revising *inter alia*, delivery, cargo, and charter hire information for the Vessel and identify Eastwind (acting on behalf of ECo), as Charterers, and Tonnevold, as Owners. (Counter-claim ¶ 48; Walle Dec. ¶ 14).

### ECo and Eastwind are Alter-egos

ECo is the alter-ego of Eastwind because it dominates and disregards ECo's corporate form to the extent that Eastwind is actually carrying on ECo's business and operations as if the same were its own, or vice versa. (Counter-claim ¶ 49).

In early 2006, Mr. Moors, acting on behalf of the interests of ECo and Eastwind, indicated to Tonnevold that the Pooling Agreement 02 would end because there were too few ships remaining in the pool and running the pool in New York resulted in high administrative accounting costs. Mr. Moors affirmed to Tonnevold that the *Thorgull*, while leaving the Pooling

Agreement 02, would be chartered by Eastwind, on behalf of ECo, in an effort to keep the Vessel working even during the blacklist period. This indicates there existed such unity of ownership and interest between ECo and Eastwind that no separation exists such that the corporate form had been disregarded. (Counter-claim ¶¶ 50-51; Walle Dec. ¶¶ 15-16).

On or about July 12, 2007, Paul Capkanis, of Eastwind Transport, Ltd., on behalf of ECo, reaffirmed Eastwind's continued intent to employ the *Thorgull* in a third addendum to the Mitigating Charter, continuing thereafter until the Vessel was de-listed by the NEAFC. Tonnevold's communications with ECo and Eastwind concerning the original charter in 2000, the breached Charter, the Mitigating Charter and addenda to that Charter have all involved the same personnel, interchangeably utilizing the same contact information for both entities, including identical mailing addresses, email addresses with the "Eastwind Group," facsimile numbers and telephone numbers, such that there is no meaningful difference between the two entities. (*Id.* ¶¶ 52-53; *Id.* ¶¶ 17-18).

On the Eastwind website, http://www.eastwindgroup.com, an Eastwind entity has a New York address of 444 Madison Avenue, Suite 200, New York, New York. Plaintiff Eastwind interchanges itself and other members of the "Eastwind Group" in its Verified Complaint, noting Eastwind operates "from the offices of the "Eastwind Group," when in fact the website describes Eastwind Maritime Inc. as the chief management office. No less than eight "Eastwind" entities are listed on the Eastwind website, none of them being Eastwind Maritime S.A. (*Id.* ¶ 54; *Id.* ¶ 19).

The New York State Department of State website lists ECo's address as 444 Madison Avenue, Suite 200, New York, the same address as Eastwind as noted on its website. Dun & Bradstreet and the New York State Department of State website list John Kousi as the president

and chief executive officer of both Eastwind and ECo. Both the Charter and the Pooling Agreement 02 were executed by Mr. Moors as "Vice-President" on behalf of ECo shipping. Mr. Moors has also been identified as Vice-President of Eastwind on Internet websites. (*Id.* ¶¶ 55-57; *Id.* ¶¶ 20-22).

The alter-ego relationship between ECo and the Eastwind Group is confirmed in notice provision for Pooling Agreement 02, which states:

> any notices under this agreement may be delivered by mail, electronic mail, telex, or facsimile:
> ECo or the Pool, to
> c/o Eastwind Transport Ltd.
> 444 Madison Avenue
> Suite 200
> New York, NY 10022
> Facsimile: (212) 838-8439
> Telex: 420111 EWINDNY
> Email: eastwind@eastwindgroup.com

The address designated for ECo and Eastwind Transport Ltd. is the same address and facsimile listed for Eastwind. (*Id.* ¶ 58; *Id.* ¶ 23).

Based on the foregoing circumstances, ECo used Eastwind to conduct business on its behalf in an effort to mitigate the losses suffered by Tonnevold as a result of ECo's breach of the Charter and despite ECo having provided no consideration to Eastwind. Alternatively, ECo and Eastwind have commingled funds and/or otherwise have failed to observe corporate formalities when entering into charter agreements. (Counter-claim ¶ 59).

It is not a general practice in the maritime community, nor anywhere else, for independent companies to allow other companies to enter into charter arrangements on its behalf. Disregard of corporate formalities when entering into binding agreements by one independent company on behalf of another independent company are suggestive of a relationship that is not "arms length" and support the alter-ego claim. (Counter-claim ¶¶ 60-61).

6

### Tonnevold Damages

As a result of the blacklisting and the ECo and Eastwind breach of the Charter, Tonnevold has suffered damages in the amount of $836,601.22. (Counter-claim ¶ 62; Walle Dec. ¶ 27).

Tonnevold made diligent efforts to have the *Thorgull* removed from the NEAFC blacklist. The efforts to remove the Thorgull from the NEAFC blacklist cost Tonnevold a total of $20,500 as a result of meetings and travel expenses on the part of Tonnevold employees when negotiating with NEAFC. (*Id.*; *Id.*).

Tonnevold has been unable to charter the *Thorgull* on the market and, instead, has been chartering it to Eastwind on a series of voyages at below market rate. The loss of revenue while under the charter to Eastwind from January 1, 2007 – September 11, 2007 was $227,940.01. (*Id.*; *Id.*).

Despite Tonnevold's diligent efforts to charter the *Thorgull*, the Vessel was unemployed during September 12 - November 28, 2007, while the Vessel remained blacklisted. Tonnevold's damages while the Vessel was unemployed was $424,129.21. (*Id.*; *Id.*).

As a result of the blacklisting, Tonnevold also suffered damages due to additional expenses incurred in operating the Vessel amounting to a total of $164,032.00, including $147,157.00 for the incremental expenses that Tonnevold incurred as the result of the Vessel not trading in its usual trade pattern. The incremental expenses are for crew travel, consumables, and lubricants. The remaining $16,875 in losses is for the transportation of spare parts from Halifax to Alexandria, Egypt, due to the Thorgull not being permitted to enter the port at Halifax because it had been placed on the NEAFC blacklist. (*Id.*; *Id.*). Tonnevold has commenced arbitration in New York per the breached Charter to recover its damages. (Counter-claim ¶ 63).

7

# ARGUMENT

The United States Court of Appeals for the Second Circuit and courts within this District have recognized that a defendant is entitled to counter-security when it alleges a non-frivolous counter-claim that arises out of the same transaction and occurrence as the plaintiff's claim. Here, Tonnevold's counter-claim arises from ECo and Eastwind's irresponsible chartering of the *Thorgull*, the same issue on which the claims in Eastwind's Verified Complaint are founded. As such, this Court should order Eastwind to post counter-security within ten days of its opinion and order. In the event that Eastwind refuses to comply with a counter-security order that might be issued, the attachment order against Tonnnevold should be vacated and/or Eastwind should be enjoined from prosecuting its claims against Tonnevold, in London arbitration, or elsewhere.

## POINT I

## TONNEVOLD IS ENTITLED TO FULL COUNTER-SECURITY FOR ITS COUNTER-CLAIM

Tonnevold's counter-security request is premised on a valid counter-claim arising out of Eastwind's breach of the Charter. That same breach serves as the predicate for additional chartering agreements for the *Thorgull*, entered into by Eastwind on behalf of ECo, in an effort to mitigate Tonnevold's damages. Consequently, as discussed below, Tonnevold's motion for counter-security should be granted in full.

### A. Tonnevold Has Set Forth a Well-Pleaded Counter-claim and Introduced Ample Evidence in Support of its Allegations against Eastwind

Tonnevold has satisfied the statutory requirements for counter-security. Counter-security is governed by Supplemental Rule E(7)(a), which provides:

> When a person who has given security for damages in the original action asserts a counter-claim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given *must*

8

> *give security for damages demanded in the counter-claim unless the court for cause shown, directs otherwise.* Proceedings on the original claim must be stayed until this security is given unless the court directs otherwise.

Fed. R. Supp. P. Supp. R. E(7)(a) (emphasis added).

Under Rule E(7)(a), Tonnevold is entitled to security for damages demanded in its counterclaim, because it is both well-pled and arises from the same transaction and occurrence as that of Eastwind's claims in its Verified Complaint.

### 1.   Tonnevold's counter-claim is well-pled

The purpose behind the admiralty counter-security rule is described as follows:

> The point of the rule is to make sure that when parties to the same transaction assert claims against each other arising from that transaction, the parties should both be fully secured, where possible, and neither should have the additional leverage of holding security, while the other must wonder if a judgment in its favor would ever be paid.

*Pancoast Trading S.A. v. Eurograni S.R.L*, No. 07 Civ. 8581, 2008 WL 190376, at *3 (S.D.N.Y. Jan. 22, 2008). The Court of Appeals for the Second Circuit has set forth two principles for district courts to consider when a defendant seeks countersecurity: (1) "to place the parties on an equality as regards security;" and (2) "the Rule is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit." *Result Shipping Co., Ltd. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995). While courts have "broad discretion" in determining whether to order the posting of counter-security, the notion of placing the parties on equal grounds "usually favors granting counter-security when a defendant whose property has been attached asserts non-frivolous counter-claims growing out of the same transaction . . . ." *Result Shipping*, 56 F.3d at 399-400. In essence, the Court must weigh "the burden of posting counter-security, against the potential injustice of requiring the defendant-counter-claimant to post security without affording reciprocal protection." *Id.* at 400.

9

In *Voyager Shipholding Corp. v. Hanjin Shipping Co., Ltd.*, No. 07 Civ. 11123, 2008 WL 400923 (S.D.N.Y. Feb. 13, 2008), the defendant Hanjin sought $388,157.80 in counter-security in connection with its speed and over-consumption counter-claims. The plaintiff challenged the counter-security request on many grounds, the primary of which concerned the lack of evidence submitted by Hanjin in support of its counter-claim. It also submitted a declaration from an English solicitor which argued that Hanjin would not be successful in the English arbitration when asserting its speed and over-consumption claims. Hanjin countered by submitting its own English solicitor's declaration which reached a different conclusion than that of the plaintiff's English solicitor. 2008 WL 400923, at *3.

Recognizing that an "inquiry into the merits of the claims is 'severely limited,'" the Court refused to determine which of the rivaling foreign law declarations was correct on a counter-security application. *Id.* (quoting *Front Carriers, Ltd. v. Transfield ER Cape. Ltd.*, No. 07 Civ. 6333, 2007 WL 4115992, at *2 (S.D.N.Y. Nov. 19, 2007)). And it rejected the notion that the lack of evidence proffered at this initial inquiry stage would be fatal to Hanjin's application because Hanjin had submitted a "well-pleaded counter-claim." *Id.* Accordingly, the Court granted Hanjin's application for counter-security, though for a lesser amount than requested. *Id.* at *5.

Here, Tonnevold has submitted detailed proof of its counter-claim, well above the threshold pleading requirements necessary to support its counter-claim. Tonnevold's verified counter-claim contains detailed allegations concerning ECo and Eastwind's breach of charter, resulting in the blacklisting of the *Thorgull*. The counter-claim also alleges in detail the damages suffered by Tonnevold as a result of the breach. Additionally, Tonnevold has submitted a sworn declaration from its Senior Vice President of Shipping who was directly involved with the

*Thorgull* charters entered into with ECo and Eastwind, the breach of charter obligations by ECo and Eastwind, and the damages suffered by Tonnevold as a result of the breach. *See generally*, Walle Dec. The counterclaim and declaration are accompanied by documentation supporting both the existence and amount of Tonnevold's damages claims. Altogether, this proof easily satisfies Tonnevold's burden of showing that its counter-claim is not frivolous.

In *Pancoast*, the plaintiff conceded that counter-security was appropriate, but questioned the amount and form the counter-security would take. 2008 WL 190376, at *1. The *Pancoast* Court granted counter-security in full, without having to address the underlying merits of the case or the counter-claim alleged by the defendant.

In addition to having a well-pled counter-claim in support of its damages, Tonnevold has also properly alleged an alter-ego relationship between ECo and Eastwind. In *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, No. 06 Civ. 15375 (KMK), 2007 WL 831810 (S.D.N.Y. Mar. 15, 2007), defendant Nirma Ltd. sought to vacate a Rule B order pursuant to Rule E(4)(f), obtained by plaintiff SPL on an alter-ego theory of liability. In that case, Nirma, a limited liability company, made a payment to SPL against a freight certificate attendant to a charter party agreement between SPL and Gujarat to which Nirma was not a party. *Id.* at *1. Judge Karas based his decision finding that SPL had stated a valid admiralty claim against Nirma on the theory of alter-ego liability and denying the vacatur motion on the following:

> Plaintiff has essentially made three allegations against Nirma: first, that Nirma has in this case, and in other cases, made payments on behalf of Gujarat to third parties; second, that "there existed such unity of ownership and interest… that no separation exists between" Nirma and Gujarat, such that the "corporate form has been disregarded"; and third, that Nirma has "dominated and used" Gujarat "for their own purposes such that there is no meaningful difference between the three entities and there has been an intermingling of funds between the several entities".

*Id.* at *4.

11

In *Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318, 325-26 (S.D.N.Y. 2006), Judge Scheindlin held that the payment of several invoices of the principal defendant by an alleged alter-ego was sufficient grounds to maintain the attachment over the alleged alter-ego, despite both Defendants having shown hundreds of millions of dollars of capitalization, separate corporate filings, affidavits supporting corporate separateness, and similar evidence. In upholding the multi-million dollar attachment over the alleged alter-ego because of the payment made on behalf of the corporate affiliate, Judge Scheindlin ruled:

> Although this is not conclusive evidence, [plaintiff] has met its burden of showing reasonable grounds for attaching the assets [of the alter ego defendant].

*Ullises Shipping Corp.*, 415 F. Supp. 2d at 326.

Likewise, in *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty. Ltd.*, No. 07 Civ. 5798 (CM), 2007 WL 2872477, at *10 (S.D.N.Y. Oct. 1, 2007), Judge McMahon looked to the fact that one party, Raecorp, was in the process of paying the defendant's legal bills when the payment was intercepted by the attachment order as a factor satisfying the burden to show an alter ego relationship between the parties.

In *Fesco Ocean Management v. High Seas Shipping,* No. 06 Civ. 1055 (NRB), 2007 WL 766115, at *3 (S.D.N.Y. Mar. 12, 2007), the allegations upon which Judge Buchwald relied to uphold the attachment were that "United" was merely a shell corporation of "High Seas," employed solely to hold or transfer money on behalf of High Seas so as to defraud, hinder, or delay creditors of High Seas and make payments on behalf of High Seas.

Here, Eastwind and ECo have failed to observe the corporate form and are alter-egos. Walle Dec. at ¶¶ 15-23. Eastwind entered into the Mitigation Charter with Tonnevold on ECo's behalf, after ECo's actions resulted in the Vessel being blacklisted. This disregard of corporate form and unity of interests mirror the allegations set forth in *SPL Shipping*. And similar to the

12

paying agent cases above, Eastwind was conducting the business of ECo, and vice versa, without any indication of corporate separateness or separate financial consideration. Executives of Eastwind's promises to Tonnevold that the Vessel would be chartered by them until the blacklisting ended supports the connection of interests between ECo actions and subsequent mitigation of damages steps taken by Eastwind on ECo's behalf.

The communications between Tonnevold, ECo and Eastwind for the Mitigation Charter involved the same corporate executives who Tonnevold dealt with over the years for the charter of the Vessel before the blacklisting event, and included the use of interchangeable email addresses, office addresses, telephone numbers and facsimile numbers. (*Id.* ¶ 18.). Moreover, in various official documents filed with the New York State Department of State, corporate reports by independent companies such as Dun & Bradstreet, and documents between the parties, executive titles and contact information for the entities are also used interchangeably. (*Id.* ¶¶ 17-21). A prime example of the interrelatedness of the entities can be seen in the Pool Agreement 02, between Tonnevold and ECo, executed by Mr. Toby Moors, "Vice-President" of ECo. The Agreement states that:

> any notices under this agreement may be delivered by mail, electronic mail, telex, or facsimile:
> ECo or the Pool, to
> c/o Eastwind Transport Ltd.
> 444 Madison Avenue
> Suite 200
> New York, NY 10022
> Facsimile: (212) 838-8439
> Telex: 420111 EWINDNY
> Email: eastwind@eastwindgroup.com

The address designated for ECo and Eastwind Transport Ltd. is the same address and facsimile listed for Eastwind. (*Id.* ¶ 23).

13

The proof introduced, not to mention the additional facts pled, clearly shows that Tonnevold has met its burden for alleging an alter-ego relationship between ECo and Eastwind such that they should be considered one entity for all legal purposes. Tonnevold respectfully submits that its well-pleaded verified counter-claim, supported by both declaratory and documentary support, merits the awarding of counter-security pursuant to Supplemental Rule E(7).

### 2. Tonnevold's counter-claim meets the transaction and occurrence requirement

Under Supplemental Rule E(7)(A), when a party who has given security for claims made in a maritime action asserts a counterclaim "that arises from the transaction or occurrence that is the subject of the original action," the plaintiff "must give security for damages demanded in the counterclaim unless the court for cause shown [] directs otherwise." *Voyager Shipholding Corp.*, 2008 WL 400923, at *1. The relevant language of Rule E(7)(A) is identical to Rule 13(a) of the Federal Rules of Civil Procedure. Accordingly, when determining whether a counterclaim arises "out of the same transaction or occurrence" under Rule E(7), courts apply the test for compulsory counterclaims under Rule 13(a). *Id.* at *2 (Citing *Incas & Monterey Printing & Packaging Ltd. v. M/V Sang Jin*, 747 F.2d 958, 964-65 (5th Cir. 1984); *Sea-Terminals Inc. v. Independent Container Lines, Ltd.*, No. 89 Civ. 6931, 1990 WL 130766, at *2 (S.D.N.Y. Sept. 4, 1990)). It has been well-established that "the word 'transaction' has a 'flexible meaning' that 'may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Voyager Shipholding Corp.*, 2008 WL 400923, at *2 (quoting *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926)).

The Second Circuit has taken a "broad view" of the rule, based on whether there is a "logical relationship between the claim and the counterclaim" such that "considerations of

14

judicial economy and fairness dictate that all of the issues be resolved in one lawsuit." *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1980) (citations omitted); *Voyager Shipholding Corp.*, 2008 WL 400923, at *2. Courts have applied the same test in the context of Rule E(7). *Id.* at *2 (citing *Incas*, 747 F.2d at 964).

Here, Tonnevold's counter-claim arises out of the "same transaction and occurrence" as the claims of Eastwind, mainly chartering agreements between Eastwind, ECo and Tonnevold for the charter of the Vessel. Specifically, the series of occurrences that led to the alleged damages suffered by Eastwind per the third addendum to the Mitigating Charter (as set forth in the Verified Complaint) originated from ECo's breach of the Charter in the first instance by having the Vessel accept redfish from blacklisted vessels. The circumstances surrounding the Mitigating Charter and the breached Charter bear a logical relationship to one another, satisfying the Rule E(7)(A) transaction and occurrence requirement.

### B.   Full Counter-security is Appropriate in This Case

Tonnnevold's counter-security request should be judged on the sufficiency of its damages allegations in its counter-claim, not on such arbitrary amounts as that sought by Eastwind in its Verified Complaint or the amount of funds actually attached to date as a result of the Court's order of attachment.[2] In *Pancoast*, the Court noted that Supplemental Rule E(7) provides that a plaintiff "must give security 'for damages demanded in the counter-claim.'" 2008 WL 190376, at *1 (quoting Supp. R. E(7)(a)). With respect to the amount of security, the Court further noted that Supplemental Rule E(7) "does not limit the countersecurity to the amount of the security provided by the defendant to secure the plaintiff's claim." *Id.*

---

[2]  *See* Verified Complaint ¶ 18 requesting an order of attachment for $452,616.48. An April 14, 2008 attachment notice to Tonnevold provides that 176,913.93 of its monies have been attached as of that date.

Tonnevold submits that this Court should exercise its discretion to grant full counter-security under Supplemental Rule E(7) as Tonnevold has supported its counter-claim damages allegations in a substantial manner, especially at this early stage of the case.

## CONCLUSION

Because:

(1)  Tonnevold has alleged a non-frivolous counter-claim against Eastwind on the same transaction and occurrence that is the basis for Eastwind's affirmative claim;

(2)  Eastwind has obtained its own attachment order and has attached its own security;

(3)  Supplemental Rule E(7)(a) by its terms does not limit counter-security applications to the amount claimed by the plaintiff;

(4)  Tonnevold has maritime claims against Eastwind; and

(5)  Tonnevold has not obtained any security for its counter-claims;

Defendant Tonnevold respectfully requests that this Court grant its motion for counter-security in the amount of $836,601.22 and award such other and further relief as the Court may deem just and proper.

Dated: New York, New York
April 18, 2008

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: _____
William J. Honan
Christopher R. Nolan
195 Broadway
New York, New York  10007
(212) 513-3200
Attorneys for Defendant
Tonnevold Reefer 7 KS,
Tonnevold Reefer 4 KS, and
O.T. Tonnevold AS

16