CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
EASTWIND MARITIME S.A.
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EASTWIND MARITIME S.A.,

                              Plaintiff,

                                                        08  CV  3292 (HB)

               v.

TONNEVOLD REEFER 7 KS,
a/ka TONNEVOLD REEFER 2 KS,
a/ka/ TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                              Defendant.
----------------------------------------------------------------X

**ATTORNEY'S AFFIDAVIT**

**IN OPPOSITION TO**

**TONNEVOLD'S MOTION FOR COUNTERSECURITY**

State of New York      :
                       :ss.
County of Nassau       :

Owen F. Duffy, being duly sworn, states under penalty of perjury as follows:

1

1.    I am a member of the Bar of the State of New York, and I am admitted to practice before this Court.

2.    I am a member of the firm of Chalos, O'Connor & Duffy, LLP, attorneys for the Plaintiff, Eastwind Maritime S.A. (hereinafter "Eastwind"), in this action.

3.    I am fully familiar with the matters set forth in this affidavit, and my knowledge of the matters set forth in this affidavit is based on information provided to me by Plaintiff Eastwind.

## Procedural History

4.    This action was instituted with the filing of a Verified Complaint against defendants on April 2, 2008.  *See*, Exhibit 1, Verified Complaint.

5.    The Verified Complaint in this action stated a cause of action against the defendant named therein as follows:

> 7.    On December 6, 2006, defendant TONNEVOLD, as owner of the ocean-going vessel M/V THROGULL, entered into a charter party contract with the predecessor in interest of plaintiff EASTWIND, Eco Shipping Ltd., as charterer.
>
> 8.    That charter party was continued three times with addendums agreed to between plaintiff EASTWIND and defendant TONNEVOLD with no mention of the Eco Shipping Ltd. thus effectually novating the charter party and making them each a maritime contract between EASTWIND and TONNEVOLD.
>
> 9.    The third addendum continuing the charter party between the parties, Addendum No. 3 dated July 19, 2007, was a maritime contract for the continuation of the charter party whereby plaintiff EASTWIND hired the M/V THORGULL to carry a cargo of cocoa being shipped from Panjang, Malaysia to Buenaventura, Colombia.
>
> 10.    The charter party contract between plaintiff EASTWIND and defendant TONNEVOLD is a maritime contract.
>
> 11.    Throughout the course off the charter and, particularly so, with respect to the voyage from Penjang to Buenaventura, the plaintiff Eastwind made regular and timely hire payments to the defendant Tonnevold.
>
> 12.    At the conclusion of the charter, and consistent with a final accounting that took into account deductions of hire for off-hire periods,

allowances for fuel used while off-hire, fuel that had been supplied to the vessel by Eastwind and other miscellaneous deductions for expenses that were for the account of the vessel Owner, there was a balance due and owing to the charterer, plaintiff EASTWIND, of US$180,946.04, plus an additional US$116,802.00 that represented an over consumption of fuel used by the vessel from what the vessel's fuel consumption was represented to be in the charter party.

13.    Despite due demand, the defendant TONNEVOLD has failed to pay the $297,748.04 that is due and owing to the plaintiff EASTWIND pursuant to the terms of the charter party.

14.    TONNEVOLD's failure to make timely payment of the outstanding balance when it became due constitutes a breach of the charter party and, therefore, plaintiff EASTWIND has a maritime claim against the defendant TONNEVOLD for breach of charter party in the principal amount of $297,748.04.

15.    The charter party contract between EASTWIND and TONNEVOLD provides, at Clause 22, that any disputes arising out of the maritime contract shall be governed by English law and shall be referred to arbitration in London.

16.    Interest and costs, including attorneys' fees, are routinely awarded to the prevailing party in London arbitration because they are recoverable damages in arbitration pursuant to the London Maritime Arbitration Association's rules.

17.    In accordance with the terms and conditions of the charter party, the plaintiff EASTWIND is preparing to initiate arbitration proceedings against defendant TONNEVOLD in London.

18.    As best as can now be estimated, the plaintiff EASTWIND expects to recover the following amounts in London arbitration from defendant TONNEVOLD:

|   |   |   |   |
|---|---|---|---|
| A. | Principal claim | | $297,748.04 |
| B. | Estimated interest on claims: 3 years at 8%, compounded quarterly | | $ 79,868.44 |
| C. | Estimated attorneys' fees: | | $ 50,000.00 |
| D. | Estimated arbitration costs/expenses: | | $ 25,000.00 |
| **Total** | | | **$452,616.48** |

*See*, Exhibit 1, at ¶'s 7 – 18.

3

6.      In connection with the Verified Complaint, and, because the Defendant was not present within the Southern District of New York, Plaintiff Eastwind requested the issuance of a Process of Maritime Attachment to obtain security for its maritime claim.

7.      On April 2, 2008, this Court issued an Order for Issuance of a Process of Maritime Attachment in the case at hand.  *See*, Exhibit 2, Order for Issuance of a Process of Maritime Attachment.

8.      In accordance with the Order of this Court, the Clerk of the Court issued a Process of Maritime Attachment and Garnishment against Defendant Tonnevold up and to the amount sued for, *to wit*, $452,616.48.

9.      After serving the Process of Maritime Attachment on various garnishees within the District, garnishee JPMorgan Chase Bank restrained $176,913.93 on or about April 14, 2008, as funds in which the Defendant Tonnevold has an interest.

10.     Additionally, on or about April 16, 2008 garnishee Citibank restrained an additional $8,525.00 as funds in which Defendant Tonnevold has an interest.

11.     Additionally, on or about April 18, 2008 garnishee Citibank restrained an additional $2,195.15 as funds in which Defendant Tonnevold has an interest.

12.     At the present time, the Plaintiff Eastwind has restrained the property of the Defendant Tonnevold in the amount of $187,634.08 as security for its claim of $452,616.48.

13.     In accordance with Rule B(2) and local rule B.2, Plaintiff Eastwind promptly notified Defendant Tonnevold following each of these attachments.  *See*, Exhibit 3, Notices of Attachment dated April 14, 2008, April 17, 2008 and April 18, 2008.

14.    On April 18, 2008, Defendant Tonnevold filed an Answer and a Counterclaim in the amount of $836,601.22 with this Court. *See*, Exhibit 4, Verified Answer and Counter-Claim, at Prayer for Relief ¶ 3.

15.    Defendant Tonnevold's Counter-Claim specifically states that it is being made against Eastwind and non-party ECo Shipping Ltd. *See*, Exhibit 4, Verified Answer and Counter-Claim, at page 5, in a paragraph preceding ¶ 33, "As for its Counter-claim against Eastwind and ECo, Tonnevold alleges as follows."

16.    Also on April 18, 2008, Defendant Tonnevold filed a Notice of Motion, requesting an Order from this Court directing "Plaintiff Eastwind Maritime S.A. to give security to Tonnevold for the damages demanded in Tonnevold's counter-claim within 10 days from the issuance of the Order." See, Exhibit 5, Notice of Motion.

### Basis of the Counterclaim

17.    After due investigation it became clear that the basis for the counterclaim of Defendant Tonnevold in the case at hand was a matter currently being arbitrated between Defendant Tonnevold and non-party ECo Shipping Ltd. in New York arbitration.

18.    Plaintiff Eastwind now hereby submits a declaration from counsel representing non-party ECo Shipping Ltd. (hereinafter "ECo") in the arbitration proceeding where Defendant Tonnevolds' counterclaim is already pending. See, Exhibit 6, Declaration of John G. Poles.

19.    Plaintiff Eastwind is not a party to the arbitration in New York between Tonnevold and ECo.  *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 1.

20. While Defendant Tonnevold alleges that non-party ECo is the alter ego of Plaintiff Eastwind, it did not name Eastwind when it instituted the arbitration action against ECo. *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 9.

21. Non-party ECo has not been served with legal process in the case at hand, and it is not a party to the case at hand.

22. The counterclaim being alleged by Defendant Tonnevold in this action does not arise from the transaction of the occurrence that is the subject of the case at hand. *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 2.

23. The action in the case at hand is based on claims regarding the overpayment of hire and overconsumption of fuel, *see* Verified Complaint at ¶s 9 to 13; whereas, the claim against non-party ECo made by Tonnevold in New York arbitration, which is the basis for Tonnevold's counterclaim, rests on the allegation that ECo illegally loaded "red fish." *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 5.

24. The counterclaim is based on an entirely different charter party contract and pooling agreement than is Plaintiff Eastwind's claim. *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 5.

25. The charter party contract which is the basis for the case at hand provides for London arbitration whereas the charter party contract which is the basis for the counterclaim calls for New York arbitration (which arbitration has commenced and is currently being litigated by Defendant Tonnevold and non-party ECo). *See*, Exhibit 6, Declaration of John G. Poles, at ¶'s 6 and 8.

26. The dispute that is the basis of both the counterclaim and the New York arbitration between Defendant Tonnevold and non-party ECo has no factual allegations,

circumstances or occurrences in common with the case at hand. It is described more fully in the Declaration of John G. Poles. *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 9.

27.    The differences between the two actions are more fully detailed in the Declaration of John G. Poles. *See*, Exhibit 6, Declaration of John G. Poles, at ¶ 10 – 12.

28.    The differences between the two actions are summarized in the Declaration of John G. Poles. *See,* Exhibit 6, Declaration of John G. Poles, at page 5.


**Inaccurate Claims made in by Defendant Tonnevold**

29.    Defendant Tonnevold alleges in its counterclaim that Plaintiff Eastwind is the alter ego of non-party ECo. *See*, Exhibit 4, Verfied Answer and Counter-claim, at ¶'s 49 – 61.

30.    However Plaintiff Eastwind and ECo are separate and distinct corporate entities deserving of the presumption of corporate separateness provided to all corporations and Defendant Tonnevold's allegations are insufficient to overcome that presumption. *See*, Williams v. McAllister Bros., Inc., 534 F.2d 19, 21 (2d Cir. 1976)

31.    Furthermore, Defendant Tonnevold's allegations that Plaintiff Eastwind was involved in the subject matter of the counterclaims is entirely belied by the fact that Eastwind was not made a party to the New York Arbitration instituted by Defendant Tonnevold against non-party ECo.

32.    Finally, it is important to carefully review the evidence submitted by Defendant Tonnevold in this matter. Defendant Tonnevold continually refers to the charter party that is the basis of the case at hand as the "Mitigating Charter." *See*, Exhibit 7, Declaration of Jan Sigvart Walle in Support of Defendant's Motion for Counter-security

pursuant to Supplemental Rule E(7) (hereinafter referred to as "Declaration of Walle"), at ¶ 13.

33.     However, the Charter Party submitted by Defendant Tonnevold makes no reference to it being made in mitigation, nor does it refer to any of the facts alleged in the counterclaim. *See*, Exhibit 7, Declaration of Walle at Exhibit 2.

34.     Furthermore, while Defendant Tonnevold admits that there were three addenda to the Charter Party that is at issue in the case at hand, and claims that they "identify Eastwind (acting on behalf of ECo)" the three addenda do not name ECo at all, state that Plaintiff Eastwind is the "charterer" and make no reference to Eastwind acting on behalf of anyone else or acting in mitigation of any matter whatsoever.  *See*, Exhibit 8, the three addenda to the Charter Party of December 6, 2006, Addendum No. 3 being the charter party that is the basis of the case at hand.

35.     Addendum No. 3, which was signed by a representative of Defendant O.T. Tonnevold AS as manager for Defendant Tonnevold Reefer 2 KS, specifically states that the contract is between Eastwind and Tonnevold Reefer 2 KS and specifies the terms of the contract, referring only to "otherwise terms as per Charter Party dated 6th December, 2006." *See*, Exhibit 8, the three addenda to the Charter Party of December 6, 2006, at Addendum No. 3.

36.     Finally, it is important to note that Defendant Tonnevold alleges that an Eastwind representative stated that the M/V THORGULL, "while leaving Pooling Agreement 02, would be chartered by Eastwind, on behalf of ECo, in an effort to keep the Vessel working even during the blacklist period." *See*, Exhibit 7, Declaration of Walle, at ¶ 16.

8

37. As evidence of this claim, Mr. Walle attaches as an exhibit email exchanges which make no reference to Eastwind keeping the MV Thorgull working during the blacklist period. *See*, Exhibit 7, Declaration of Walle, at Exhibit 3.

38. Mere unsupported allegations that these two matters involve the same transaction or occurrence are insufficient to support the awarding of countersecurity pursuant to Rule E(7) as the evidence that has been submitted indicates that the counterclaim involves different laws, different jurisdictions for arbitration, different charter party contracts, one pursuant to a pooling agreement and the other independent of the pooling agreement, and a wholly different subject matter.


## Conclusion

39. On the basis of the foregoing, it is respectfully submitted that the subject matter of the counterclaim of the counterclaimant Defendant Tonnevold is for a transaction or occurrence that is separate and distinct from the subject matter of the Verified Complaint in the case at hand, and therefore the counterclaimant should not be granted security pursuant to Supplemental Rule E(7) in the case at hand for its claims which are currently being arbitrated in New York.


Dated: Port Washington, New York
      May 28, 2008

                                  CHALOS O'CONNOR & DUFFY, LLP
                                  Attorneys for Plaintiff
                                  EASTWIND MARITIME S.A.

By:       _____
                                  Owen F. Duffy (OD-3144) ·
                                  366 Main Street

Port Washington, New York
11050
Tel:     516-767-3600
Telefax: 516-767-3605
Email: ofd@codus-law.com

Subscribed and sworn to before me this
May 28, 2008

Notary Public, State of New York

GEORGE E. MURRAY
Notary Public, State of New York
No. 02MU6108120
Qualified in New York County
Commission Expires April 12, 2008
2012

# EXHIBIT 1

JUDGE BAER

# 08 CV 03292

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
EASTWIND MARITIME S.A.
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

EASTWIND MARITIME S.A.,

                                  Plaintiff,

              v.

TONNEVOLD REEFER 7 KS,
a/ka TONNEVOLD REEFER 2 KS,
a/ka/ TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                                  Defendant.
-------------------------------------------------------------X

RECEIVED
APR 0 2 2008
U.S.D.C. S.D. N.Y.
CASHIERS

08 CV _____ (___)

**VERIFIED COMPLAINT**

Plaintiff EASTWIND MARITIME S.A. (hereinafter "EASTWIND"), by its

attorneys, Chalos, O'Connor & Duffy, as and for its Verified Complaint against the

Defendant, TONNEVOLD REEFER 7 KS a/ka TONNEVOLD REEFER 2 KS a/ka

TONNEVOLD REEFER 4 KS a/ka/ O.T. TONNEVOLD AS, a/k/a TONNEVOLD OT

(hereinafter referred to collectively as "TONNEVOLD"), alleges upon information and

belief as follows:

JURISDICTION

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and the district court has original subject matter

jurisdiction, exclusive of the states, pursuant to 28 U.S.C. § 1333.


THE PARTIES

2.    At all times material hereto, Plaintiff EASTWIND was and still is a

foreign business entity duly organized and existing pursuant to the laws of a foreign

country, but operating from the offices of the Eastwind Group in the United States at 444

Madison Avenue, New York, New York, 10022.

3.    The plaintiff EASTWIND is engaged in the business of chartering and

operating vessels for the carriage of goods by sea.

4.    At all times material hereto, the defendant TONNEVOLD was and still is

a foreign business entity duly organized and existing pursuant to the laws of Norway with

a place of business at 1 Odden, Grimstad, Norway.

5.    The defendant TONNEVOLD is the registered owner of the vessel M/V

THORGULL, and the primary business of TONNEVOLD is to charter the M/V

THORGULL to others for the carriage of cargo in exchange for payments of hire or

freight.

6.    The underlying maritime contract described hereinafter was originally

entered into by the defendant TONNEVOLD under the name of Tonnevold Reefer 7 KS,

but TONNEVOLD has at various times referred to itself as Tonnevold Reefer 2 KS, O.T.

Tonnevold AS and Tonnevold OT such that each of those other names are aliases or they

2

are the alter ego of the registered Owner of the M/V THORGULL and, therefore, each of

them is a party to the underlying maritime contract or, otherwise, liable for the debts of

Tonnevold Reefer 7 KS pursuant to the underlying maritime contract.

## AS AND FOR A CAUSE OF ACTION
### FOR BREACH OF MARITIME CONTRACT

7.    On December 6, 2006, defendant TONNEVOLD, as owner of the ocean-

going vessel M/V THROGULL, entered into a charter party contract with the predecessor

in interest of plaintiff EASTWIND, Eco Shipping Ltd., as charterer.

8.    That charter party was continued three times with addendums agreed to

between plaintiff EASTWIND and defendant TONNEVOLD with no mention of the Eco

Shipping Ltd. thus effectually novating the charter party and making them each a

maritime contract between EASTWIND and TONNEVOLD.

9.    The third addendum continuing the charter party between the parties,

Addendum No. 3 dated July 19, 2007, was a maritime contract for the continuation of the

charter party whereby plaintiff EASTWIND hired the M/V THORGULL to carry a cargo

of cocoa being shipped from Panjang, Malaysia to Buenaventura, Colombia.

10.    The charter party contract between plaintiff EASTWIND and defendant

TONNEVOLD is a maritime contract.

11.    Throughout the course off the charter and, particularly so, with respect to

the voyage from Penjang to Buenaventura, the plaintiff Eastwind made regular and

timely hire payments to the defendant Tonnevold.

12.    At the conclusion of the charter, and consistent with a final accounting

that took into account deductions of hire for off-hire periods, allowances for fuel used

3

while off-hire, fuel that had been supplied to the vessel by Eastwind and other

miscellaneous deductions for expenses that were for the account of the vessel Owner,

there was a balance due and owing to the charterer, plaintiff EASTWIND, of

US$180,946.04, plus an additional US$116,802.00 that represented an over consumption

of fuel used by the vessel from what the vessel's fuel consumption was represented to be

in the charter party.

13.    Despite due demand, the defendant TONNEVOLD has failed to pay the

$297,748.04 that is due and owing to the plaintiff EASTWIND pursuant to the terms of

the charter party.

14.    TONNEVOLD's failure to make timely payment of the outstanding

balance when it became due constitutes a breach of the charter party and, therefore,

plaintiff EASTWIND has a maritime claim against the defendant TONNEVOLD for

breach of charter party in the principal amount of $297,748.04.

15.    The charter party contract between EASTWIND and TONNEVOLD

provides, at Clause 22, that any disputes arising out of the maritime contract shall be

governed by English law and shall be referred to arbitration in London.

16.    Interest and costs, including attorneys' fees, are routinely awarded to the

prevailing party in London arbitration because they are recoverable damages in

arbitration pursuant to the London Maritime Arbitration Association's rules.

17.    In accordance with the terms and conditions of the charter party, the

plaintiff EASTWIND is preparing to initiate arbitration proceedings against defendant

TONNEVOLD in London.

4

18.    As best as can now be estimated, the plaintiff EASTWIND expects to

recover the following amounts in London arbitration from defendant TONNEVOLD:

| | | |
|---|---|---|
| A. | Principal claim | $297,748.04 |
| B. | Estimated interest on claims: 3 years at 8%, compounded quarterly | $ 79,868.44 |
| C. | Estimated attorneys' fees: | $ 50,000.00 |
| D. | Estimated arbitration costs/expenses: | $ 25,000.00 |
| **Total** | | **$452,616.48** |

### PRAYER FOR RELIEF

19.    Notwithstanding the fact that the liability of the defendant is subject to

determination by arbitration in London, there are now, or will be during the pendency of

this action, certain assets, accounts, freights, monies, charter hire, credits, effects,

payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or

claimed by the defendant within this District and held by various parties, as garnishees.

20.    Plaintiff EASTWIND believes that some of these assets, *to wit*: bank

accounts; freight and/or hire payments from other charterers or shippers of cargo; and/or

Clearing House Interbank Payment System (CHIPS) credits; and/or funds being

transferred through intermediary banks are located in this District in the possession of

garnishees, namely banks or financial institutions located in New York.

21.    As set forth in the accompanying affidavit of Owen F. Duffy, the

defendant cannot be found within this District within the meaning of Rule B of the

Supplemental Rules for Admiralty or Maritime Claims of the Federal Rules of Civil

Procedure.

221.    Because this Verified Complaint sets forth an *in personam* maritime claim

against the defendant and because the defendant cannot be found within this District

within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime

Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment

and garnishment are met and Plaintiff seeks the issuance of process of maritime

attachment so that it may obtain security for its claims against the defendant and/or *quasi*

*in rem* jurisdiction over the property of the defendant so that an eventual judgment and/or

award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.    That the defendant be summoned to appear and answer this Verified

Complaint;

B.    That the defendant not being found within this District, as set forth in the

Affidavit of Owen F. Duffy, then all of its assets, accounts, freights, monies, charter hire,

credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like

belonging to or claimed by the defendant within this District up to the amount sued for

herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages;

C.    That this Court retain jurisdiction over this matter through the entry of a

judgment either by this Court, and/or the London arbitration panel, so that judgment may

be entered in favor of Plaintiff for the amount of its claim with costs, *i.e.* **$452,616.48,**

and that a judgment of condemnation and sale be entered against the property arrested

and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the

proceeds thereof; and

D.    That Plaintiff has such other and further relief as the Court may determine

to be just and proper under the circumstances.

Dated: Port Washington, New York
　　　　April 2, 2008

                                    CHALOS, O'CONNOR & DUFFY, LLP
                                    Attorneys for Plaintiff,
                                    EASTWIND MARITIME S.A.

                        By:         _____

                                    George M. Murray (GM-4172)
                                    Owen F. Duffy (OD-3144)
                                    366 Main Street
                                    Port Washington, New York 11050
                                    Tel:  (516) 767-3600
                                    Fax:  (516) 767-3605

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
EASTWIND MARITIME S.A.
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
EASTWIND MARITIME S.A.,

                              Plaintiff,

                                                                08  CV  _____ (____)

               v.
                                                                **VERIFICATION**

TONNEVOLD REEFER 7 KS,
a/ka TONNEVOLD REEFER 2 KS,
a/ka/ TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,


                              Defendant.
------------------------------------------------------------X
STATE OF NEW YORK          :
                          : ss.
COUNTY OF NASSAU           :

          BEFORE ME, the undersigned authority, personally came and appeared George

E. Murray, who, after being duly sworn, did depose and state:

          1.        That he is an associate in the law firm of Chalos, O'Connor & Duffy LLP,

counsel for the Plaintiff, EASTWIND MARITIME S.A., herein;

          2.        That he has read the foregoing complaint and knows the contents thereof;

3.    That he believes the matters to be true based on documents and

information obtained from employees and representatives of the Plaintiff through its

agents, underwriters and attorneys; and

4.    That the reason that this verification was made by deponent and not by the

Plaintiff is because the officers' verification of Plaintiff could not be obtained within the

time constraints presented by the circumstances of this case.


Dated: Port Washington, New York
      April 2, 2008

                CHALOS, O'CONNOR & DUFFY, LLP
                Attorneys for Plaintiff,
                EASTWIND MARITIME S.A.

By:

                George E. Murray (GM-4172)
                366 Main Street
                Port Washington, New York 11050
                Tel:  (516) 767-3600
                Fax:  (516) 767-3605


Subscribed and sworn to before me this
April 2, 2008

Notary Public, State of New York


TIMOTHY SEMENORO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02SE6112804
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES JULY 12, 2008

2

# EXHIBIT 2

08 CV 03292

(BAER, )

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
EASTWIND MARITIME S.A.
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____        │
│ DATE FILED: 4/2/08           │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

EASTWIND MARITIME S.A.,

                              Plaintiff,

        v.                                              08 CV _____ ( )

TONNEVOLD REEFER 7 KS,                          ORDER FOR ISSUANCE
a/ka TONNEVOLD REEFER 2 KS,                     OF A PROCESS OF
a/ka/ TONNEVOLD REEFER 4 KS,                    MARITIME ATTACHMENT
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                              Defendant.
----------------------------------------------------------------X

        Upon reading the Verified Complaint requesting issuance of Process of Maritime

Attachment and Garnishment, and the Affidavit of George E. Murray, Esq. attached

thereto, and the Court finding that the conditions for an attachment under Rule B of the

Supplemental Rules for Admiralty or Maritime Claims to the Federal Rules of Civil

Procedure appear to exist, it is this day, by the United States District Court for the

Southern District of New York, hereby

        ORDERED that the Clerk shall issue a Process of Maritime Attachment and

Garnishment as prayed for in the Verified Complaint; and it is further

        ORDERED that the Process of Attachment issued by the Clerk shall be against all

property, tangible or intangible, including funds, goods, chattels, credits, effects, debts

owned by or owed to the Defendant EASTWIND MARITIME S.A., or monies to be paid

to discharge a debt owed to the Defendant, including monies being electronically transferred

by or to TONNEVOLD REEFER 7 KS, a/ka TONNEVOLD REEFER 2 KS, a/ka/

TONNEVOLD REEFER 4 KS, a/k/a O.T. TONNEVOLD AS, a/k/a TONNEVOLD OT

which are in the possession or control of, or being transferred through any garnishee within

this District, including, without limitation, property held by or in the possession or control of

the following garnishee(s):

1. ABN AMRO Bank N.V.
   55 East 52nd Street
   New York, New York 10055

2. American Express Bank Ltd.
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America
   575 Lexington Avenue, 10th floor
   New York, New York 10022

3. Bank of America, National Association
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America, N.A.
   575 Lexington Avenue, 10th floor
   New York, New York 10022

4. Bank of China
   410 Madison Avenue
   New York, New York 10017

5. Bank of New York Mellon
   120 Broadway, 19th Floor
   New York, New York

6. Citibank, N.A.
   Legal Service Intake Unit
   1 Court Square, 7th Floor
   Long Island City, NY 11120

7. Deutsche Bank Trust Company Americas
   60 Wall Street
   New York, New York 10005

2

8.    DnB NOR Bank ASA
      200 Park Avenue, (31st Floor)
      New York, NY 10022 0396

9.    HSBC Bank U.S.A., National Association
      452 Fifth Avenue
      New York, New York

10.   JPMorgan Chase Bank, National Association
      One Chase Manhattan Plaza
      New York, New York 10081

11.   Nordea Bank Finland Plc
      437 Madison Avenue
      New York, NY 10022 7001

12.   Nordea Bank Norge ASA
      437 Madison Avenue
      New York, NY 10022 7001

13.   Skandinaviska Enskilda Banken
      245 Park Avenue
      New York, NY 10167 0061

14.   Standard Chartered Bank
      One Madison Avenue
      New York, NY 10010

15.   Swedbank New York Branch
      One Penn Plaza, 15th Floor
      New York, New York 10119

16.   UBS AG
      299 Park Avenue
      New York, New York, 10017

17.   Wachovia Bank, National Association
      11 Penn Plaza
      New York, New York 10001

or any of their affiliates and any other garnishee(s) within this district upon whom a copy

of the Process of Maritime Attachment and Garnishment herein may be served, in an

amount up to the amount sued for, *i.e.*, **$452,616.48**, it is further

3

**ORDERED** that any person claiming an interest in the property attached or garnished pursuant to said Order shall, upon application to the Court, be entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment and garnishment should not be vacated or other relief granted, and it is further

**ORDERED** that a copy of this Order be attached to and served with the said Process of Maritime Attachment and Garnishment, and it is further

**ORDERED** that pursuant to Fed. R. Civ. P., Supplemental Rules for Certain Admiralty and Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any person, who is not less than 18 years old, and who is not a party to this action, and it is further

**ORDERED** that service on any garnishee(s) (i.e. any original garnishee or any garnishee herein) is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day, and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that following initial service upon any garnishee by the United States Marshal or any other person designated by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment shall thereafter be made by way of service of a copy of the Process of Maritime Attachment and Garnishment via facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served, and it is further

**ORDERED** that supplemental process enforcing this Order may be issued by the Clerk and served without further Order of the Court.

4

Dated: New York, New York
      April 2, 2008

SO ORDERED:

_____
U. S. D. J.

# EXHIBIT 3

# CHALOS, O'CONNOR & DUFFY

## ATTORNEYS AT LAW

Michael G. Chalos
Eugene J. O'Connor
George M. Chalos
Owen F. Duffy
Leroy S. Corsa
Timothy Semenoro*
Brian T. McCarthy
George E. Murray

366 MAIN STREET
PORT WASHINGTON, NEW YORK 11050-3120

TELEPHONE (516) 767-3600
TELECOPIER (516) 767-3605 & 3925
WEBSITE: WWW.CODUS-LAW.COM

*Admitted in NY & NJ

Owen F. Duffy
Partner
ofd@codus-law.com

April 14, 2008

Tonnevold Reefer 7 KS
1 Odden
4891 Grimstad
Norway
Tel.: +47 37 25 89 00

*Via DHL*

Re:    Eastwind Maritime S.A, v. Tonnevold Reefer 7 KS
S.D.N.Y. Index No. 08 CV 3292 (HB)
Our ref.: 500115.019

## *Notice of Lawsuit and Maritime Attachment*

Dear Sirs:

We are New York attorneys, who represent Eastwind Maritime S.A. in the above-referenced matter.

The purpose of this letter is to provide you with Notice of a Lawsuit that has been commenced by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS in the U.S. District Court for the Southern District of New York. Additionally, the purpose of this letter is to provide you with Notice, in accordance with Fed. R. Civ. P. Supplemental Rule B(2), that property belonging to Tonnevold Reefer 7 KS is being restrained pursuant to Process of Maritime Attachment issued by the U.S. District Court for the Southern District of New York. The property, *i.e.* money, has been restrained, and will be held pursuant to the Court's Order, to secure the claim asserted by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS for security in Eastwind Maritime S.A.'s dispute with Tonnevold Reefer 7 KS regarding its breach of the charter party dated December 6, 2006 and its three addenda, between Eastwind Maritime S.A. and Tonnevold Reefer 7 KS for the ship the M/V THORGULL.

CHALOS, O'CONNOR & DUFFY LLP

In order to protect our client's rights in this matter, we have initiated a lawsuit against Tonnevold Reefer 7 KS in the U.S. District Court for the Southern District of New York. Briefly stated, the lawsuit in New York was initiated to make use of the Supplemental Rules for Admiralty or Maritime Claims, which provide for a Maritime Attachment procedure whereby a defendant's assets can be attached to obtain security or satisfy an award that arises out of another legal proceeding such as arbitration in London.

The purpose of this letter is to provide you with formal Notice of the Lawsuit and Notice of the Attachment as required by Rule B(2) of the Supplemental Rules for Admiralty or Maritime Claims.

Accordingly, **PLEASE TAKE NOTICE** that the lawsuit filed by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS in New York is as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
EASTWIND MARITIME S.A.,

                      Plaintiff,

                                       08  CV  3292 (HB)

       v.

TONNEVOLD REEFER 7 KS,
a/ka TONNEVOLD REEFER 2 KS,
a/ka/ TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                      Defendant.
-------------------------------------------------------------X

Copies of the relevant pleadings that were filed in the case to obtain Process of Maritime Attachment and the Court's Orders are attached herewith for your guidance. These enclosed documents are the following:

1.   Verified Complaint, with Request for Issuance of Maritime Attachment and Garnishment, dated April 2, 2008;

2.   Order for Issuance of a Process of Maritime Attachment, dated April 2, 2008; and

3.   Process of Maritime Attachment and Garnishment, dated April 2, 2008.

Also attached is an original Summons for you to serve upon the Plaintiff's attorney an Answer in this action within thirty (30) days after receiving this letter, exclusive of the day of receipt. If you fail to serve an Answer upon the Plaintiff's attorney, judgment by default will be taken against you for the relief demanded in the Verified Complaint. You must also file your Answer with the Clerk of this Court within a reasonable period of time after service.

**PLEASE TAKE FURTHER NOTICE** that the Process of Maritime Attachment has been executed in that the Process of Maritime Attachment was served, among others, on JPMorgan Chase Bank. This garnishee-bank has confirmed that it is holding funds belonging to Tonnevold Reefer 7 KS in accordance with the Process of Maritime Attachment. The money that has been attached was $176,913.93 with the originator being Dreamship Pte. Ltd. and the intended beneficiary being Tonnevold Reefer 7 KS.

The total amount that is presently being restrained, $176,913.93, is insufficient to fully secure Eastwind Maritime S.A.'s claim in this matter. As such we are continuing to serve the Process of Maritime Attachment on JPMOrgan Chase Bank and other banks in New York so as to restrain any further funds that are being electronically transferred to or from Tonnevold Reefer 7 KS.

As set forth in Supplemental Rule E (4)(f), any person claiming an interest in such property is entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with the rules. We are, however, of the firm view that there are no grounds for the attachment to be vacated.

Alternatively, whenever Process of Maritime Attachment and Garnishment is issued, the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by the stipulation of the parties, conditioned to answer the

judgment of the court or any appellate court. The parties may stipulate the amount and nature of such security.

Under the circumstances, if you are interested in providing alternate security so as to release the attachment over its funds being held by the garnishee-bank, then I ask that you or your legal counsel contact the undersigned. If we fail to hear from you, we will eventually proceed to execute on such funds.

I thank you for your attention to this matter, and I look forward to hearing from you.

Very truly yours,

CHALOS, O'CONNOR & DUFFY, LLP

Owen F. Duffy

Encl.****
OFD:gem

# CHALOS, O'CONNOR & DUFFY
### ATTORNEYS AT LAW

Michael G. Chalos
Eugene J. O'Connor
George M. Chalos
Owen F. Duffy
Leroy S. Corsa
Timothy Semenoro*
Brian T. McCarthy
George E. Murray

*Admitted in NY & NJ

**366 MAIN STREET**
**PORT WASHINGTON, NEW YORK 11050-3120**

TELEPHONE (516) 767-3600
TELECOPIER (516) 767-3605 & 3925
WEBSITE: WWW.CODUS-LAW.COM

Owen F. Duffy
Partner
ofd@codus-law.com

**April 17, 2008**

O.T. Tonnevold AS
1 Odden
4891 Grimstad                                     ***Via DHL***
Norway
Tel.:  +47 37 25 89 00

Re:    Eastwind Maritime S.A. v. Tonnevold Reefer 7 KS
        S.D.N.Y. Index No. 08 CV 3292 (HB)
        Our ref.: 500115.019

## _Notice of Additional Funds Restrained pursuant to  Maritime Attachment_

Dear Sirs:

As you know, we are New York attorneys who represent Eastwind Maritime S.A. in the above-referenced matter.

We provided you by letter dated April 14, 2008 with Notice of a Lawsuit that has been commenced by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS, also known as O.T. Tonnevold AS, in the U.S. District Court for the Southern District of New York. Additionally, we provided you Notice, in accordance with Fed. R. Civ. P. Supplemental Rule B(2), that property belonging to Toonevold Reefer 7 KS is being restrained pursuant to Process of Maritime Attachment issued by the U.S. District Court for the Southern District of New York. The property, *i.e.* money, has been restrained, and will be held pursuant to the Court's Order, to secure the claim asserted by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS regarding its breach of the charter party dated December 6, 2006 and its three addenda, between Eastwind Maritime S.A. and Tonnevold Reefer 7 KS for the ship the M/V THORGULL.

**CHALOS, O'CONNOR & DUFFY LLP**

We now write to you so that you may,

**PLEASE TAKE FURTHER NOTICE** that the Process of Maritime Attachment has been executed in that the Process of Maritime Attachment was served, among others, on Citibank. This garnishee bank has confirmed that they are holding funds belonging to O.T. Tonnevold AS in accordance with the Process of Maritime Attachment. Citibank restrained $8,525.00 on April 16, 2008 and informed us of this attachment on April 17, 2008.

As such the $8,525.00 has been restrained in this matter. This is in addition to the $176,913.93 which we informed you of in our letter of April 14, 2008.

The total amount that is presently being restrained, $185,438.93, is insufficient to fully secure Eastwind Maritime S.A's claim of $452,616.48. As such we are continuing to serve the Process of Maritime Attachment on Citibank and other banks in New York so as to restrain any further funds that are being electronically transferred to or from Tonnevold Reefer 7 KS or any of its aliases.

As set forth in Supplemental Rule E (4)(f), any person claiming an interest in such property is entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with the rules. We are, however, of the firm view that there are no grounds for the attachment to be vacated.

Alternatively, whenever Process of Maritime Attachment and Garnishment is issued, the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by the stipulation of the parties, conditioned to answer the judgment of the court or any appellate court. The parties may stipulate the amount and nature of such security.

Under the circumstances, if you are interested in providing alternate security so as to release the attachment over its funds being held by the garnishee-bank and to prevent the attachment of additional funds, then I ask that you or your legal counsel contact the undersigned. If we fail to hear from you, we will eventually proceed to execute on such funds.

CHALOS, O'CONNOR & DUFFY LLP                                          2

I thank you for your attention to this matter, and I look forward to hearing from you.

Very truly yours,

CHALOS, O'CONNOR & DUFFY, LLP

Owen F. Duffy

OFD:gem

# CHALOS, O'CONNOR & DUFFY

### ATTORNEYS AT LAW

Michael G. Chalos
Eugene J. O'Connor
George M. Chalos
Owen F. Duffy
Leroy S. Corsa
Timothy Semenoro*
Brian T. McCarthy
George E. Murray

*Admitted in NY & NJ

**366 MAIN STREET**
**PORT WASHINGTON, NEW YORK 11050-3120**

TELEPHONE (516) 767-3600
TELECOPIER (516) 767-3605 & 3925
WEBSITE: WWW.CODUS-LAW.COM

Owen F. Duffy
Partner
ofd@codus-law.com

**April 18, 2008**

Tonnevold Reefer 7 KS
1 Odden
4891 Grimstad
Norway
Tel.: +47 37 25 89 00

*Via DHL*

Re:    Eastwind Maritime S.A. v. Tonnevold Reefer 7 KS
S.D.N.Y. Index No. 08 CV 3292 (HB)
Our ref.: 500115.019

## *Notice of Additional Funds Restrained pursuant to Maritime Attachment*

Dear Sirs:

As you know, we are New York attorneys who represent Eastwind Maritime S.A. in the above-referenced matter.

We provided you by letter dated April 14, 2008 with Notice of a Lawsuit that has been commenced by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS in the U.S. District Court for the Southern District of New York. Additionally, we provided you Notice, in accordance with Fed. R. Civ. P. Supplemental Rule B(2), that property belonging to Tonnevold Reefer 7 KS is being restrained pursuant to Process of Maritime Attachment issued by the U.S. District Court for the Southern District of New York. The property, *i.e.* money, has been restrained, and will be held pursuant to the Court's Order, to secure the claim asserted by Eastwind Maritime S.A. against Tonnevold Reefer 7 KS regarding its breach of the charter party dated December 6, 2006 and its three addenda, between Eastwind Maritime S.A. and Tonnevold Reefer 7 KS for the ship the M/V THORGULL.

**CHALOS, O'CONNOR & DUFFY LLP**

Additionally, by letter dated April 17, 2008, we provided you with notice that additional funds had been restrained in this matter.

We now write to you so that you may,

**PLEASE TAKE FURTHER NOTICE** that the Process of Maritime Attachment has been executed in that the Process of Maritime Attachment was served, among others, on Citibank. This garnishee bank has confirmed that they are holding funds belonging to Tonnevold Reefer 7 KS in accordance with the Process of Maritime Attachment. Citibank restrained $2,195.15 on April 18, 2008.

As such the $2,195.15 has been restrained in this matter. This is in addition to the $176,913.93 which we informed you of in our letter of April 14, 2008 and the $8,525.00 which we informed you of in our letter of April 17, 2008.

The total amount that is presently being restrained, $187,634.08, is insufficient to fully secure Eastwind Maritime S.A's claim of $452,616.48. As such we are continuing to serve the Process of Maritime Attachment on Citibank and other banks in New York so as to restrain any further funds that are being electronically transferred to or from Tonnevold Reefer 7 KS or any of its aliases.

As set forth in Supplemental Rule E (4)(f), any person claiming an interest in such property is entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with the rules. We are, however, of the firm view that there are no grounds for the attachment to be vacated.

Alternatively, whenever Process of Maritime Attachment and Garnishment is issued, the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by the stipulation of the parties, conditioned to answer the judgment of the court or any appellate court. The parties may stipulate the amount and nature of such security.

CHALOS, O'CONNOR & DUFFY LLP

Under the circumstances, if you are interested in providing alternate security so as to release the attachment over its funds being held by the garnishee-bank and to prevent the attachment of additional funds, then I ask that you or your legal counsel contact the undersigned. If we fail to hear from you, we will eventually proceed to execute on such funds.

I thank you for your attention to this matter, and I look forward to hearing from you.

Very truly yours,

CHALOS, O'CONNOR & DUFFY, LLP

Owen F. Duffy

OFD:gem

# EXHIBIT 4

William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
TONNEVOLD REEFER 7 KS, A/K/A,
TONNEVOLD REEFER 4 KS, A/K/A, AND
O.T TONNEVOLD AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EASTWIND MARITIME, S.A.<br><br>                    Plaintiff,<br><br>          -against-<br><br>TONNEVOLD REEFER 7 KS,<br>a/k/a TONNEVOLD REEFER 2 KS,<br>a/k/a TONNEVOLD REEFER 4 KS,<br>a/k/a O.T. TONNEVOLD AS,<br>a/k/a TONNEVOLD OT,<br><br>                    Defendant. | 08 Civ. 03292 (HB)<br><br>**VERIFIED ANSWER**<br>**AND COUNTER-CLAIM** |

NOW COMES Defendant, Tonnevold Reefer 7 KS, A/K/A, Tonnevold Reefer 4 KS, A/K/A, O.T. Tonnevold AS, A/K/A, and Tonnevold OT (collectively "Tonnevold" or "Defendant"), by and through its attorneys, Holland & Knight LLP, answering the Complaint of Eastwind Maritime, S.A. ("Eastwind"), and respectfully alleging as follows:

    1.    Admits the allegations set forth in paragraph "1" of the Verified Complaint.

2.    Admits Eastwind Maritime Inc. lists on its website an office at 444 Madison Avenue, New York, New York, 10022, but denies having knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth in paragraph "2" of the Verified Complaint.

3.    Admits the allegations set forth in paragraph "3" of the Verified Complaint.

4.    Admits the allegations set forth in paragraph "4" of the Verified Complaint.

5.    Admits Tonnevold is the registered owner of the *M/V Thorgull ("Thorgull"* or "Vessel"), and denies the remainder of the allegations set forth in paragraph "5" of the Verified Complaint.

6.    Admits that Tonnevold Reefer 4 KS originally entered into a time charter for the *Thorgull* with ECo Shipping Ltd. ("ECo") on or about September 29, 2000, and denies the remainder of the allegations set forth in paragraph "6" of the Verified Complaint.

7.    Admits that Tonnevold agreed to enter into a mitigating charter party with ECo and Eastwind on or about December 6, 2006 ("Mitigating Charter"), after ECo and Eastwind breached the December 20, 2005 charter between Tonnevold Reefer 7 KS, a successor corporation, and ECo ("Breaching Charter"), and denies the remainder of the allegations set forth in paragraph "7" of the Verified Complaint.

8.    Admits that Tonnevold, ECo and Eastwind agreed to three addenda to the Mitigating Charter in connection with the Vessel, and denies the remainder of the allegations set forth in paragraph "8" of the Verified Complaint.

9.    Admits that Tonnevold, ECo and Eastwind agreed to a third addendum to the Mitigating Charter on or about July 19, 2007, for the Vessel and that the Vessel carried cocoa

2

beans shipped from Panjang, Malaysia to Buenaventura, Columbia, and  denies the remainder of the allegations set forth in paragraph "9" of the Verified Complaint.

10.     Admits that the third addendum between Tonnevold, ECo and Eastwind is a maritime contract, but denies the remainder of the allegations set forth in paragraph "10" of the Verified Complaint.

11.     Admits that with respect to the voyage from Penjang to Buenaventura, ECo and Eastwind made regular and timely hire payments to Tonnevold, and denies the remainder of the allegations set forth in paragraph "11" of the Verified Complaint.

12.     Denies the allegations set forth in paragraph "12" of the Verified Complaint.

13.     Admits that ECo and Eastwind have demanded Tonnevold pay $297,748.04 in connection with the Vessel and that Tonnevold has not made payment to ECo and/or Eastwind in the amount claimed in paragraphs "12" and "14" of the Verified Complaint due to ECo and Eastwind's breach of the Breaching Charter, and denies the remainder of the allegations set forth in paragraph "13" of the Verified Complaint.

14.     Denies the allegations set forth in paragraph "14" of the Verified Complaint.

15.     Admits that the charter between Tonnevold, ECo and Eastwind provides, at clause 22, that any disputes arising out of the charter shall be governed by English law and shall be referred to arbitration in London, and denies the remainder of the allegations set forth in paragraph "15" of the Verified Complaint.

16.     Paragraph "16" asserts legal conclusions to which no response is required.

17.     Denies having knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in paragraph "17" of the Verified Complaint.

18.     Denies the allegations set forth in paragraph "18" of the Verified Complaint.

19.    Admit that at least one garnishee bank in this District has attached monies in connection with this action, and that an arbitration will decide the merits of the dispute between the parties, and denies the remainder of the allegations set forth in paragraph "19" of the Verified Complaint.

20.    Admit that at least one garnishee bank in this District has attached monies in connection with this action, and denies the remainder of the allegations set forth in paragraph "20" of the Verified Complaint.

21.    Admits Tonnevold cannot be found within the Southern District of New York within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Forfeiture Actions of the Federal Rules of Civil Procedure, and asserts the statement in paragraph "21" of the Verified Complaint concerning the affidavit of Owen F. Duffy is a legal conclusion to which no response is required.

22.    Paragraph "22" asserts legal conclusions to which no response is required.

### FURTHER ANSWERING THE COMPLAINT, AND AS FOR SEPARATE, PARTIAL AND/OR COMPLETE DEFENSES THERETO, DEFENDANT TONNEVOLD STATES:

23.    The Verified Complaint fails to state a cause of action upon which relief may be granted.

24.    Tonnevold is not liable to ECo and Eastwind on the causes of action alleged in the Verified Complaint.

25.    This Court lacks *quasi in rem* jurisdiction over Defendant.

26.    ECo and Eastwind has improperly and/or insufficiently served process on Tonnevold.

27.    Eco and Eastwind's claims are barred by the equitable doctrine of unclean hands.

28.    Any damages sustained by ECo and Eastwind, as alleged in the Verified Complaint, were proximately caused by the negligent acts of third persons whom Tonnevold has no direction or control.

29.    ECo and Eastwind's claims are overstated in the level of security sought from and provided by Tonnevold and should be reduced to a reasonable sum.

30.    Tonnevold pleads by way of defense and/or limitation every provision in the Breaching Charter, Mitigating Charter, and the addendums to the Mitigating Charter.

31.    Eco and Eastwind's claims are subject to arbitration in London, England and English law pursuant to the Breaching Charter, the Mitigating Charter, and the addendums to the Mitigating Charter, and Tonnevold has no liability to ECo and Eastwind as a matter of law.

32.    This Answer and Counter-claim is made without waiver of any of the jurisdictional defenses or rights to arbitrate that may exist between Tonnevold, ECo, and Eastwind.

### TONNEVOLD'S COUNTER-CLAIM
#### (Breach of a Maritime Contract)

As for its Counter-claim against Eastwind and ECo, Tonnevold alleges as follows:

33.    Admiralty and maritime jurisdiction lies pursuant to 28 U.S.C. §1333(1) for Tonnevold's counter-claim, as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

34.    At all material times herein, Tonnevold is a foreign business entity organized and existing under the laws of Norway, and maintains a place of business in Grimstad, Norway.

5

35.     Upon information and belief, at all times material herein, Eastwind is and was a business entity organized and existing under the laws of a foreign country, and claiming an office in the United States at 444 Madison Avenue, New York, New York 10022.

36.     Upon information and belief, at all times material herein, ECo, alter-ego of Eastwind, is and was a business entity organized and existing under the laws of a foreign country, maintaining a place of business at 80 Broad Street, Monrovia, Liberia.

**The Charter**

37.     On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a time charter of the *Thorgull* with ECo for a period of about twelve months, which charter was extended by the agreement of the parties until December 20, 2005.  On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a pool agreement with ECo to include the *Thorgull.*

38.     On or about December 20, 2005, a successor to Tonnevold Reefer 4 KS, Tonnevold Reefer 7 KS, entered into a charter with ECo for charter of the *Thorgull* for a period of about twelve months (the "Charter").  At the same time, Tonnevold Reefer 7 KS and ECo entered into a new pooling agreement with respect to the Vessel, named "ECo 2002 Pool Agreement" ("Pooling Agreement 02").  Both the Charter and the Pooling Agreement 02 were executed by Mr. Charles T. ("Toby") Moors, Vice President of ECo Shipping.

39.     Pursuant to the Charter and while in the employ of ECo, the *Thorgull* performed a voyage from Los Palmas, Canary Islands to Tarifa, Spain from August 7 – September 18, 2006. During the voyage, the *Thorgull*, under the control of ECo and Eastwind, received for on-carriage recently-caught redfish from at least seven fishing vessels at sea.

6

40.    All of the vessels from which the *Thorgull* received transshipments had been blacklisted by North East Atlantic Fisheries Commission ("NEAFC") and Northwest Atlantic Fisheries Organization ("NAFO") for activity that had contravened the NEAFC and NAFO rules and regulations.

41.    In receiving redfish for on-carriage for the blacklisted vessels, ECo violated the NEAFC regulations, specifically Article 44 of the NEAFC Scheme of Control and Enforcement ("NEAFC Enforcement"), which prohibited such on-carriage of certain protected fish species, such as redfish.

42.    The NEAFC is a Regional Fisheries Management Organization ("RFMO") that exists to conserve and manage the fishery resources of the northeast region of the Atlantic Ocean. The NAFO is another RFMO that exists to protect the fishery resources in a contiguous area, the northwest Atlantic Ocean.

43.    This violation of the NEAFC rules and regulations is illegal activity in breach of Charter Clause 15, which requires that ECo and Eastwind employ the Vessel in "lawful trades."

44.    As a result of the breach, NEAFC placed the *Thorgull* on the blacklist on November 17, 2006 and NAFO placed the "Thorgull" in its blacklist on February 23, 2007.

45.    Through the diligent efforts of Tonnevold, the *Thorgull* was removed from the NEAFC blacklist on November 16, 2007, approximately one year after it was placed on the list, and from the NAFO blacklist thereafter.

46.    As a result of the blacklisting of the Vessel, Tonnevold was unable to charter the vessel at market rate. In order to mitigate the damages caused by ECo's breach of the Charter, its alter-ego Eastwind agreed to charter the *Thorgull* while the Vessel was blacklisted.

7

47.     On December 6, 2006, ECo, through its alter-ego Eastwind, and Tonnevold entered into a charter for a period of "about 60 days" as part of ECo and Eastwind's agreement to employ the *Thorgull* during the period it was blacklisted, the Mitigating Charter.

48.     There were three single-page addenda to the Mitigating Charter; Addendum Number 1 is dated February 13, 2007, Addendum Number 2 is dated April 19, 2007, and Addendum Number 3 is dated July 19, 2007. All three addenda incorporate by reference the terms of the Mitigating Charter except revising *inter alia*, delivery, cargo, and hire information for the Vessel and identify Eastwind (acting on behalf of ECo), as Charterers, and Tonnevold, as Owners.

**ECo and Eastwind are Alter-egos**

49.     ECo is the alter-ego of Eastwind because it dominates and disregards ECo's corporate form to the extent that Eastwind is actually carrying on ECo's business and operations as if the same were its own, or vice versa.

50.     In early 2006, Mr. Moors, acting on behalf of the interests of ECo and Eastwind, indicated to Tonnevold that the Pooling Agreement 02 would end because there were too few ships remaining in the pool and running the pool in New York resulted in high administrative accounting costs.

51.     Mr. Moors affirmed to Tonnevold that the *Thorgull*, while leaving the Pooling Agreement 02, would be chartered by Eastwind, on behalf of ECo, in an effort to keep the Vessel working even during the blacklist period. This indicates there existed such unity of ownership and interest between ECo and Eastwind that no separation exists such that the corporate form had been disregarded.

8

52.    On or about July 12, 2007, Paul Capkanis, of Eastwind Transport, Ltd., on behalf of ECo, reaffirmed Eastwind's continued intent to employ the *Thorgull* in a third addendum to the Mitigating Charter, continuing thereafter until the Vessel was de-listed by the NEAFC.

53.    Tonnevold's communications with ECo and Eastwind concerning the original charter in 2000, the breached Charter, the Mitigating Charter and addenda to that Charter have all involved the same personnel, interchangeably utilizing the same contact information for both entities, including identical mailing addresses, email addresses with the "Eastwind Group," facsimile numbers and telephone numbers, such that there is no meaningful difference between the two entities.

54.    On the Eastwind website, http://www.eastwindgroup.com, an Eastwind entity has a New York address of 444 Madison Avenue, Suite 200, New York, New York.  Plaintiff Eastwind interchanges itself and other members of the "Eastwind Group" in its Verified Complaint, noting Eastwind operates "from the offices of the "Eastwind Group," when in fact the website describes Eastwind Maritime Inc. as the chief management office.  No less than eight "Eastwind" entities are listed on the Eastwind website, none of them being Eastwind Maritime S.A.

55.    The New York State Department of State website lists ECo's address as 444 Madison Avenue, Suite 200, New York, the same address as Eastwind as noted on its website.

56.    Dun & Bradstreet and the New York State Department of State website list  John Kousi as the president and chief executive officer of both Eastwind and ECo.

57.    Both the Charter and the Pooling Agreement 02 were executed by Mr. Moors as

"Vice-President" on behalf of ECo shipping. Mr. Moors has also been identified as Vice-

President of Eastwind on Internet websites.

58.    The alter-ego relationship between ECo and the Eastwind Group is confirmed in

notice provision for Pooling Agreement 02, which states:

> any notices under this agreement may be delivered by mail, electronic mail, telex,
> or facsimile:
> ECo or the Pool, to
> c/o Eastwind Transport Ltd.
> 444 Madison Avenue
> Suite 200
> New York, NY 10022
> Facsimile: (212) 838-8439
> Telex: 420111 EWINDNY
> Email: eastwind@eastwindgroup.com

The address designated for ECo and Eastwind Transport Ltd. is the same address and facsimile

listed for Eastwind.

59.    Based on the foregoing circumstances, ECo used Eastwind to conduct business on

its behalf in an effort to mitigate the losses suffered by Tonnevold as a result of ECo's breach of

the Charter and despite ECo having provided no consideration to Eastwind. Alternatively, ECo

and Eastwind have commingled funds and/or otherwise have failed to observe corporate

formalities when entering into charter agreements.

60.    It is not a general practice in the maritime community, nor anywhere else, for

independent companies to allow other companies to enter into charter arrangements on its behalf.

61.    Disregard of corporate formalities when entering into binding agreements by one

independent company on behalf of another independent company are suggestive of a relationship

that is not "arms length" and support the alter-ego claim.

**Tonnevold Damages**

62.     As a result of the blacklisting and the ECo and Eastwind breach of the Charter,

Tonnevold has suffered damages in the amount of $836,601.22, as set forth below:

a.     Tonnevold made diligent efforts to have the *Thorgull* removed

from the NEAFC blacklist. The efforts to remove the Thorgull from the NEAFC blacklist cost

Tonnevold a total of $20,500 as a result of meetings and travel expenses on the part of

Tonnevold employees when negotiating with NEAFC.

b.     Tonnevold has been unable to charter the *Thorgull* on the market

and, instead, has been chartering it to Eastwind on a series of voyages at below market rate. The

loss of revenue while under the charter to Eastwind from January 1, 2007 – September 11, 2007

was $227,940.01.

c.     Despite Tonnevold's diligent efforts to charter the *Thorgull*, the

vessel was unemployed during September 12 - November 28, 2007, while the Vessel remained

blacklisted. Tonnevold's damages while the Vessel was unemployed was $424,129.21.

d.     As a result of the blacklisting, Tonnevold also suffered damages

due to additional expenses incurred in operating the Vessel amounting to a total of $164,032.00,

including $147,157.00 for the incremental expenses that Tonnevold incurred as the result of the

vessel not trading in its usual trade pattern. The incremental expenses are for crew travel,

consumables, and lubricants. The remaining $16,875 in losses is for the transportation of spare

parts from Halifax to Alexandria, Egypt, due to the Thorgull not being permitted to enter the port

at Halifax because it had been placed on the NEAFC blacklist.

63.    Tonnevold has filed for arbitration in accordance with the arbitration provisions contained in all of the Vessel charters described herein, and its Answer and counter-claim are not and cannot be considered a waiver of the parties' agreement to arbitrate.

### PRAYER FOR RELIEF

WHEREFORE, the Defendant Tonnevold respectfully requests:

1.    That this Court dismisses the Verified Complaint against Tonnevold with prejudice;

2.    That this Court cites ECo and Eastwind to answer under oath all allegations in this counter-claim;

3.    That pursuant to the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions, this Court issue an Order directing Eco and/or Eastwind to post counter-security in the sum of $836,601.22, failing which, (a) ECo and Eastwind be enjoined from prosecuting its claims against Tonnevold here, in the London arbitration, or any other venue; and/or (b) Eco and Eastwind's attachment of any and all of Tonnevold's property attached in this action pursuant to Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture Actions immediately be vacated;

4.    That upon the posting of counter-security in the sum of $836,601.22, that this matter be placed on the suspense calendar pending arbitration in London, and that this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

5.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the counter-claim set forth herein as a Judgment of this Court; and

6.    That this Court grant Tonnevold such other and further relief as the Court may

deem just and proper.

Dated:    New York, New York
April 18, 2008

HOLLAND & KNIGHT LLP

By: _____
William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Defendant*
Tonnevold

TO:    Chalos, O'Conner & Duffy, LLP
George E. Murphy
366 Main Street
Port Washington, NY 11050
Tel:  516-767-3600
Fax:  516-767-3605
*Attorneys for Plaintiff*

13

## VERIFICATION

STATE OF NEW YORK      )

                             :ss.:

COUNTY OF NEW YORK    )

CHRISTOPHER R. NOLAN, being duly sworn, deposes and says:

      I am associated with the firm of Holland & Knight LLP, counsel for Tonnevold, defendant in the foregoing action. I have read the foregoing Verified Answer and counter-claim and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Tonnevold and corresponded with Tonnevold's representatives regarding this matter. I am authorized by Tonnevold to make this verification, and the reason for my making it as opposed to an officer or director of Tonnevold is that there are none within the jurisdiction of this Honorable Court.

_____
Christopher R. Nolan

Sworn to before me this
18st day of April, 2008

_____
Notary Public

Linda M. Wilkens
Notary Public, State of New York
No. 01WI9672455
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 30, 2010

# 5268798_v1

14

# EXHIBIT 5

William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
TONNEVOLD REEFER 7 KS,
TONNEVOLD REEFER 4 KS, AND
O.T TONNEVOLD AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTWIND MARITIME, S.A.

                        Plaintiff,

        -against-

TONNEVOLD REEFER 7 KS,
a/k/a TONNEVOLD REEFER 2 KS,
a/k/a TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                        Defendant.

08 Civ. 03292 (HB)

**NOTICE OF MOTION**

**PLEASE TAKE NOTICE THAT** upon the declaration of Jan Sigvart Walle dated April 18, 2008, and the accompanying Memorandum of Law in Support, and all pleadings heretofore had in this matter, Defendant Tonnevold Reefer 7 KS, Tonnevold Reefer 4 KS, and O.T. Tonnevold AS (collectively "Tonnevold"), will move this Court, before the Honorable Harold Baer, United States District Judge, at 500 Pearl Street, Courtroom 23B, New York, New York, on a date to be set by this Honorable Court, for an order pursuant to Rule E(7)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, directing

(a) Plaintiff Eastwind Maritime S.A. to give security to Tonnevold for the damages demanded in

Tonnevold's counter-claim within 10 days from the issuance of the order; and (b) directing such

other and further relief as the Court may deem proper.

Dated: New York, New York
April 18, 2008

HOLLAND & KNIGHT LLP

By: _____

William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Defendant*
*Defendant Tonnevold Reefer 7 KS,*
*Tonnevold Reefer 4 KS, and*
*O.T. Tonnevold AS*

TO:    Chalos, O'Conner & Duffy, LLP
George E. Murphy
366 Main Street
Port Washington, NY 11050
Tel: 516-767-3600
Fax: 516-767-3605
*Attorneys for Plaintiff*

2

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EASTWIND MARITIME S.A.,

                            Plaintiff,

          -against-                                 08 CV 3292 (HB)

TONNEVOLD REEFER 7 KS,                      **DECLARATION OF**
a/k/a TONNEVOLD REEFER 2 KS,                **JOHN G. POLES**
a/k/a TONNEVOLD REEFER 4 KS,
a/k/a O.T. TONNEVOLD AS,
a/k/a TONNEVOLD OT,

                            Defendant.
----------------------------------------------------------X

          I, John G. Poles, declare under penalty of perjury under the laws of the

United States of America, pursuant to 28 U.S.C. § 1746 that the following is true and

correct:

          1.      I am a partner at the firm of Poles, Tublin, Stratakis, Gonzalez &

Weichert, LLP, representing non-party ECo Shipping Ltd. (hereinafter "ECo") in an

arbitration between ECo and a defendant named in the above-captioned case, and I make

this declaration in opposition to the request for counter-security requested by the

defendants herein from ECo in the amount of $836,601.22.

          2.      Our opposition is founded upon the fact that the counter-claim

being alleged by defendants herein does not arise from the transaction or the occurrence

that is the subject of the above named action. Consequently, Supplemental Rule E(7)(a)

is not applicable. The captioned action in which application for Rule B attachment in the

amount of $452,616.48 was made is being prosecuted by a different law firm, i.e. Chalos,

O'Connor & Duffy, LLP.

3.     It should be noted that ECo is not a named party to the above-captioned action and I have been informed by ECo that it has not been served in the above-captioned action.

4.     The above-captioned action was brought by a company that is distinct but related to ECo, namely Eastwind Maritime S.A. These companies are not alter egos of each other and maintain separate corporate existence.

5.     I am informed that the above-captioned action is grounded upon claims for hire, expenses and overpayment of hire. On the other hand, the alleged claim against ECo made by Tonnevold in a New York arbitration is an allegation that ECo illegally loaded "red fish", based upon a different charter party and pooling agreement.

6.     The charter which Tonnevold Reefer 7 KS (hereinafter "Tonnevold") has called for arbitration provides for New York arbitration. The charter which is the subject of the above-captioned action provides for London arbitration.

7.     The different charter party which is presently being arbitrated in New York between ECo and Tonnevold is dated December 20, 2005 and is a direct continuance of a time charter dated September 29, 2000 for use in a pooling arrangement. A copy of the charter and pool agreement are annexed hereto as Exhibits A and B.

8.     It is important to note that the different charter referred to in Paragraph 7 is presently being heard in arbitration in New York. The arbitrators have been duly appointed and the first hearing is set for June 11, 2008.

9.     The background of this separate, distinct transaction and occurrence is as follows:  Holland & Knight, representing the owners of the m/v THORGULL demanded arbitration on behalf of their client, Tonnevold against ECo,

represented by Poles, Tublin, Stratakis, Gonzalez & Weichert. The m/v THORGULL was specifically chartered to ECo on December 20, 2005 as a direct continuance of a time charter dated September 29, 2000 **for use in a pooling arrangement** which was a direct continuance of "ECo Pool Vessel Contribution Agreement 1999" (the "ECo 99 Pool Agreement"). As stated above, the time charter from owner to ECo provides for arbitration in New York pursuant to New York law before two (2) arbitrators; if the two (2) arbitrators did not agree, an umpire would be appointed by the two (2) arbitrators in order to resolve the deadlock. The ECo Pool Vessel Contribution Agreement (ECo 99 Pool Agreement) provided that, in case of conflict between the provisions of the ECo Pool Vessel Contribution Agreement and the provisions of the ECo Time 99 Charter party, the dispute would be resolved by arbitration in New York by a panel of three (3) arbitrators. For practicality, the attorneys for the respective parties, i.e., ECo and Tonnevold, agreed that any conflicts between the provisions of ECo 99 <u>Pool Agreement</u> and the provisions of ECo Time 99 <u>Charter Party</u>, shall be submitted to the same three (3) arbitrators in New York and the panel of arbitrators would resolve all disputes arising out of the <u>Time Charter dated December 20, 2005</u> and the ECo 2002 <u>Pool Agreement</u>. Hence, the duly constituted panel of three (3) arbitrators in New York have been appointed to resolve any disputes dealing with the Charter Party of December 2005 and the Pooling Agreement. **See arbitration clause 61 re charter party and arbitration clause 17 re pooling agreement.**

       10.    There is no relationship whatsoever between the claim being made which serves as the foundation of the action herein and the alleged claim being arbitrated before the duly constituted New York panel. The Charter Party dated December 20, 2005

and the Pooling Agreement is a completely separate type of transaction from the action

brought herein based upon a different charter dated December 6, 2006:

> A. In the New York Arbitration proceeding (December 20, 2005 charter and pooling agreement) the vessel was specifically chartered to be placed in a pooling arrangement with other vessels, whereupon the vessel would be operated out of the pool. In effect, the vessel became part of a cooperative venture, the operating rights or liabilities would be determined by the pool agreements and the charter party dated December 20, 2005.

> B. In the different direct charter between owner and charterer dated December 6, 2006, the vessel was not to be used as part of a pooling agreement and the arbitration clause provides for London arbitration pursuant to English law.

> C. I am informed that the above-captioned matter is, in fact, based on a Third Addendum to the Charter Party dated December 6, 2006, that was entered into between Eastwind Maritime S.A. and the Tonnevold entities. ECo was not a party to the addendums to the Charter Party dated December 6, 2006.

Hence, the character and type of transactions (the subject of the action

herein) are completely different and each provides for dispute resolution pursuant to

arbitration in different places under different laws.

11.    The claim which is the subject of the above-captioned action, deals

with matters of hire, expenses and overpayment of hire and is to be arbitrated in London

under English law; however, the alleged claim which the owner of the m/v THORGULL

is arbitrating in New York deals with the allegation of loading illegal red fish cargo.

12.    The arbitration clause which serves as a basis for the action herein

provides for London arbitration under terms of English law.

13.    The arbitration clauses which the owner seeks to resolve the illegal

red fish loading provides for arbitration in New York.

4

In summary, the charter contracts are different. The arbitration clauses contained therein are different in that they provide for resolution of disputes in different jurisdictions, venues and different laws. The charter being arbitrated in New York is controlled by a different charter party and a pooling agreement. The pooling agreement had expired prior to the charter which is the basis of the action herein. Consequently, the rights and liabilities of the parties are controlled by different contractual foundations.

The alleged claim which the owner of the m/v THORGULL seeks to employ for purposes of counter-security does not arise from the same transaction or occurrence which is the subject of the above-captioned action. Hence, the request for counter security is not subject to Supplemental Rule E(7)(a) and should be dismissed.

It is respectfully submitted that the claim for counter-security by the owner is merely a transparent attempt to lump two completely different transactions and occurrences (arising from different legal foundations) in order to avoid the fact that ECo is present in this jurisdiction and is therefore immune from prejudgment attachment actions in New York made pursuant to Rule B of the Supplemental Rules of the Federal Rules of Civil Procedure.

Dated: New York, New York
      May 28, 2008

By: _____
       John G. Poles

# EXHIBIT "A"



# ECO
## SHIPPING

ORIGINAL

# ECOTIME 99 – PART I
### Issued in January 1999

| | |
|---|---|
| **1.  Date**<br>29 September, 2000 | **4.  Charterers**<br><br>ECo Shipping Ltd.<br>80 Broad Street<br>Monrovia, Liberia |
| **2.  Vessel**<br>M/V Thorgull | |
| **3.  Owners**<br>Tonnevold Reefer 4 KS<br>C/- O.T. Tonnevold<br>Grimstad, Norway | **7.  Vessel's present position**<br><br>Far East. |
| | **8.  Place or range of delivery**<br><br>See ECo 99 Pool Agreement,  29 September, 2000<br>Clause 4 |
| **5.  Charter period**<br>Twelve (12) months<br>Plus / minus 30 days in charterers option | **9.  Time of delivery**<br>DOP Shanghai after Drydock 15-31, 2000. |
| **6.  Trading limits**<br><br>Within IWL excluding N. Korea, Finland, Laos, Cambodia. | **10.  Cancelling date**<br>N/A |
| | **11.   Place or range of redelivery**<br><br>Worldwide<br>see ECo 99 Pool Agreement 29 September , 2000 clause 6 |
| **12.  Delivery notices**<br>N/A | **13.  Redelivery notices**<br><br>See ECo 99 Pool Agreement clause 3 |
| **14.  Quantity of fuel on delivery**<br><br>A. IFO  max:          min:<br><br>B. MDO max:          min: | **16.   Fuel price  (If fixed price agreed, see clause 9)**<br><br>A.  Delivery IFO : As per ECo 99<br>          Pool Agreement 29 September, 2000.<br><br>B.  Delivery MDO : |
| **15.  Quantity of fuel on redelivery (see Clause 9)**<br><br>A. IFO max:          min:<br><br>B. MDO max:          min: | C.  Redelivery IFO :<br><br>D.  Redelivery MDO : |

**17. Vessel's**

A. Flag:  Liberia

B. Year/Month of building:  1983 / 02

C. Call sign:  E L T U 4

D Official reg. number:  10601

E. Telex system number  Inmarsat A - 1260746
Inmarsat C - 463677710

F. Trade factor:  REEFER

**18. Class**

A. Hull:  NK

B. Machinery:  NK

C. Ice:  N/A

D. Certificate for temp.
    between: -25 / +32 Cel

E. USDA-equipment
    Yes  X  No

F. USDA-certificate
    Yes     No  X

G. Live Car Certificate
    Yes     No  X

**19. Vessel's dimensions**

| | | | | | |
|---|---|---|---|---|---|
| Length over all | 145.58 | metres | Draft on full DW summer freeboard: | 6765 | |
| | | | Higher/closed shelter | N/A | metres |
| Beam moulded | 17.80 | metres | | | |
| | | | Lower/open shelter | N/A | metres |
| Draft, ballast | 4.45 | metres | | | |
| | | | Draft, banana laden | 5.84 | metres |

**20. Tonnage**

higher / lower

A. Gross:  6127  /

B. Panama:  6784 GRT / 5184 NRT

C. Deadweight all told in Mtons on summer freeboard:  6324.5

D. Net:  2699  /

E. Suez  6329.47 GRT / 5070.78 NRT

**21. Quantity of stores and freshwater not exceeding**
Stores 320 MT

**22. Operational bunker capacity in cbm) 85 % (CBM)**

IFO 380 :  902.6 /IFO 180 : 216.4          MDO:  119.9

**23. Main engines, speed and consumption**
Bunker viscosity:
IFO 180

Makers:    MITSUI B&W
Type:       8L45G FCA
BHP/MCR:   7890 PS
At RPM:     175 rpm

| Ordinary nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons |
| Full DWT | 17.5 | | | 17.0 | | | 15.5 | | |
| Full banana cargo | 17.5 | | | 17.0 | | | 15.5 | | |
| Ballast | 17.5 | | | 17.0 | | | 15.5 | | |

| Low speed nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons |
| Full DWT | | | | | | | | | |
| Full banana cargo | | | | | | | | | |
| Ballast | | | | | | | | | |

**24. Auxiliary engines**    Yanmar Diesel
Bunker viscosity/blend in percent:    180 CST

| Consumption at sea | Consumption in port |
|---|---|
| Min   1.6        and max   4.1    MTons per 24 hours | Min   1.6        and max   3.3    MTons per 24 hours |

A. Compartments furnished with elevator hatches:
N/A

B. Number of sideports each side:
Port:    4          Starboard:
Deck:    A          Deck:
Clear opening:   2.05 x 2.05 meters

C. Type of tween deck and weather deck hatch covers:
Weather deck – End rolling type
Tween deck - Folding type

D. Type of gratings:    Wooden Daiken
- thickness/material:    42 mm/Apiton plywood
- permissible weight of fork lift + cargo:   5.0    Mtons

E. All gratings flush?     Yes   X   No
-   if no, describe:

F. Container capacity:
on weather deck:    N/A      TEU
in holds:    N/A      TEU
Lashing material for          containers  N/A

G. Refer container capacity with plug in sets:
on weather deck:   N/A      TEU

H. Size of hatches (weather deck, hatch opening L x W)

Hatch No 1    7.03   x   5.32    metres
Hatch No. 2    7.03   x   5.32    metres
Hatch No 3    7.03   x   5.32    metres
Hatch No 4    7.03   x   5.31    metres
Hatch No.5     -    x    -    metres

I. Engine room between holds  No. 4  and  STERN

J. Permanent side shorings
Yes  X    No

K. Number of separately insulated compartments:
8

L. Number of compartments with separate cooling units:
8

### CBFT, minimum deck height (in meters) and deck area (in sqm)

| | Hatch No 5 | | Hatch No 4 | | Hatch No 3 | | Hatch No 2 | | Hatch No 1 | |
|---|---|---|---|---|---|---|---|---|---|---|
| H | | | 1716 | | 1716 | | 1716 | | 1850 | |
| | | | 1.30 | 37.40 | 1.30 | | 1.30 | 37.40 | 1.34 | 37.40 |
| FC | | | | | | | | | | |
| A | | | 20,738 | | 28,813 | | 28,135 | | 30,201 | |
| | | | 2.18 | 344.50 | 2.21 | 334.90 | 2.21 | 324.20 | 2.25 | 243.80 |
| B | | | 28,188 | | 28,464 | | 26,571 | | 16,372 | |
| | | | 2.19 | 331.20 | 2.17 | 339.30 | 2.17 | 311.80 | 2.17 | 175.60 |
| C | | | 25,607 | | 27,676 | | 24,229 | | 12,127 | |
| | | | 2.21 | 283.30 | 2.21 | 328.90 | 2.17 | 278.70 | 2.21 | 128.30 |
| D | | | | | | | | | | |
| E | | | | | | | | | | |
| T | | | 85,249 | 959.0 | 86,669 | 1003.10 | 80,651 | 914.7 | 60,550 | 547.7 |

H = Hatch coaming      FC = Forecastle      T = Total

Note: HORIZONTAL INSULATION to be marked with DOUBLE LINE

CBFT      BALE
----------------------------
min deck    Deck area
height

GRAND  TOTAL
----------------------------
CBFT         313,122
Deck area    3,424.5

26. Cargo gear

    A.  Number of cranes:  N/A
        SWL in MTons:

    B.  Number of derricks:  8
        SWL in MTons:    5.0
        Union purchase capacity in MTons:  3.5

    C.  Other type of gear:  N/A
        Lifting capacity:

27. Refrigeration and ventilation

    A.  Vessel has Tobson or Ductless ventilation system
        DUCTLESS

    B.  Air is circulated upwards or downwards:
        UPWARDS

    C.  Hatch coamings are ventilated
        Yes ☐ X      No ☐

    D.  Number of air circulations per hour:  90 / 45

    E.  Number of fresh air renewals per hour:  4 / 1.5

    F.  Ozone generators
        Yes ☐ X      No ☐

    G.  Refrigeration capacity (0°C evaporation
        temperature and 30°C cooling water temperature)
        kcal/hr: 330,000 Kcal/hr

28.  Passengers      NONE

    Number of berths:      Price per day:

29.  Meals, telegrams, entertainment etc (state, if agreed, lump sum per month)

    USD 800

30.  Hire payment in US dollars (state, mode and place of payment; also beneficiary and bank account no.)  See ECo99 Pool Agreement 29 September, 2000.

Finansbanken ASA, P.O. Box 817 Sentrum, N - 0104 Oslo, Norway

Acct No.:  9680 55 16361  for account of Tonnevold Reefer 4 KS

31.  Remarks:

In the event of a default by ECo in the performance of its obligations under this Charter-Party that shall not have been cured within a reasonable period, the owners may unilaterally terminate this Charter-Party and withdraw the vessel from ECo's service without economic penalty arising from the withdrawal.

Owners to pay a commission of 1.25 % to Orion Shipping AS, Oslo on net payments from the Pool

It is mutually agreed that this contract shall be performed subject to the terms and conditions contained in this Charter, which shall include Part I as well as Part II.

AS Agent for Tonnevold Reefer 4 KS
Signature for the Owners      Signature for ECo Shipping Ltd.

# ECoTIME 99 – Part II

## Issued in January 1999

ORIGINAL

| | |
|---|---|
| **DATE :** | **29 SEPTEMBER, 2000** |
| **VESSEL :** | **MV THORGULL** |
| **OWNERS :** | **O.T. TONNEVOLD**<br>**GRIMSTAD**<br>**NORWAY** |



ECo
SHIPPING

It is agreed between the party mentioned above and in Box 3 as Owners ("the Owners", which shall include Disponent Owners) of the Vessel named in Box 2 ("the Vessel") now in position as stated in Box 7, and ECo Shipping Ltd ("ECo") as Charterers on the terms and conditions set out below.    1 / 2 / 3 / 4

**A PERIOD DELIVERY AND REDELIVERY**    5
**1. Period and place of delivery**    6
The Owners agree to let and ECo agree to hire the Vessel for the period stated in Box 5 ("the Charter period") from the time the Vessel is delivered and placed at the disposal of ECo at the place or range stated in Box 8.    7 / 8 / 9

**1. The Vessel's condition on delivery**    10
It is a condition of the Charter that, on delivery, the Vessel shall be in accordance with the terms and conditions of the Charter, be ready to receive cargo, seaworthy and in every way fitted for service, with refrigerated holds cleaned and swept and fully prepared for the proper carriage of cargoes within the limits of the Charter, with gantage complete throughout and with a Master and a full and proper complement of Officers and Crew. Acceptance of delivery of the Vessel shall not constitute a waiver of ECo's rights under the Charter.    11 / 12 / 13 / 14 / 15 / 16 / 17

**3. Time for delivery**    18
The Vessel to be delivered at any time, day or night, weekdays or holidays, not before the date stated in Box 9. The Owners to give ECo not less than the period of notice stated in Box 12 of the date on which the Vessel is expected to be ready for delivery. The Owners to keep ECo closely advised of possible changes in the Vessel's position and expected date of delivery.    19 / 20 / 21 / 22 / 23

**4. Cancelling**    24
Should the Vessel not be delivered by the date and time indicated in Box 10, ECo to have the option of cancelling. If the Vessel cannot be delivered by the date and the time indicated in Box 9, ECo, if required by Owners, to declare within 7 days after receiving notice thereof whether they cancel or will take delivery of the Vessel.    25 / 26 / 27 / 28 / 29

**5. Redelivery**    30
The Vessel to be redelivered at any time, day or night, weekdays or holidays, on the expiration of the Charter at the place or range stated in Box 11. ECo to give the Owners notices of redelivery as stated in Box 13. ECo to keep the Owners closely advised of possible changes in the Vessel's position and expected date of redelivery.    31 / 32 / 33 / 34 / 35

**6. Late redelivery**    36
Should the Vessel be ordered on a voyage by which the Charter period is exceeded, ECo to have the use of the Vessel to enable them to complete the voyage provided it could reasonably have been calculated at the date the orders were given to the Vessel that the voyage would allow redelivery at about the end of the charter period.    37 / 38 / 39 / 40 / 41

**7. The Vessel's condition on redelivery**    42
On redelivery the Vessel's holds to be properly swept and cleaned.    43

**8. Surveys**    44
A joint survey on delivery to be arranged by the Owners and effected in their time. A joint survey on redelivery to be arranged by ECo and effected in their time. Costs for both surveys to be shared equally. ECo shall have the discretion to waive this clause by timely notice to the owners.    45 / 46 / 47 / 48

**9. Fuel**    49
The Vessel to be redelivered with not less than the quantity of fuel specified in Box 14. The Vessel to be redelivered with about the same quantity of fuel on board as on delivery unless otherwise agreed in Box 15.
ECo at port or place of delivery and the Owners at port or place of redelivery to take over and pay for all fuel remaining in the Vessel's bunkers in accordance with paragraph 4 (b) of the ECo99 Pool Agreement of Jan. 1, 1999..    50 / 51 / 52 / 53 / 54 / 55

**B. THE VESSEL**    56
**10. Description**    57
It is a condition of the Charter that, on delivery and throughout the Charter period, the Vessel shall in all respect conform to the description contained in Part I and any additional Clauses of the Charter and, in the event that the Vessel is described herein as a new building, to the specifications agreed between the Owners and the builder, and that, throughout the Charter period, she shall be maintained by the Owners in a like state and in accordance with OA-plans or similar handed over to ECo.    58 / 59 / 60 / 61 / 62 / 63 / 64

**11. Maintenance, repairs and manning**    65
It is a condition of the Charter that throughout the Charter period the Owners will maintain the Vessel (including bottom cleaning and cleaning of the hold) as a first-class reefer in a thoroughly efficient state in hull, machinery, refrigerating plant, cargo hold and cargo gear and at all times capable of maintaining the obligations warranted in Box 23.
The Owners will ensure that the Vessel is at all times manned with an experienced Master, Officers and Crew, fully qualified for trading and handling the Vessel and cargo within the limits of the Charter, and with Master capable of speaking, reading and writing in the English language.
For intermediate hold cleaning ECo to pay owners a lumpsum compensation of USD 600 for sweeping and USD 500 for sweeping/washing always subject to such cleaning not being prevented by any regulation or agreement, safety or duration of the ballast voyage.    66 / 67 / 68 / 69 / 70 / 71 / 72 / 73 / 74 / 75 / 76 / 77 / 78

**12. Maintenance and repair of gratings**    79
The Owners shall maintain the gratings in good condition, well fitting and sound. The gratings to be thoroughly inspected upon completion of discharge and damage, if any, to be properly repaired before next loading.
ECo or their representatives have the right to inspect the condition of the gratings at all times    80 / 81 / 82 / 83 / 84

The Vessel shall keep a sufficient stock of spare gratings and material on board.    85
If the gratings are not permanently fixed the grating pieces are to be marked to enable identification when they are replaced.    86 / 87
If the Owners should fail to comply with the requirements of this Clause, then ECo shall be entitled to recover damages for any loss which they may suffer as a result thereof, and to put the Vessel off-hire for any period lost by reason of such failure.    88 / 89 / 90 / 91

**13. Drydocking**    92
The Owners to put the Vessel closely informed about their long-range drydocking programme. Actual time and place for drydocking and other planned repairs and maintenance to be mutually agreed save that ECo shall be under no obligation to agree to any drydocking or repairs taking place between 1st February and 10th June in any calendar year unless specifically required by the Classification Society or as a result of underwater damage requiring immediate drydocking. All extra costs, including but not limited to extra costs for fuel and bunkering, in connection with drydocking or repairing to be borne by the Owners. For the purposes of this Clause, dry-docking and other planned repairs and maintenance shall include the cleaning of the Vessel's bottom so as to enable her to comply with the provisions of Clause 10 hereof.    93 / 94 / 95 / 96 / 97 / 98 / 99 / 100 / 101 / A / 101

**14. Compliance and manning**    102
The Owners are to ensure throughout the currency of this Charter:    103
(a) that the Vessel is provided with such technical equipment, navigational aids and certificates relating to safety, pollution, equipment and freedom to trade as will enable her to trade without hindrance in accordance with the terms of this Charter and    104 / 105 / 106 / 107
(b) that the terms and conditions on which the Master, Officers and Crew are engaged are in compliance with the minimum current requirement of the ITF collective agreement for worldwide trading or such equivalent as may be necessary for such trading henceforward, and that any necessary certificate to that effect shall be provided on board the Vessel,    108 / 109 / 110 / 111 / 112
and, in the event of any breach of this Clause, or any delay or hindrance to the Vessel resulting therefrom, ECo shall be entitled to recover damages for and be indemnified against any such breach and to put the Vessel off-hire for any period of time lost by reason thereof.    113 / 114 / 115 / 116

**15. Trade**    117
The Vessel to be employed in lawful trades, within the limits stated in Box 6, between good and safe ports or places where she can lie always afloat or safely aground where it is customary for Vessels of similar size and draft to lie safely aground. Trading to sensitive areas always to be subject to approval of Owners which not to be unreasonably withheld.    118 / 119 / 120 / 121 / 122

**16. Excluded ports**    123
The Vessel not to be ordered to nor bound to enter:    124
(a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; or    125 / 126
(b) any icebound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging.    127 / 128 / 129 / 130
The Vessel not to be obliged to force ice nor to follow ice-breaker. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has the liberty to sail to a convenient open place and await ECo's fresh instructions.    131 / 132 / 133 / 134
Detention through any of above causes to be treated as a voyage cost.    135

**17. Cargo**    136
The Vessel to be employed for carriage of cooled and frozen cargo as well as other cargo not likely to be injurious to the Vessel. Dangerous goods to be carried in accordance with the IMDG-code at ECo's option, and any additional premium in respect thereof to be for ECo's account.    137 / 138 / 139 / 140

**18. Transshipment**    141
ECo to have the right to load and/or discharge up to full cargo on open sea by direct transshipment to/from trawlers or other Vessels including factory ships. ECo to arrange for fenders on board the feeding ships. Should the weather circumstances or heavy sea during load operation hinder transshipment operation or endanger the safety of the Vessel, the Master at his sole discretion may leave the feeding ships respectively, instruct the feeding ships to leave from along side until the weather/sea condition has improved. In case of discharge operation feeding Vessel means receiving Vessel. ECo is also to be permitted to load at safe anchorage(s). Any extra insurance for the Vessel necessary on account of transshipments to be at ECo's expense. Any damage caused to the Vessel by transshipment, provided the Master/Owners have exercised due diligence in all operations to be repaired at ECo's time and expense. ECo shall indemnify and hold the Owners harmless in respect of any liability to third parties which the Owners may sustain by reason of transshipment operation at sea, provided the Master/Owners have exercised due diligence in all operations.    142 / 143 / 144 / 145 / 146 / 147 / 148 / 149 / 150 / 151 / 152 / 153 / 154 / 155 / 156

**C. HIRE, PAYMENT AND OFF-HIRE**    157
**19. Entitlement to hire**    See Box 16 in ECoTime-99 part I    158
The Vessel shall be employed by ECo in accordance with the ECo Pool Vessel Contribution Agreement 1999  (the "ECo99 Pool Agreement")    159

**20. Payment of hire**    160
Notwithstanding that the Owners shall be entitled to hire, ECo shall only be bound to pay, and shall pay, to the Owners, within eight days after the end of each calendar month, a sum representing ECo's reasonable estimate of the Owners' entitlement to hire hereunder for the preceding calendar month or part thereof. The first such payment to be made on the eighth day of the calendar month following the date of delivery into the Charter.    161 / 162 / 163 / 164 / 165 / 166
Such sum shall be adjusted, in relation to the second and any subsequent payment, by the difference between any sum paid in respect of any preceding calendar month or part thereof and the amount due in respect thereof    167 / 168 / 169

**21. Right to set of**
Upon payment of each instalment of hire, ECo shall have the right to deduct any sums due to them under the Charter and any sums retained by them under the Scheme. ECo's right to deduct includes but is not limited to the estimated amount of off-hire, the estimated amount of hire recoverable by ECo in respect of the non-availability of space on the Vessel, estimated disbursements for Owners' account, and estimated amounts due from the Owners in accordance with Clause 9 hereof, any sum for the credit of ECo by reason of an adjustment under Clause 20 hereof, and any other sums payable to ECo pursuant to the terms hereof.

**22. Default in payment**
The Owners to have a duty to notify ECo when any hire payment has not been received in accordance with the Charter. In the event of payment being overdue by more than 3 banking days from such notification, the Owners have the right either immediately to withdraw the Vessel from the service of ECo or, if the Vessel is on a cargo voyage, to withdraw her on completion of the current voyage without any intervention by any Court or without any formality whatsoever and without prejudice to any claim which the Owners may have against ECo under the Charter. Unless notice of withdrawal or intended withdrawal at the end of the voyage is given within 15 days after default in payment the Owners shall be deemed to have waived their right of withdrawal and their right to claim damages

**23. Loss of the Vessel**
Should the Vessel be lost or missing, hire to cease from the time when she was lost. If the date of loss cannot be ascertained hire to be paid up to the date and hour the Vessel was last reported. Any overpaid hire to be returned to ECo forthwith.

**24. Laying up**
ECo shall have the option of laying up the Vessel, in which case hire shall continue but they shall be given credit for any saving which the Owners may make during such period of lay-up through reduction in expenses, less any extra expenses to which Owners are put as a result of such lay-up. The Owners shall use their best efforts and take proper steps to reduce costs.

**25. Advances**
Should the Master require funds for customary disbursements at any port, ECo or their agents to advance the same provided any hire under the Charter remains unpaid. Such advances and commissions due thereon shall be deducted from the hire.

**26. Lien**
The Owners shall have a lien upon all subfreights and all subhires relating to cargoes carried on board the Vessel for any amounts due under the Charter and ECo to have a lien on the Vessel for all money paid in advance and not earned.

**27. Profit charge**
Void.

**28. Fees and Expenses**
See clauses 4 e) and 11 b) of the ECo99 Pool Agreement.

**29. Suspension of Hire**
In the event of drydocking or other measures necessary to maintain the efficiency of the Vessel, deficiency of men or Owners' stores, strike or refusal to work of Master, Officers or Crew, detention or interference with the Vessel by authorities or organisations resulting from contravention of any law or regulation or any act of the Owners, their servants or agents, arrest of the Vessel, boycott or blacklisting or any threat of boycott or blacklisting of the Vessel on account of her flag, technical equipment, lack of certificates or the terms on which the Master, Officers or Crew are engaged, breakdown (partial or total) of machinery, refrigerating plant or cargo gear, fire, collision, grounding, stranding or damage to hull or other accident, deviation (unless ordered by ECo) any failure of the Vessel to maintain the speed set out in Box 23, or any other interference attributable to the Owners either hindering or preventing the working or the readiness of the Vessel, no hire to be paid in respect of any time actually lost thereby.
Should the Vessel be put back on a voyage by reason of any off-hire event as set out above or for any other reason whatsoever for which the Owners are responsible, it is hereby agreed that hire shall be suspended from the time of her putting back until she is again in the same or an equidistant position and the voyage resumed there from. In addition to any off-hire, ECo shall be entitled to any directly related expenses and disbursements incurred by reason of any such off-hire event, including the bunkers and stores consumed during any period of off-hire, and shall be entitled to deduct the same from hire and/or any other sums payable hereunder

**30. Breakdown of cargo gear or hatch covers**
In the event of insufficient power to operate cargo gear or hatch covers or a breakdown of cargo gear or hatch covers, not caused by negligence of ECo's servants, the Owners to pay for stevedores' waiting time and time lost to be calculated pro rata for the period of such inefficiency in relation to the gear required for work. If ECo elect to continue work, the Owners are to pay for shore appliances in lieu of the Vessel's gear, but in such cases ECo to pay full hire.

**31. Transfer of cargo**
Should anything mentioned in Clause 29 or 30 hinder or prevent the proper care and carriage of the cargo, ECo may arrange to transfer such cargo and in order to do so may under the ship into any safe port, all at their absolute discretion and at the Owners' expense. They shall inform the Owners as soon as practicable if they exercise any powers under this provision and shall be bound at the Owner's request to take any steps necessary to preserve the Owners' lien on cargo after transfer

**D COSTS, DUTIES AND RIGHTS**

**31. Vessel's name**
Void

**33. ECo to provide**
Whilst on hire ECo to order and pay for fuel (not less than is required to cover expected consumption to next port of call) to pay for port charges, pilotage (whether compulsory or not, but harbour pilots always to be for ECo's account), canal overman, boatage (unless ordered for Vessel's Crew), ballast, tug assistance, consular charges (except those payable to the Consulates of the country of the Vessel's flag), canal dock and other dues and charges, including any foreign, general, municipality or state taxes, agencies (unless attributable to maintenance

---

...and managing of the Vessel, Master, Crew or the Owners), also to arrange and pay for although the same shall be under the responsibility of the Master loading, stowing, and dunnage and shifting boards (except for any already on board), unloading, weighing/tallying if compulsory or if ordered by ECo.

**34. Special Gear**
Any special gear, including special ropes, hawsers and chains required by the custom of the port for mooring to be for ECo's account unless already on board.

**35. Sublet and chartering-in**
ECo to have the option of subletting the Vessel, but shall always remain responsible to the Owners for due performance of the Charter.
ECo shall be entitled, where in its sole discretion it considers it necessary for the proper operation of the Scheme, to charter in on such terms as it thinks fit another Vessel or Vessels to supplement those from time to time employed in the Scheme, and any sums payable by way of hire or freight or otherwise to the Owner of any such Vessel shall be treated as a voyage cost for the purpose of computing distributions to owners as per Box 30.

**36. Liberty to Employ**
ECo shall have the liberty to employ as Owners or disponent Owners in the Scheme, any Vessel which it has or shall at any time own or have on charter, other than Vessels currently employed in the Scheme.

**37. Side Logo and Funnel Mark**
ECo to have the option of painting their logo on the Vessel's funnel in their own colours, and with their own logo, but the Vessel to be redelivered with the Owners' colours. Painting and repainting to be for ECo's account and in their time against a payment of USD 500 on each occasion. ECo also has the option of flying their house flag during the Charter period.

**38. Owners to provide**
The Owners to provide and pay for the maintenance of and repairs to the Vessel, for all provisions, wages, for insurance of the Vessel, for all cabin, deck and engine room and other necessary spare parts and stores (including cleaning material, cooling medium, lubricating oil, fresh water and water for the boilers), loading certificates, and garbage dues (unless compulsory or emanating from the cargo).
The Owners also to provide runners, blocks and winches or cranes and mooring gear facilities. All such gear and equipment to be kept in full working condition for immediate use.

**39. Gangway Watchmen**
The Gangway Watchmen to be provided by the Owners but where compulsory to employ Gangway Watchmen from shore, the expenses to be for ECo's account.

**40. Light**
The Owners to supply light on deck and in holds, as on board, at all times, free of expense to Cool Carriers, unless electrical clusters from shore are compulsory, in which case same to be for ECo's account.

**41. Ballast**
If any solid or fluid ballast is required, all expenses for same including time used in loading and discharging, to be for the Owners' account.

**42. Day and night working**
The Vessel to work day and night if required by ECo (overtime is included in hire) and all cargo gear to be at ECo's disposal during loading and discharging, and the Vessel to provide men to work day and night if required. Should winchmen not be available from shore labour, the Owners to provide from the Vessel's crew one winchman per hatch, cost for such work to be for ECo's account.

**43. Fumigation**
Expenses in connection with fumigation and/or quarantine ordered because of cargoes carried or ports visited while the Vessel is employed under the Charter to be for ECo's account. Expenses in connection with all other fumigations and/or quarantine to be for the Owners' account.

**44. Meals, telegrams etc**
The Owners to be paid the lump sum per month stated in Box 29 for meals and entertainment for pilots, clearance and custom officers, tally clerks, stevedores' foremen, ECo's guests, etc. and telegrams.

**45. Master**
The Master shall properly and carefully supervise and be responsible for the loading, stowing and discharging of cargo, and ensure that loading is carried out so as to give the Vessel her optimum trim, shall prosecute his voyages, and ensure that loading and discharging are carried out, with the utmost dispatch and care, and shall render all customary assistance with the Vessel's Crew, tackle and boats as if the Vessel were trading for the Owners' own account. The Master shall be under the orders and directions of ECo as regards the Vessel's speed, employment, agency and other arrangements necessary for ECo's use of the Vessel.
If ECo shall have reason to be dissatisfied with the Master or any of the Officers and Crew, the Owners, on receiving particulars of their complaint, are promptly to investigate the matter and if necessary and practicable, are to make a change in the appointment.

**46. Instructions and Logs**
The Master shall be furnished by ECo from time to time with all required instructions and sailing directions. The Master shall keep full and correct logs, including refrigeration logs (as normal in a Vessel of her type) as required by ECo, all of which shall be available to ECo or to their agents or nominees on demand, and he shall furnish ECo, their agents, nominees or supercargo when required, with a true daily copy of any log (including reports in accordance with the bunker performance evaluation System referred to in Clause 19 hereof) in the manner prescribed by ECo, who shall also have full access to the Vessel and to all logs and reports and the right to inspect without prior notice.

**47. Ship advisor and Supercargo**
ECo has the right to appoint either a ship advisor who shall accompany the Vessel as ECo's representative and/or a supercargo. They are to be furnished with first class accommodation on board and same fare as provided for Master's table paying USD 10 per day. The Vessel's Master, Officers and Crew shall co-operate with them about all respects of the operation of the Vessel that can affect costs, performance or the custody and handling of the cargo. The Owners,

however, to remain responsible for acts, faults and omissions of their Master,
Officers and Crew; all matter referred to in Clause 53, and all liability and                358
decisions relating to the safety of the Vessel and Crew.                                       359
                                                                                               360

**48. Cargo Space**                                                                            361
The whole reach and burden of the Vessel's holds, deck and usual places of                    362
loading and passengers' accommodation (number of berths and price per day                     363
stated in Box 28), shall be at ECo's disposal, reserving only proper and sufficient           364
space for the Vessel's Master, Officers and Crew                                               365

**49. Bills of Lading**                                                                        366
ECo shall be responsible for the preparation and issue of Bills of Lading, and                367
shall have the option of using their own regular Bill of Lading from which shall              368
contain a Paramount Clause, New Jason and Both to Blame clauses. Where                         369
required by ECo, such Bills of Lading are to be signed by the Master (who, in                 370
that event, is authorised to sign Bills of Lading which accurately reflect the                 371
quantity and condition of cargo loaded) or by ECo or sub-Charterers, or their                 372
respective servants or agents (who are hereby authorised by the Owners and the                373
Master, where such authority is required, to issue and sign such Bills of Lading)             374

**E RESPONSIBILITIES AND EXEMPTIONS**                                                          375
**50. Claims**                                                                                 376
In the event that, in Breach of the Charter, the Owners withdrew the Vessel from              377
the Scheme or otherwise terminate the Charter before the effluxion of the Charter             378
period, the provisions of paragraph 4 of the ECo pool agreement to apply.                     379

In the event that, by reason of any breach of any contract connected with the                 380
Scheme between ECo on the one hand and a third party, including the Owner or                   381
Disponent Owner of any other Vessel from the time employed in the ECo99 Pool                  382
Agreement, on the other, ECo has a claim against such third party other than a                383
claim or part thereof relating to losses solely born by ECo then ECo will be                  384
obliged to pay the Owner such proportion of any sums which are due from such                  385
third party by reason of such breach as the payment due to the Owners by way of              386
hire for the calendar month during which the breach occurred bore to the total of            387
such payments to the Owners or Disponent Owners of all the Vessels employed                   388
in the ECo99 Pool Agreement for such calendar month, provided that, in the                    389
event that ECo fails, for whatsoever reason, to recover any such sum from such                390
third party, then their obligation hereunder shall not be enforceable by the                  391
Owners and shall no longer arise.                                                              392

**51. Cargo claims**                                                                           393
ECo shall be responsible for (subject as below) all claims in connection with                 394
cargo under Bills of Lading and they shall insure against such responsibility.                395
ECo shall also take over the handling of all such claims and any other claims in             396
connection with cargo under Bills of Lading issued pursuant to the terms of the              397
Charter, whether brought against Eco, the Owners and/or the Vessel. However,                  398
ECo shall be entitled to be indemnified by the Owners against all liabilities and            399
claims caused by unseaworthiness of the Vessel, failure of the Owners or the                  400
Vessel's Officers or Crew properly and carefully to supervise loading, stowing               401
and discharging of the Cargo or properly to deliver the cargo to the receivers,             402
where such unseaworthiness and/or failure would constitute a breach by the                    403
Owners of the Carrier's obligations under the Hague-Visby Rules.                              404

**52. Orders, directions and information**                                                     405
The Owners shall be liable for any loss or damage arising out of (a) their                    406
Master's, Officers' or Crew's failure to comply with ECo's lawful orders or                   407
directions and (b) Master negligently giving incorrect information to ECo or their           408
servants or nominees.                                                                          409

**53. Other responsibility**                                                                   410
In any event, nothing herein is to be construed as a demise of the Vessel to ECo.            411
The Owners are to remain responsible for the navigation of the Vessel, acts of               412
pilots and tug-boats, crew, care of cargo and all other matter, same as when                  413
trading for their own account.                                                                 414

**54. Notice of damage to the Vessel**                                                         415
ECo shall not be responsible for damage to the Vessel unless:                                  416
(a) the Master advises ECo and the sub-Charterers in writing immediately when                 417
ascertained by telegram of any damage sustained by the Vessel for which they are             418
liable and also                                                                                419
(b) if possible notifies in writing the parties who have caused the damage and               420
endeavours to obtain their admission of liability.                                            421
Notwithstanding the above, ECo in any event not to be held responsible for                    422
damage to the Vessel attributable to fair wear and tear.                                       423

**55. Reimbursement**                                                                          424
If for any reason ECo or the Owners are obliged to pay any claims for which the               425
other party has assumed liability under the Charter, that other party hereby agrees          426
to indemnify the Owners or ECo as the case may be against all loss, damage or                 427
expense arising or resulting from such claims.                                                428

**56. Effect on Suspension of Hire Clause**                                                    429
The provisions of this section E shall in no way affect the provisions as to                  430
suspension of hire in the Charter.                                                             431

**F  ADDITIONAL CLAUSES**                                                                      432
**57. Information**                                                                            433
Any information as to the operation of the ECo99 Pool Agreement or the                        434
employment of Vessels therein, and the termination of the Charter, shall be kept             435
confidential by the Owners and ECo. ECo reserves the right to disclose such                   436
information as to the operation of the Scheme or the employment of Vessels                    437
therein (including the ECoTime99 Charter Party form) for the purpose of                       438
marketing and/or the introduction of new owners into the Scheme.                             439
The Owners agree to ECo making such information available to the Owners of                     440
other Vessels for the time being employed in the Scheme, on the understanding                 441
that such information shall be kept confidential by them.                                      442

**58. Salvage**                                                                                443
All salvage and assistance to other Vessels to be for the Owners' and ECo's                   444
equal benefit after deducting the Master's and Crew's proportion and all legal                445
other expenses including hire paid under the Charter for time lost in the salvage,           446
also repairs of damage and fuel consumed. ECo to be bound by all measures                     447
taken by the Owners in order to secure payment of salvage and to fix its amount.             448

**59. General Average**                                                                        449
General Average to be settled according to York-Antwerp Rules 1994. Hire not                  450
to contribute to General Average                                                               451

**60. War**                                                                                    452
(1) For the purpose of this Clause, the words                                                  453
(a) "Owners" shall include the shipowners, bareboat charterers, disponent                     454
owners, managers or other operators who are charged with the management of the               455
Vessel, and the Master; and                                                                    456
(b) "War Risks" shall include any war (whether actual or threatened), act of war,            457
civil war, hostilities, revolution, rebellion, civil commotion, warlike operations,          458
the laying of mines, (whether actual or reported), acts of piracy, acts of terrorists,       459
acts of hostility or malicious damage, blockades (whether imposed against all                460
Vessels or imposed selectively against Vessels of certain flags or ownership, or             461
against certain cargoes or crews or otherwise howsoever), by any person, body,               462
terrorist or political group, or the Government of any state whatsoever, which, in           463
the reasonable judgement of the Master and/or the Owners, may be dangerous or                464
are likely to be or to become dangerous to the Vessel, her cargo, crew or other              465
persons on board the Vessel.                                                                  466

(2) The Vessel, unless the written consent of the Owners be first obtained, shall            467
not be ordered to or required to continue to or through, any port, place, area or            468
zone (whether of land or sea), or any waterway or canal, where it appears that the           469
Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable              470
judgement of the Master and/or the Owners, may be, or are likely to be exposed               471
to War Risks.  Should the Vessel be within any such place as aforesaid, which                472
only becomes dangerous, or is likely to be or to become dangerous, after her                 473
entry into it, she shall be at liberty to leave it                                            474

(3) The Vessel shall not be required to load contraband cargo, or to pass through            475
any blockade, whether such blockade be imposed on all Vessels, or is imposed                  476
selectively in any way whatsoever against Vessels of certain flags or ownership,             477
or against certain cargoes or crew or otherwise howsoever, or to proceed to an               478
area where she shall be subject, or is likely to be subject to a belligerent's right of      479
search and/or confiscation.                                                                   480

(4) (i) The Owners may effect war risks insurance in respect of the Hull and                 481
Machinery of the Vessel and their other interests (including, but not limited to,            482
loss of earnings and detention, the crew and their Protection and Indemnity                   483
Risks), and the premiums and/or calls therefor shall be for their account.                   484
(b)If the Underwriters of such insurance should require payment of premiums                   485
and/or calls because, pursuant to ECo's orders, the Vessel is within, or is due to           486
enter and remain within, any area or area which are specified by such                         487
Underwriters as being subject to additional premiums because of War Risks, then             488
such premiums and/or calls shall be reimbursed by ECo to the Owners at the                   489
same time as the next payment of hire is due.                                                 490

(5) If the Owners become liable under the terms of employment to pay to the                  491
Crew any bonus or additional wages in respect of sailing into an area which is               492
dangerous in the manner defined by the said terms, then such bonus or additional            493
wages shall be reimbursed to the Owners by ECo at the same time as the next                  494
payment of hire is due.                                                                        495

(6) The Vessel shall have liberty:                                                             496
(a) to comply with all orders, directions, recommendations or advice as to                   497
departure, arrival routes, sailing in convoy, ports of call, stoppages, destinations,        498
discharge of cargo, delivery, or in any other way whatsoever, which are given by             499
the Government of the Nation under whose flag the Vessel sails, or other                       500
Government to whose law the Owners are subject, or any other Government,                       501
body or group whatsoever acting with the power to compel compliance with their               502
orders or directions;                                                                          503
(b) to comply with the order, directions or recommendations of any war risks                 504
under writers who have the authority to give the same under the terms of the war             505
risks insurance;                                                                               506
(c) to comply with the terms of any resolution of the Security Council of the                 507
United Nations, any directives of the European Community, the effective order of             508
any other Supranational body which has the right to issue and give the same, and             509
with national laws aimed at enforcing the same to which the Owners are subject,              510
and to obey the orders and directions of those who are charged with their                     511
enforcement;                                                                                   512
(d) to divert and discharge at any other port any cargo or part thereof which may            513
render the Vessel liable to confiscation as a contraband carrier,                             514
(e) to divert and call at any other port to change the crew or any part thereof or           515
other persons on board the Vessel when there is reason to believe that they may              516
be subject to internment, imprisonment or other sanctions.                                    517

(7) If in accordance with their rights under the foregoing provisions of this                 518
Clause, the Owners shall refuse to proceed to the loading or discharging ports, or           519
any one or more of them, they shall immediately inform ECo.  No cargo shall be               520
discharged at any alternative port without first giving ECo notice of the Owners'            521
intention to do so and requesting them to nominate a safe port for such discharge.           522
Failing such nomination by ECo within 48 hours of the receipt of such notice and             523
request, the Owners may discharge the cargo at any safe port of their own choice.            524

(8) If in compliance with any of the provisions of Sub-Clauses (2) to (7) of this            525
Clause anything is done or not done, such shall not be deemed a deviation, but               526
shall be considered as due fulfillment of this Charterparty                                  527

**61. Arbitration**                                                                            528
Any dispute arising under the Charter to be referred to arbitration in New York              529
(New York law to apply), one Arbitrator to be nominated by the Owners and the               530
other by ECo and in case the Arbitrators shall not agree then to the decision of an          531
Umpire to be appointed by them, the award of the Arbitrators or the Umpire to be            532
final and binding upon both parties.                                                          533
If either of the Arbitrators refuses to act, or is incapable of acting, or dies, the         534
party who appointed him may appoint a new Arbitrator in his place                            535
If one party fails to appoint an Arbitrator, either originally, or by way of                 536
substitution as aforesaid, for seven clear days after the other party, having                537
appointed his Arbitrator, has served the party making default with notice to make           538
the appointment, the party who has appointed an Arbitrator may appoint that                  539
Arbitrator to act as sole Arbitrator in the reference and his award shall be binding         540
on both parties as if he had been appointed by consent                                       541

**62. Containers** (Clause valid only if container capacity stated in box 35.)               542
The vessel  is capable of accommodating containers at the capacity set out in Box           543
25E of which capacity the Vessel is equipped with electric plugs for the                     544
transportation of reefer containers at the capacity set out in Box 25 G.                     545
Throughout the Charter period, the Owners will make such capacity available and             546
will maintain fittings necessary to utilize such capacity in a thoroughly efficient          547
state, and, shall maintain, in the case of the reefer container capacity, the fittings       548

and electrical power generating plant necessary to utilize such capacity in a 549
thoroughly efficient state  Owners shall provide and pay for the minimum 550
quantities of lashing material specified in Box25F hereof 551
ECo shall be entitled to load container and/or reefer containers up to the 552
capacities mentioned in Boxes 25F and 25G. 553
Reefer containers shall, at the commencement of each voyage, be equipped with 554
suitable refrigeration equipment to ensure adequate cooling of its content and 555
shall also be accompanied with spare part kits.  Owners shall be responsible for 556
ensuring that the reefer containers are properly connected to the Vessel's power 557
supply, that the containers reefer containers are properly lashed and secured and 558
that the Vessel's fittings and power supply are kept in full working order 559
throughout the period of each voyage  In addition, the Vessel's crew shall also be 560
responsible for monitoring the performance of the reefer containers during each 561
voyage and shall use their best endeavours to rectify any faults that may occur 562

The Vessel's crew shall be responsible for reporting any loss, damage or failure 563
that may occur to any container laden on board the Vessel, whether caused by 564
stevedores or any other party. 565
The Vessel's crew shall follow the instructions of ECo in relation to this and any 566
other matter concerning the handling, operation and stowage of such containers. 567
ECo or their agents to provide Master with Shippers' declared weight of 568
containers prior to departure. 569
Clause 51 of this Charter shall apply to claims arising out of damage to cargo 570
within any such container. 571

63. Co-operation against drugs 572
Owners and ECo both warrant that they are signatories to the Sea Carrier 573
Initiative Agreement  Owners and ECo will mutually discuss to be signatories to 574
other similar agreements if and when introduced. 575

It is mutually agreed that this contract shall be performed subject to the terms and conditions in this Charter, which shall include also Part I.

Place and date

As Agent for Tønnevold Reefer 4 KS
**Signature for the Owners**

**Signature for ECo Shipping Ltd.**

# EXHIBIT "B"



# ECo POOL VESSEL CONTRIBUTION AGREEMENT 1999

### (The "ECo 99 Pool Agreement")

**AGREEMENT** between **ECo Shipping Ltd.,** a Liberian corporation established in 1996 by Cool Carriers AB and Eastwind Transport Ltd. ("ECo Ltd."), and Tonnevold Reefer 1 KS, a Norwegian corporation ("Shipowner").

**WHEREAS,** Shipowner wishes to contribute one or more handy-size refrigerated transport vessels under its ownership or disponent ownership (the "Vessel" or "Vessels") to a pool of similar vessels under the commercial management of ECo Ltd. (the "Pool"); and

**WHEREAS,** ECo Ltd. is prepared to employ the Vessel or Vessels in the Pool on terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual promises of the parties contained herein, it is AGREED as follows:

1.     The Vessel or Vessels to be contributed by Shipowner to the Pool are listed in Exhibit A hereto. Shipowner warrants to ECo that it is the owner or disponent owner of the Vessel or Vessels. All ships contributed to the Pool by any owner will be refrigerated transport vessels of cargo capacity between approximately 250,000 and 350,000 cubic feet.

2.     ECo Ltd. will at any time, upon request, advise Shipowner of the complete current list of all ships in the Pool. Shipowner undertakes to identify to ECo Ltd. prior to signing this Agreement each refrigerated vessel of 250/350,000 cubic feet owned, chartered in, or otherwise commercially controlled by Shipowner or by any other shareholder, parent, subsidiary, or affiliate of Shipowner ("Competing Vessel") and to advise ECo Ltd. when any such Competing Vessel is either added or deleted.

3.     Each Vessel entering the Pool will do so by being time-chartered to ECo Ltd. in accordance with the provisions of the ECoTime 99 charter party attached hereto as Exhibit B. A Vessel may enter the Pool at any time and will thereupon be chartered to the Pool for a period of twelve months

# ECO
## SHIPPING

plus or minus 30 days at ECo's option. The charter will at the conclusion of any 12-month period be automatically extended for a further 12 months, with the extension period to commence on the anniversary of the original date of delivery of the Vessel to ECo Ltd., unless written notice of redelivery is given by either party to the other not later than forty-five (45) days prior to completion of the current 12-month period.

4.    Conditions under which each Vessel will be delivered to ECo Ltd. and entered in the Pool include the following:

a)    The place of delivery of the Vessel to ECo Ltd. may not be less favorable geographically than the Malta/Elbe 1 range or Osaka Bay. If the Vessel is in a less favorable position, it must be brought to an equivalent geographical position before entry unless the parties agree on a "ballast penalty" amount or other compensatory arrangements. If the Vessel is delivered to the Pool in a more favorable geographical position that above, a ballast bonus payable to the Shipowner will be calculated and agreed, based on assessing ship's time at current spot market rates and including bunker costs appropriate for the region.

b)    ECo Ltd. will, for the account of the Pool, purchase the bunkers on board at the time of delivery of a Vessel at current Platt's Oilgram prices prevailing at the nearest main bunkering port. When the Vessel is eventually redelivered by ECo Ltd. to the Shipowner, the Shipowner will purchase the bunkers then remaining on board at the then current Platt's Oilgram prices at the nearest main bunkering port.

c)    Shipowner will pay to ECo Ltd. (not for account of the Pool) a nonrefundable management fee of $20,000 per year of entry in the Pool, payable annually in advance. The first year's fee will be assessed at the time of the Vessel's initial entry into the Pool and will be offset against any payments owed by the Pool to the Shipowner for bunkers or ballast bonus. Subsequent annual management fees will be assessed at 12-month intervals by withholding from the Vessel's share of Pool earnings distributed in each anniversary month.

ECO
SHIPPING

d)    During the period of a Vessel's entry in the Pool, Shipowner will be responsible for crewing and insuring the Vessel and for all aspects of technical management.. The Vessel will at all times be entered in an internationally accepted Protection and Indemnity Club and will have an ITF Blue Card or other equivalent arrangements enabling her to trade world-wide.

5.    Notwithstanding the 12-month period of the Vessel's charter to ECo Ltd., Shipowner may at its election at any time, upon sixty (60) days' written notice, withdraw the Vessel from the Pool and terminate the charter to ECo Ltd. subject to the following conditions:

a)    The premature withdrawal must be occasioned by either

(i)    In the case of a Vessel owned by Shipowner or any affiliate of Shipowner, the sale of the Vessel to an unrelated party; or

(ii)    In the case of a vessel chartered to Shipowner from an unrelated party, the termination of the charter party in accordance with its terms.

b)    If the Vessel has been specifically fixed on employment beyond the expiration of the 60-day notice period, ECo Ltd. will attempt in good faith to substitute a different ship in order to free the Vessel, with any additional expense incurred by the Pool to be reimbursed by the Shipowner.  If, however, substitution proves to be impossible or impractical, then the Vessel must remain in the Pool (perhaps with a different owner) at least until completion of the said fixed employment.

c)     If the premature withdrawal of the Vessel occurs at a time when the total expected spot market earnings of the Vessel from the date of withdrawal to the next 12-month anniversary date exceed the expected earnings of the Vessel as a Pool member during that time interval, then at the time of withdrawal the Shipowner will pay to the Pool the expected earnings differential resulting therefrom.  ECo Ltd.'s computation of the earnings differential amount will be discussed fully with Shipowner, and a reputable shipbroker may be engaged as

# ECO
## SHIPPING

advisor if either party so requests, with the cost thereof to be shared equally between the Pool and Shipowner.   In the event of failure to reach agreement, ECo Ltd.'s determination of the earnings differential amount will be conclusive and binding.  If the premature withdrawal of the vessel occurs at a time that is economically favorable to the Pool, no earnings differential payment will be due to Shipowner from the Pool.

6.    When any Vessel withdraws from the Pool and is redelivered to Shipowner by ECo Ltd., whether at the end of a 12-month period or prematurely, if she is redelivered in a geographical position more favorable than the Malta/Elbe 1 range or Osaka Bay, a redelivery bonus payable by the Shipowner to the Pool will be calculated and agreed, based on assessing ship's time at current spot market rates and including bunker costs appropriate for the region.  A Vessel may not be redelivered in an unfavorable geographical position unless the parties agree on a "positional penalty payment" to Shipowner or other compensatory arrangement.

7.    Each Vessel in the Pool will at all times have a Weighting Factor assigned to it that reflects its capacity, by reason of its physical and performance characteristics, to generate a greater or lesser level of earnings relative to other similar tonnage.   The initial Weighting Factor of each of the Vessels will be as set forth in Exhibit A.   Shipowner warrants the accuracy of the physical and performance characteristics of the Vessels submitted to ECo Ltd. for use in calculating their Weighting Factors. Weighting Factors of all Vessels in the Pool will be reviewed and reset periodically, not less often than once per year, to reflect observed changes in performance characteristics and relative revenue-generating capacity. ECo Ltd. will normally use the computational algorithms developed by Cool Carriers AB for the purpose of calculating Weighting Factors but reserves the right to adopt other fair and reasonable methods for doing so.  If a Vessel is found to under perform with respect to her speed, bunker consumption, or other characteristics submitted by Shipowner and used in calculating the Vessel's Weighting Factor, then Shipowner will be liable for speed/consumption or other performance penalties computed in accordance with the normal practices of the industry.  These penalties will be due and

# ECO
## SHIPPING

payable, via deduction from Pool distributions, until such time as the Vessel's Weighting Factor will have been revised to correctly reflect the Vessel's performance characteristics.

8.    The Pool will be managed and operated in the name of "ECo Shipping Ltd." by personnel seconded to ECo Ltd. by Eastwind Transport Ltd. and UniCool Ltd., and by any other persons that may reasonably be engaged for management or operational purposes.  Eastwind Transport Ltd. will serve as overall Administrator of the Pool.

9.    The Vessels, and all other ships in the Pool, will be employed on voyage charters, contracts of affreightment, time charters, or other commercial arrangements with the objective of maximizing the total Net Voyage Earnings of all Pool vessels, denominated in U.S. dollars.  In the event the Pool realizes any revenues in other currencies, they will be converted to U.S. dollars as soon as possible.  All cash held by the Pool will be invested in U.S. Dollar money market funds.  "Net Voyage Earnings" means the sum of all charter hire income, freights, demurrage, ballast bonuses, and all other revenues earned by the Pool vessels, less the total of their bunker costs, canal tolls, stevedoring costs, port charges, agency fees and expenses, brokerage and booking commissions, dispatch, and any other voyage costs, including cargo-handling material and any liability insurance for the Pool's account.  The foregoing notwithstanding, no vessel will be time chartered out or otherwise specifically committed for a period extending beyond its next 12-month anniversary date unless either ECo Ltd. will have a right of substitution or the approval of the Shipowner will have been obtained in advance.

10.    From time to time ECo Ltd. may also charter in ships from the market on a voyage or time-charter basis, provided that the total of all chartered-in tonnage, measured in cubic feet, will never be permitted to exceed 25% of the total cubic capacity of all Pool vessels.  Earnings (or losses) accrued by all chartered-in vessels will be added to (or subtracted from) the overall Pool earnings available for distribution to the Pool Vessels.

11.    In any calendar month the total earnings of the Pool will equal the total Net Voyage Earnings of the Pool vessels as defined above, plus or minus earnings or losses on chartered-in vessels, less allowable overhead expenses of the Pool.

ECO
SHIPPING

a)      The earnings of each Pool Vessel in a given month will be calculated in accordance with standard percentage-of-completion rules, in which the earnings on a voyage that takes place during two or more calendar months will be allocated to those months in proportion to the numbers of days of the voyage's total duration that fall in those months. At the end of a month, the earnings for that month on a voyage in progress will be calculated using the best available estimates of voyage duration and total earnings; thereafter, the earnings will be corrected retroactively when final results are known.

b)      Allowable overhead expenses include the salary, benefits, and general office cost allocations of all personnel working on behalf of the Pool, plus travel expenses, audit fees, and other reasonable out-of-pocket expenses incurred on behalf of the Pool. Total personnel and out-of-pocket costs will be estimated for each calendar year in January, with one-twelfth (1/12) of the calculated annual amount being charged against Pool earnings in each month. After the end of a year, out-of-pocket costs actually incurred for the account of the Pool will be computed, with the difference between budgeted and actual costs being assessed against or rebated to, as the case may be, the vessels that were in the Pool during the year on a pro-rated basis. No such adjustment will be made in the case of personnel costs.

12.     Net earnings of the Pool in any calendar month will be allocated to the vessels that were entered in the Pool at any time during that month in proportion to (a) the cubic capacities of those vessels, (b) their weighting factors, and (c) the fractional numbers of days during the month when the vessels were on hire to the Pool, as defined in the ECoTime 99 charter party. As an example, if the Pool included only two ships, namely, Vessel X of capacity 300,000 cubic feet, weighting factor 0.90, and 30.0 on-hire days during a given month and Vessel Y with 275,000 cubic feet, weighting factor 1.10, and 29.0 on-hire days, then the earnings allocation for that month would be calculated as follows:

# ECO
## SHIPPING

| Vessel X "claim" = | 300,000 x 0.90 x 30.0 | = | 8,100,000 |
|---|---|---|---|
| Vessel Y "claim" = | 275,000 x 1.10 x 29.0 | = | 8,772,500 |

Share of the month's Pool earnings allocated to Vessel X =
8,100,000/(8,100,000 + 8,772,500)   =   48.007%

Share of the month's Pool earnings allocated to Vessel Y =
8,772,500/(8,100,000 + 8,772,500)   =   51.993%

This method of calculation is employed in all circumstances, including in months when a vessel may have entered the Pool during the last day or two.

13.    Each vessel in the Pool during any month is entitled eventually to receive cash distributions equal to the earnings allocated to her during that month.   All Pool earnings net of allowable overhead expenses and annual management fees will be distributed eventually to Pool vessels; ECo Ltd. itself will not be left with any earnings (or losses) other than the annual management fees.

14.    Total earnings of the Pool and the earnings shares allocated to the various Pool vessels for each calendar month will be determined and reported monthly in arrears by ECo Ltd., normally within eight days after the end of the month in question.   At about the same time., insofar as permitted by availability of funds (in light of anticipated revenues and expenses), the earnings of the month just ended will be distributed in cash to the (disponent) owners of the various Pool vessels.  If the funds available in the Pool following any month of operation are insufficient for the distribution of 100% of that month's earnings, then such lesser percentage of earnings will be distributed to the owners of the vessels *pro rata* as ECo Ltd. determines to be prudent, considering the Pool's projected cash income and obligations; and in such case the undistributed balance of the Pool's earnings for that month will be distributed in the following month.  However, at no time will the Pool distribute cash in excess of the total amount of the as-yet-undistributed Pool earnings.

15.    Following the end of each month, ECo Ltd. will prepare and submit to Shipowner financial and operational reports showing, *inter alia*, the voyages performed by the Vessels, earnings therefrom, total Pool earnings, share thereof to be distributed to each Vessel, and related financial information.  At the end of each calendar year, in addition to its own year-end reporting ECo Ltd. will arrange for an audit

M:\ECOVOYGE\POOLTHO.DOC

ECO
SHIPPING

of the Pool's performance and results to be performed at the Pool's expense by a competent internationally recognized auditing firm, with a copy of the audit report to be furnished to Shipowner as soon as available. All of the foregoing information reported to Shipowner will be treated as confidential.

16.     Any notices under this agreement may be delivered by mail, electronic mail, telex, or facsimile:

a)      If to ECo Ltd. or the Pool, to

c/o Eastwind Transport Ltd.
444 Madison Avenue
Suite 200
New York, NY 10022
Facsimile:      (212) 838-8439
Telex:          420111 EWINDNY
E-Mail: 62107718@eln.attmail.com

(b)     If to Shipowner, to:

Tonnevold Reefer 1 KS
C/- O.T. Tonnevold
P.O. Box 115
4891 Grimstad, Norway

Facsimile:      +47 37 25 88 99
Telex:          21 386

17.     In case of any conflict between the provisions of this ECo Pool Vessel Contribution Agreement and the provisions of the ECoTime 99 charter party, the provisions of this Agreement will prevail. In case of any dispute between the parties, a good faith attempt to settle it shall be made by a meeting of the senior officials controlling the parties. Should such good faith attempt fail to achieve success, the parties shall each appoint a qualified arbitrator, and the two arbitrators so appointed shall jointly select a third, and the dispute shall be finally resolved by the panel of three so chosen by arbitration in New York City, New York. Any decision of the arbitrators shall be binding on both parties. The law of New York shall govern this Agreement.

M:\ECOVOYGE\POOLTHO.DOC

ECO
SHIPPING

**IN WITNESS WHEREOF,** the parties hereto have each executed this document below at the places and dates indicated.

ECo SHIPPING LTD.
New York City New York

TONNEVOLD REEFER 1 KS
Grimstad Norway

———————————————

———————————————

By:_____
Name:

By:_____
Name:

Title:_____

Title:_____

Date:_____

Date:_____

# ECO
## SHIPPING

### ECo Pool Agreement 99

#### Exhibit A

#### Current Pool vessels

Vessels contributed by Eastwind, or companies associated with Eastwind

| | | | | |
|---|---|---|---|---|
| Snowmass | Eastwind | 231,983 | 2,452 | 1982 |
| Maunakea | Capewind | 264,348 | 2,861 | 1983 |
| EW McKinley | Eastwind | 321,782 | 3,428 | 1983 |
| Rosa | Eastwind | 264,452 | 2,875 | 1984 |
| EW Kenya | Eastwind | 280,118 | 2,991 | 1985 |
| Arctic Wolf | Sevrybkhodiflot | 261,576 | 2,784 | 1985 |
| Evans | Eastwind | 265,319 | 2,806 | 1986 |
| EW Cook | Eastwind | 257,904 | 2,811 | 1986 |
| Saramati | Eastwind | 326,112 | 3,487 | 1986 |
| Kohfu | Eastwind | 262,846 | 2,943 | 1986 |
| Fitzroy | Eastwind | 331,944 | 3,541 | 1987 |
| Vinson | Eastwind | 332,219 | 3,543 | 1988 |
| Tenfu | Eastwind | 262,492 | 2,933 | 1988 |
| EW Rainier | Eastwind | 270,883 | 3,179 | 1988 |
| EW Kilimanjaro | Eastwind | 270,792 | 3,177 | 1988 |
| Kaifu | Eastwind | 262,931 | 2,928 | 1988 |
| Elbrus | Eastwind | 373,588 | 3,976 | 1990 |
| Glacier | Eastwind | 270,258 | 3,077 | 1991 |
| Blue Crystal | Sevrybkhodiflot | 298,024 | 3,441 | 1991 |
| Cape Belle | Capewind | 346,408 | 3,950 | 1991 |
| Annapurna | Eastwind | 347,143 | 3,943 | 1992 |
| Cape Blossom | Capewind | 347,082 | 3,950 | 1993 |

Vessels contributed by Osterreichischer Lloyd

| | | | | |
|---|---|---|---|---|
| White Sun | Ost. Lloyd | 312,426 | 3,426 | 1984 |

Vessels contributed by Tonnevold

| | | | | |
|---|---|---|---|---|
| Thordis | Tonnevold | 313,122 | 3,424 | 1982 |
| Thorfrid | Tonnevold | 237,986 | 2,653 | 1982 |
| Thorhild | Tonnevold | 306,983 | 3,447 | 1983 |
| Thorgull | Tonnevold | 313,122 | 3,424 | 1983 |
| Thorunn | Tonnevold | 313,122 | 3,424 | 1983 |



S:\Toby\ECOVOYGE\ECO pool agreement 99 Exhibit A.doc

Index No.    3292 (HB)    Year    2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTWIND MARITIME S.A.,

    Plaintiff,

  - against -

TONNEVOLD REEFER 7KS, a/k/a TONNEVOLD REEFER 2KS, a/k/a TONNEVOLD REEFER 4KS, a/k/a O.T. TONNEVOLD AS, a/k/a TONNEVOLD OT,

    Defendant.

DECLARATION OF JOHN G. POLES

*Poles Tublin Stratakis Gonzalez & Weichert, LLP*
*Attorneys for Non-Party Eco Shipping Ltd.*
*46 Trinity Place, 5th Floor*
*New York, New York 10006*
*Telephone: 212 943 0110*
*Telefax: 212 269 9875*

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:*.......................................    Signature ...........................................................

    Print Signer's Name ...............................................

*Service of a copy of the within*    *is hereby admitted.*

*Dated:*

    .......................................................................

    *Attorney(s) for*

*PLEASE TAKE NOTICE*

    ☐    *that the within is a (certified) true copy of a*    *entered in the office*
  NOTICE OF    *of the clerk of the within named Court on*
  ENTRY

    ☐    *that an Order of which the within is a true copy will be presented for settlement to the*
  NOTICE OF    *Hon.*    *, one of the judges of the within named Court, at*
  SETTLEMENT    *on*    *, at*    *M.*

*Dated:*

    *Attorney(s) for*

*To:*    *Office Address & Tel. No.:*

*Attorney(s) for*

# EXHIBIT 7A

William J. Honan
Christopher R. Nolan
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

ATTORNEYS FOR DEFENDANT
TONNEVOLD REEFER 7 KS, A/K/A,
TONNEVOLD REEFER 4 KS, A/K/A, AND
O.T TONNEVOLD AS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EASTWIND MARITIME, S.A.,

                                    Plaintiff,            08 Civ. 3292 (HB)

            -against-
                                                         **DECLARATION OF**
TONNEVOLD REEFER 7 KS,                                   **JAN SIGVART WALLE IN**
a/k/a TONNEVOLD REEFER 2 KS,                             **SUPPORT OF DEFENDANT'S**
a/k/a TONNEVOLD REEFER 4 KS,                             **MOTION FOR COUNTER-**
a/k/a O.T. TONNEVOLD AS,                                 **SECURITY PURSUANT TO**
a/k/a TONNEVOLD OT,                                      **SUPPLEMENTAL RULE E(7)**

                                    Defendant.

        I, Jan Sigvart Walle, declare under penalty of perjury under the laws of the United

States of America, pursuant to 28 U.S.C. §1746 that the following is true and correct:

        1.      I am Senior Vice President of Shipping at O.T. Tonnevold AS

("Tonnevold"). I make this Declaration in support of Tonnevold's Motion for Counter-security

against Plaintiff Eastwind Maritime, S.A. ("Eastwind").

1

2.     As Senior Vice President, I was directly involved with chartering for the *M/V Thorgull* ("*Thorgull*" or "Vessel").

**The Charter**

3.     On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a time charter of the *Thorgull* with ECo Shipping Ltd. ("ECo") for a period of about twelve months, which charter was extended by the agreement of the parties until December 20, 2005. On or about September 29, 2000, Tonnevold Reefer 4 KS entered into a pool agreement with ECo to include the *Thorgull*.

4.     On or about December 20, 2005, a successor to Tonnevold Reefer 4 KS, Tonnevold Reefer 7 KS, entered into a charter with ECo for charter of the *Thorgull* for a period of about twelve months (the "Charter").  At the same time, Tonnevold Reefer 7 KS and ECo entered into a new pooling agreement with respect to the Vessel, named "ECo 2002 Pool Agreement" ("Pooling Agreement 02").  Both the Charter and the Pooling Agreement 02 were executed by Mr. Charles T. ("Toby") Moors, Vice President of ECo Shipping.  A true and accurate copy of the Charter and Pooling Agreement 02 are annexed as Exhibit 1.

5.     Pursuant to the Charter and while in the employ of ECo, the *Thorgull* performed a voyage from Los Palmas, Canary Islands to Tarifa, Spain from August 7 -- September 18, 2006.  During the voyage, the *Thorgull*, under the control of ECo and Eastwind, received for on-carriage recently-caught redfish from at least seven fishing vessels at sea.

6.     All of the vessels from which the *Thorgull* received transshipments had been blacklisted by North East Atlantic Fisheries Commission ("NEAFC") and Northwest

2

Atlantic Fisheries Organization ("NAFO") for activity that had contravened the NEAFC and

NAFO rules and regulations.

7.    In receiving redfish for on-carriage for the blacklisted vessels, ECo

violated the NEAFC regulations, specifically Article 44 of the NEAFC Scheme of Control and

Enforcement ("NEAFC Enforcement"), which prohibited such on-carriage of certain protected

fish species, such as redfish.

8.    The NEAFC is a Regional Fisheries Management Organization ("RFMO")

that exists to conserve and manage the fishery resources of the northeast region of the Atlantic

Ocean. The NAFO is another RFMO that exists to protect the fishery resources in a contiguous

area, the northwest Atlantic Ocean.

9.    This violation of the NEAFC rules and regulations is illegal activity in

breach of Charter Clause 15, which requires that ECo and Eastwind employ the Vessel in "lawful

trades."

10.    As a result of the breach, NEAFC placed the *Thorgull* on its blacklist on

November 17, 2006 and NAFO placed the *Thorgull* on its blacklist on February 23, 2007.

11.    Through the diligent efforts of Tonnevold, the *Thorgull* was removed

from the NEAFC blacklist on November 16, 2007, approximately one year after it was placed on

the list, and from the NAFO blacklist thereafter.

12.    As a result of the blacklisting of the Vessel, Tonnevold was unable to

charter the vessel at market rate. In order to mitigate the damages caused by ECo's breach of the

Charter, its alter-ego Eastwind agreed to charter the *Thorgull* while the Vessel was blacklisted.

3

13.     On December 6, 2006, ECo, through Eastwind, and Tonnevold entered into a charter for a period of "about 60 days" as part of ECo and Eastwind's agreement to employ the *Thorgull* during the period it was blacklisted ("Mitigating Charter"). The Mitigating Charter is annexed as Exhibit 2.

14.     There were three single-page addenda to the Mitigating Charter; Addendum Number 1 is dated February 13, 2007, Addendum Number 2 is dated April 19, 2007, and Addendum Number 3 is dated July 19, 2007. All three addenda incorporate by reference the terms of the Mitigating Charter except revising *inter alia*, delivery, cargo, and hire information for the Vessel and identify Eastwind (acting on behalf of ECo), as Charterers, and Tonnevold, as Owners.

**ECo and Eastwind are Alter-egos**

15.     In early 2006, Mr. Moors, acting on behalf of the interests of ECo and Eastwind, indicated to Tonnevold that the Pooling Agreement 02 would end because there were too few ships remaining in the pool and running the pool in New York resulted in high administrative accounting costs.

16.     Mr. Moors affirmed to Tonnevold that the *Thorgull*, while leaving the Pooling Agreement 02, would be chartered by Eastwind, on behalf of ECo, in an effort to keep the Vessel working even during the blacklist period. The email exchanges between Tonnevold and Mr. Moors addressing the Pooling Agreement 02 are annexed as Exhibit 3.

17.     On or about July 12, 2007, Paul Capkanis, of Eastwind Transport, Ltd., on behalf of ECo, reaffirmed to Tonnevold Eastwind's continued intent to employ the *Thorgull* in a

4

third addendum to the Mitigating Charter, continuing thereafter until the Vessel was de-listed by the NEAFC.

18.     Tonnevold's communications with ECo and Eastwind concerning the original charter in 2000, the breached Charter, the Mitigating Charter and addenda to that Charter have all involved the same personnel, utilizing the same contact information for both entities, including identical mailing addresses, email addresses with the "Eastwind Group," facsimile numbers and telephone numbers.

19.     On the Eastwind website, http://www.eastwindgroup.com, an Eastwind entity has a New York address of 444 Madison Avenue, Suite 200, New York, New York. Plaintiff Eastwind interchanges itself and other members of the "Eastwind Group" in its Verified Complaint, noting Eastwind operates "from the offices of the "Eastwind Group," when in fact the website describes Eastwind Maritime Inc. as the chief management office. No less than eight "Eastwind" entities are listed on the Eastwind website, none of them being Eastwind Maritime S.A.

20.     The New York State Department of State website lists ECo's address as 444 Madison Avenue, Suite 200, New York, the same address as Eastwind. Copies of both the Eastwind website noting the Madison Avenue address and the Department of State website noting the ECo address are annexed as Exhibit 4.

21.     Dun & Bradstreet and the New York State Department of State website list John Kousi as the president and chief executive officer of both Eastwind and ECo. A true and correct copy of this information is annexed as Exhibit 5.

5

22.     Both the Charter and the Pooling Agreement 02 were executed by Mr.

Moors as "Vice-President" on behalf of ECo shipping. Mr. Moors has also been identified as

Vice-President of Eastwind on Internet websites.

23.     The alter-ego relationship between ECo and the Eastwind Group is

confirmed in notice provision for Pooling Agreement 02, which states:

> any notices under this agreement may be delivered by mail, electronic mail, telex,
> or facsimile:
> ECo or the Pool, to
> c/o Eastwind Transport Ltd.
> 444 Madison Avenue
> Suite 200
> New York, NY 10022
> Facsimile: (212) 838-8439
> Telex: 420111 EWINDNY
> Email: eastwind@eastwindgroup.com

The address designated for ECo and Eastwind Transport Ltd. is the same address and facsimile

listed for Eastwind, as referenced in Exhibit 1.

**Tonnevold Damages**

27.     As a result of the blacklisting and the ECo and Eastwind breach of the

Charter, Tonnevold has suffered damages in the amount of $836,601.22, as set forth below:

a.     Tonnevold made diligent efforts to have the *Thorgull* removed

from the NEAFC and NAFO blacklists. The efforts to remove the Thorgull from the blacklists

cost Tonnevold a total of $20,500 as a result of meetings and travel expenses on the part of

Tonnevold employees when negotiating with the international organizations.

b.     Tonnevold has been unable to charter the *Thorgull* on the market

and, instead, has been chartering it to Eastwind on a series of voyages at below market rate. The

loss of revenue while under the charter to Eastwind from January 1, 2007 – September 11, 2007 was $227,940.01.

      c.     Despite Tonnevold's diligent efforts to charter the *Thorgull*, the vessel was unemployed during September 12 - November 28, 2007, while the Vessel remained blacklisted.   Tonnevold's damages while the Vessel was unemployed was $424,129.21.

      d.     As a result of the blacklisting, Tonnevold also suffered damages due to additional expenses incurred in operating the Vessel amounting to a total of $164,032.00, including $147,157.00 for the incremental expenses that Tonnevold incurred as the result of the vessel not trading in its usual trade pattern.  The incremental expenses are for crew travel, consumables, and lubricants.  The remaining $16,875 in losses is for the transportation of spare parts from Halifax to Alexandria, Egypt, due to the *Thorgull* not being permitted to enter the port at Halifax because it had been placed on the NEAFC blacklist.

      28.  Tonnevold has filed for arbitration in accordance with the arbitration provisions contained in all of the Vessel charters described herein.

Executed this 18th day of April, 2008 at Sandefjord, Norway.

Jan Sigvart Walle

7

# EXHIBIT 1

2005   3:53 PM FR EASTWIND-ECO     212 838 3578 TO 90114737258899     P.01



# ECo
## SHIPPING

# ECOTIME 99 – PART I
### Issued in January 1999

| | |
|---|---|
| **1.   Date** <br> ~~22~~ December, 2005 <br> 20 | **4.   Charterers** <br> ECo Shipping Ltd. <br> 80 Broad Street <br> Monrovia, Liberia |
| **2.   Vessel** <br> M/V Thorgull | |
| **3.   Owners** <br> Tonnevold Reefer 7 KS <br> c/o O.T. Tonnevold <br> Grimstad, Norway | **7.   Vessel's present position** <br> At Sea. |
| | **8.   Place or range of delivery** <br> See ECo ~~99~~ Pool Agreement, 22 December, 2005 <br> Clause 4. 2002 |
| **5.   Charter period** <br><br> Twelve months (12) <br> Plus/minus 30 days in Charterers' option. | **9.~  Time of delivery** <br><br> 22 - 25 December, 2005 |
| **6.   Trading limits** <br><br> Within IWL excluding N. Korea, Finland, Laos, <br> Cambodia. | **10.   Cancelling date** <br><br> N/A |
| | **11.   Place or range of redelivery** <br> Worldwide. <br> See ECo ~~99~~ Pool Agreement 22 Dec. 2005 Clause 6. <br> 2002 |
| **12.   Delivery notices** <br><br> N/A | **13.   Redelivery notices** <br><br> See ECo ~~99~~ Pool Agreement Clause 3. <br> 2002 |
| **14.   Quantity of fuel on delivery** <br><br> A. IFO max:                min: <br><br> B. MDO max:               min: | **16.   Fuel price (if fixed price agreed, see clause 9)** <br><br> Delivery IFO :  As per ECo ~~99~~ 2002 <br>                Pool Agreement 22 December, 2005 |
| **15.   Quantity of fuel on redelivery (see Clause 9)** <br><br> A. IFO max:                min: <br><br> B. MDO max:               min: | A.   Delivery MDO : <br><br> B.   Redelivery IFO : <br><br> C.   Redelivery MDO : |

2005  3:54 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.02

**Vessel's Descriptions (As per attached)**

A. Flag : Liberia     B. Year/Month of building: 1983/02     C. Call sign:    E L T U 4

D. Official reg. number: 10601     E. Telex system/number    Inmarsat A - 1260746     F. Trade factor:    REEFER
Inmarsat C - 463677710

**18. Class**

A. Hull:    NK        B. Machinery:    NK                C. Ice:    N/A

D. Certificate for temp.     E. USDA-equipment        F. USDA-certificate        G. Live Car Certificate
between: - 25 /-32 Cel·     Yes  X  No        Yes    No  X        Yes    No  X

**19. Vessel's dimensions**

| | | | | |
|---|---|---|---|---|
| Length over all | 145.58 | metres | Draft on full DW summer freeboard:  6765 | |
| | | | Higher/closed shelter    N/A | metres |
| Beam moulded | 17.80 | metres | Lower/open shelter    N/A | metres |
| Draft, ballast | 4.45 | metres | Draft, banana laden    5.84 | metres |

**20. Tonnage**

higher / lower

A. Gross:  6127  /       B. Panama:  6784 GRT / 5184 NRT     C. Deadweight all told in Mtons on
summer freeboard:  6324.5

D. Net:  2699  /       E. Suex    6329.47 GRT / 5070.78 NRT

**21. Quantity of stores and freshwater not exceeding**
Stores  320  mt

**22. Operational bunker capacity in cbm) 85 % (CBM)**

IFO 380  902.6 / IFO 180 216.4     MDO:  1149.9

**23. Main engines, speed and consumption**
Bunker viscosity:
IFO  180 CST

Makers  :  MITSUI B&W
Type    :  8L45GFCA
BHP/MCR  :  7890 PS
At RPM  :  175 RPM

| Ordinary nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. Mtons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons |
| Full DWT | 17.5 | | | 17.0 | | | 15.5 | | |
| Full banana cargo | 17.5 | | | 17.0 | | | 15.5 | | |
| Ballast | 17.5 | | | 17.0 | | | 15.5 | | |

| Low speed nozzles | Max continuous speed | | | Service speed | | | Min continuous speed | | |
|---|---|---|---|---|---|---|---|---|---|
| | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons | Knots | RPM | Cons. MTons |
| Full DWT | | | | | | | | | |
| Full banana cargo | | | | | | | | | |
| Ballast | | | | | | | | | |

**24. Auxiliary engines**
Bunker viscosity/blend in percent;    180 CST

| Consumption at sea | Consumption in port |
|---|---|
| Min  1.6    and max  4.1    MTons per 24 hours | Min  1.6    and max  3.3    MTons per 24 hours |

DEC 20 2005  3:54 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.03

## 25. Cargo holds and decks

**A.** Compartments furnished with elevator hatches:
N/A

**B.** Number of sideports each side:
Port:   4        Starboard:
Deck:   A        Deck:
Clear opening:  2.05 x 2.05 meters

**C.** Type of tween deck and weather deck hatch covers:
Weather deck  - End rolling type
Tween deck    - Folding type

**D.** Type of gratings:  Wooden Daiken
- thickness/material:  42 mm/Apiton Plywood
- permissible weight of fork lift + cargo:  5.0 Mtons

**E.** All gratings flush?       Yes    X    No
- if no, describe:

**F.** Container capacity:
on weather deck:    N/A   TEU
in holds:           N/A   TEU
Lashing material for          containers    N/A

**G.** Reefer container capacity with plug'in sets:
on weather deck:   N/A   TEU

**H.** Size of hatches (weather deck, hatch opening L x W)

Hatch No 1   7.03   x   5.32   metres
Hatch No 2   7.03   x   5.32   metres
Hatch No 3   7.03   x   5.32   metres
Hatch No 4   7.03   x   5.32   metres
Hatch No 5   -      x        metres

**I.** Engine room  between  holds  No. 4  and  STERN

**J.** Permanent side shorings
Yes    X    No

**K.** Number of separately insulated compartments:
8

**L.** Number of compartments with separate cooling units:
8

CBFT, minimum deck height (in meters) and deck area (in sqm)

| | Hatch No 5 | | Hatch No 4 | | Hatch No 3 | | Hatch No 2 | | Hatch No 1 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **H** | | | 1716 | | 1716 | | 1716 | | 1850 | |
| | | | 1.30 | 37.40 | 1.30 | 37.40 | 1.30 | 37.40 | 1.34 | 73.40 |
| **FC** | | | | | | | | | | |
| **A** | | | 20,738 | | 28,813 | | 28,135 | | 30,201 | |
| | | | 2.18 | 344.50 | 2.21 | 334.90 | 2.21 | 324.20 | 2.25 | 243.80 |
| **B** | | | 28,188 | | 28,464 | | 26,571 | | 16,372 | |
| | | | 2.19 | 331.20 | 2.17 | 339.30 | 2.17 | 311.80 | 2.17 | 175.60 |
| **C** | | | 25,607 | | 27,676 | | 24,229 | | 12,127 | |
| | | | 2.21 | 283.30 | 2.21 | 328.90 | 2.17 | 278.70 | 2.21 | 128.30 |
| **D** | | | | | | | | | | |
| **E** | | | | | | | | | | |
| **T** | | | 85,249 | | 86,669 | | 80,651 | | 60,550 | |
| | | | | 959.0 | | 1003.10 | | 914.7 | | 547.7 |

H = Hatch coaming       FC = Forecastle       T = Total

Note: HORIZONTAL INSULATION to be marked with DOUBLE LINE

CBFT    BALE
min deck   Deck area
height

GRAND TOTAL

CBFT        313,122
Deck area   3,424.5

DEC 20 2005  3:54 PM FR EASTWIND-ECO    212 838 3578 TO 90114737259899

| 26. Cargo gear | 27. Refrigeration and ventilation |
|---|---|
| A. Number of cranes:  N/A<br>SWL in MTons: | A. Vessel has Tobson or Ductless ventilation system<br>DUCTLESS |
| B. Number of derricks:  8<br>SWL in MTons:  5.0 | B.- Air is circulated upwards or downwards:<br>UPWARDS |
| C. Union purchase capacity in MTons:  3.5 | B. Hatch coamings are ventilated<br>Yes X      No ☐ |
| D. Other type of gear:  N/A<br>Lifting capacity: | C. Number of air circulations per hour:  90 / 45 |
| | D. Number of fresh air renewals per hour:  4 / 1.5 |
| | E. Ozone generators<br>Yes X      No ☐ |
| | F. Refrigeration capacity (0°C evaporation<br>temperature and 30°C cooling water temperature)<br>kcal/hr:  330,000 Kcal/hr |
| 28. Passengers      NONE<br><br>Number of berths:          Price per day: | 29. Meals, telegrams, entertainment etc (state, if agreed,<br>hmsp sum per month)<br><br>USD 800 |

30. Hire payment in US dollars (state, mode and place of payment; also beneficiary and bank account no.)
    Bank Name :    See ECo Pool Agreement 20 December, 2005

    Sparebanken Rogaland. Bjersted Terrasse 1. 4007 Stavanger, Norway. Att : Jonas Ytreland.
    Telefax : 47 51 53 54 67

    USD Account No. 3185.05.33922

31. Remarks:

    In the event of a default by ECo in the performance of its obligations under
    this Charter-Party that shall not have been cured within a reasonable period,
    the owners may unilaterally terminate this Charter-Party and withdraw the
    vessel from ECo's service without economic penalty arising from the
    withdrawal.

    Owners to pay a commission of 1.25 % to Orion Shipping AS, Oslo on net payments from the Pool.

    It is mutually agreed that this contract shall be performed subject to the terms
    and conditions contained in this Charter, which shall include Part I as well as
    Part II.

    Signature for the Owners                    Signature for ECo Shipping Ltd.

DEC 20 2005  3:54 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258099    P.05

# ECO
## SHIPPING

### ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002

(The "ECo 2002 Pool Agreement")

**AGREEMENT** between **ECo Shipping Ltd.,** a Liberian corporation established in 1996 by Cool Carriers AB and Eastwind Transport Ltd. ("ECo Ltd."), and Tonnevold Reefer 7 KS, a Norwegian corporation ("Shipowner").

**WHEREAS,** Shipowner wishes to contribute one or more handy-size refrigerated transport vessels under its ownership or disponent ownership (the "Vessel" or "Vessels") to a pool of similar vessels under the commercial management of ECo Ltd, (the "Pool"); and

**WHEREAS,** ECo Ltd. is prepared to employ the Vessel or Vessels in the Pool on terms and conditions set forth below.

**NOW, THEREFORE,** in consideration of the mutual promises of the parties contained herein, it is AGREED as follows:

1.      The Vessel or Vessels to be contributed by Shipowner to the Pool are listed in Exhibit A hereto. Shipowner warrants to ECo that it is the owner or disponent owner of the Vessel or Vessels.  All ships contributed to the Pool by any owner will be refrigerated transport vessels of cargo capacity between approximately 250,000 and 350,000 cubic feet.

2.      ECo Ltd. will at any time, upon request, advise Shipowner of the complete current list of all ships in the Pool.  Shipowner undertakes to identify to ECo Ltd. prior to signing this Agreement each refrigerated vessel of 250/350,000 cubic feet owned, chartered in, or otherwise commercially controlled by Shipowner or by any other shareholder, parent, subsidiary, or affiliate of Shipowner ("Competing Vessel") and to advise ECo Ltd. when any such Competing Vessel is either added or deleted.

3.      Each Vessel entering the Pool will do so by being time-chartered to ECo Ltd. in accordance with the provisions of the ECoTime 99 charter party attached hereto as Exhibit B.  A Vessel may enter the Pool at any time and will thereupon be chartered to the Pool for a period of twelve months

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002 -thorgull.doc

Page 1 of 9

DEC 20 2005  3:55 PM FR EASTWIND-ECO    212 938 3570 TO 90114737258899    P.06

# ECO
## SHIPPING

plus or minus 30 days at ECo's option. The charter will at the conclusion of any 12-month period be automatically extended for a further 12 months, with the extension period to commence on the anniversary of the original date of delivery of the Vessel to ECo Ltd., unless written notice of redelivery is given by either party to the other not later than forty-five (45) days prior to completion of the current 12-month period.

4.    Conditions under which each Vessel will be delivered to ECo Ltd. and entered in the Pool include the following:

a)    The place of delivery of the Vessel to ECo Ltd. may not be less favorable geographically than the Malta/Elbe 1 range or Osaka Bay. If the Vessel is in a less favorable position, it must be brought to an equivalent geographical position before entry unless the parties agree on a "ballast penalty" amount or other compensatory arrangements. If the Vessel is delivered to the Pool in a more favorable geographical position that above, a ballast bonus payable to the Shipowner will be calculated and agreed, based on assessing ship's time at current spot market rates and including bunker costs appropriate for the region.

b)    ECo Ltd. will, for the account of the Pool, purchase the bunkers on board at the time of delivery of a Vessel at current Platt's Oilgram prices prevailing at the nearest main bunkering port. When the Vessel is eventually redelivered by ECo Ltd. to the Shipowner, the Shipowner will purchase the bunkers then remaining on board at the then current Platt's Oilgram prices at the nearest main bunkering port.

c)    Shipowner will pay to ECo Ltd. (not for account of the Pool), in respect of each entered vessel, a nonrefundable management fee of $25,000 per year of entry in the Pool, payable annually in advance. The first year's fee will be assessed at the time of the Vessel's initial entry into the Pool and will be offset against any payments owed by the Pool to the Shipowner for bunkers or ballast bonus. Subsequent annual management fees will be assessed in five equal installments by withholding from the Vessel's share of Pool earnings distributed during the first five calendar months of each year of entry.

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION
AGREEMENT 2002 -thorgull.doc
Page 7 of 9

DEC 20 2005  3:55 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.07

# ECO
## SHIPPING

    d)   During the period of a Vessel's entry in the Pool, Shipowner will be responsible for crewing and insuring the Vessel and for all aspects of technical management.. The Vessel will at all times be entered in an internationally accepted Protection and Indemnity Club and will have an ITF Blue Card or other equivalent arrangements enabling her to trade world-wide.

    5.   Notwithstanding the 12-month period of the Vessel's charter to ECo Ltd., Shipowner may at its election at any time, upon sixty (60) days' written notice, withdraw the Vessel from the Pool and terminate the charter to ECo Ltd. subject to the following conditions:

    a)   The premature withdrawal must be occasioned by either

        (i)   in the case of a Vessel owned by Shipowner or any affiliate of Shipowner, the sale of the Vessel to an unrelated party; or

        (ii)   in the case of a vessel chartered to Shipowner from an unrelated party, the termination of the charter party in accordance with its terms.

    b)   If the Vessel has been specifically fixed on employment beyond the expiration of the 60-day notice period, ECo Ltd. will attempt in good faith to substitute a different ship in order to free the Vessel, with any additional expense incurred by the Pool to be reimbursed by the Shipowner. If, however, substitution proves to be impossible or impractical, then the Vessel must remain in the Pool (perhaps with a different owner) at least until completion of the said fixed employment.

    c)   If the premature withdrawal of the Vessel occurs at a time when the total expected spot market earnings of the Vessel from the date of withdrawal to the next 12-month anniversary date exceed the expected earnings of the Vessel as a Pool member during that time interval, then at the time of withdrawal the Shipowner will pay to the Pool the expected earnings differential resulting therefrom. ECo Ltd.'s computation of the earnings differential amount will be discussed fully with Shipowner, and a reputable shipbroker may be engaged as

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002 -thorgull.doc

Page 3 of 8

DEC 20 2005   3:55 PM FR EASTWIND-ECO    212 838 3578 TO 90114737259899    P.08



**ECO**
**SHIPPING**

advisor if either party so requests, with the cost thereof to be shared equally between the Pool and Shipowner.   In the event of failure to reach agreement, ECo Ltd.'s determination of the earnings differential amount will be conclusive and binding.  If the premature withdrawal of the vessel occurs at a time that is economically favorable to the Pool, no earnings differential payment will be due to Shipowner from the Pool.

6.    When any Vessel withdraws from the Pool and is redelivered to Shipowner by ECo Ltd., whether at the end of a 12-month period or prematurely, if she is redelivered in a geographical position more favorable than the Malta/Elbe 1 range or Osaka Bay, a redelivery bonus payable by the Shipowner to the Pool will be calculated and agreed, based on assessing ship's time at current spot market rates and including bunker costs appropriate for the region.  A Vessel may not be redelivered in an unfavorable geographical position unless the parties agree on a "positional penalty payment" to Shipowner or other compensatory arrangement.

7.    Each Vessel in the Pool will at all times have a Weighting Factor assigned to it that reflects its capacity, by reason of its physical and performance characteristics, to generate a greater or lesser level of earnings relative to other similar tonnage.   The initial Weighting Factor of each of the Vessels will be as set forth in Exhibit A.   Shipowner warrants the accuracy of the physical and performance characteristics of the Vessels submitted to ECo Ltd. for use in calculating their Weighting Factors. Weighting Factors of all Vessels in the Pool will be reviewed and reset periodically, not less often than once per year, to reflect observed changes in performance characteristics and relative revenue-generating capacity.  ECo Ltd. will normally use the computational algorithms developed by Cool Carriers AB for the purpose of calculating Weighting Factors but reserves the right to adopt other fair and reasonable methods for doing so.  If a Vessel is found to under perform with respect to her speed, bunker consumption, or other characteristics submitted by Shipowner and used in calculating the Vessel's Weighting Factor, then Shipowner will be liable for speed/consumption or other performance penalties computed in accordance with the normal practices of the industry.  These penalties will be due and

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002 -thorgull.doc

Page 4 of 9

DEC 20 2005  3:55 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.09

# ECO
**SHIPPING**

payable, via deduction from Pool distributions, until such time as the Vessel's Weighting Factor will have been revised to correctly reflect the Vessel's performance characteristics.

8.    The Pool will be managed and operated in the name of "ECo Shipping Ltd" or "Reefership Ltd" by personnel seconded to ECo Ltd. by Eastwind Transport Ltd. and LaauritzenCool AB., and by any other persons that may reasonably be engaged for management or operational purposes. Eastwind Transport Ltd. will serve as overall Administrator of the Pool.

9.    The Vessels, and all other ships in the Pool, will be employed on voyage charters, contracts of affreightment, time charters, or other commercial arrangements with the objective of maximizing the total Net Voyage Earnings of all Pool vessels, denominated in U.S. dollars. In the event the Pool realizes any revenues in other currencies, they will be converted to U.S. dollars as soon as possible. All cash held by the Pool will be invested in U.S. Dollar money market funds. "Net Voyage Earnings" means the sum of all charter hire income, freights, demurrage, ballast bonuses, and all other revenues earned by the Pool vessels, *less* the total of their bunker costs, canal tolls, stevedoring costs, port charges, agency fees and expenses, brokerage and booking commissions, dispatch, and any other voyage costs, including cargo-handling material and any liability insurance for the Pool's account. The foregoing notwithstanding, no vessel will be time chartered out or otherwise specifically committed for a period of more than 12 months unless either ECo Ltd. will have a right of substitution or the approval of the Shipowner will have been obtained in advance.

10.    From time to time ECo Ltd. may also charter in ships from the market on a voyage or time-charter basis, provided that the total of all chartered-in tonnage, measured in cubic feet, will never be permitted to exceed 25% of the total cubic capacity of all Pool vessels. Earnings (or losses) accrued by all chartered-in vessels will be added to (or subtracted from) the overall Pool earnings available for distribution to the Pool Vessels.

11.    In any calendar month the total earnings of the Pool will equal the total Net Voyage Earnings of the Pool vessels as defined above, plus or minus earnings or losses on chartered-in vessels, less allowable overhead expenses of the Pool.

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION AGREEMENT 2002 -thorguil.doc

Page 5 of 9

DEC 20 2005  3:56 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.10



# ECO
## SHIPPING

a)    The earnings of each Pool Vessel in a given month will be calculated in accordance with standard percentage-of-completion rules, in which the earnings on a voyage that takes place during two or more calendar months will be allocated to those months in proportion to the numbers of days of the voyage's total duration that fall in those months. At the end of a month, the earnings for that month on a voyage in progress will be calculated using the best available estimates of voyage duration and total earnings; thereafter, the earnings will be corrected retroactively when final results are known.

b)    Allowable overhead expenses include the salary, benefits, and general office cost allocations of all personnel working on behalf of the Pool, plus travel expenses, audit fees, and other reasonable out-of-pocket expenses incurred on behalf of the Pool. Total personnel and out-of-pocket costs will be estimated for each calendar year in January, with one-twelfth (1/12) of the calculated annual amount being charged against Pool earnings in each month. After the end of a year, out-of-pocket costs actually incurred for the account of the Pool will be computed, with the difference between budgeted and actual costs being assessed against or rebated to, as the case may be, the vessels that were in the Pool during the year on a pro-rated basis. No such adjustment will be made in the case of personnel costs.

12.    Net earnings of the Pool in any calendar month will be allocated to the vessels that were entered in the Pool at any time during that month in proportion to (a) the cubic capacities of those vessels, (b) their weighting factors, and (c) the fractional numbers of days during the month when the vessels were on hire to the Pool, as defined in the ECoTime 99 charter party. As an example, if the Pool included only two ships, namely, Vessel X of capacity 300,000 cubic feet, weighting factor 0.90, and 30.0 on-hire days during a given month and Vessel Y with 275,000 cubic feet, weighting factor 1.10, and 29.0 on-hire days, then the earnings allocation for that month would be calculated as follows:

DEC 20 2005  3:56 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.11

# ECO
## SHIPPING

| | | | |
|---|---|---|---|
| Vessel X "claim" = | 300,000 x 0.90 x 30.0 | = | 8,100,000 |
| Vessel Y "claim" = | 275,000 x 1.10 x 29.0 | = | 8,772,500 |

Share of the month's Pool earnings allocated to Vessel X =
8,100,000/(8,100,000 + 8,772,500)        =        48.007%

Share of the month's Pool earnings allocated to Vessel Y =
8,772,500/(8,100,000 + 8,772,500)        =        51.993%

This method of calculation is employed in all circumstances, including in months when a vessel may have entered the Pool during the last day or two.

13.    Each vessel in the Pool during any month is entitled eventually to receive cash distributions equal to the earnings allocated to her during that month. All Pool earnings net of allowable overhead expenses and annual management fees will be distributed eventually to Pool vessels; ECo Ltd. itself will not be left with any earnings (or losses) other than the annual management fees.

14.    Total earnings of the Pool and the earnings shares allocated to the various Pool vessels for each calendar month will be determined and reported monthly in arrears by ECo Ltd., normally within eight days after the end of the month in question. At about the same time, insofar as permitted by availability of funds (in light of anticipated revenues and expenses), the earnings of the month just ended will be distributed in cash to the (disponent) owners of the various Pool vessels. If the funds available in the Pool following any month of operation are insufficient for the distribution of 100% of that month's earnings, then such lesser percentage of earnings will be distributed to the owners of the vessels *pro rata* as ECo Ltd. determines to be prudent, considering the Pool's projected cash income and obligations; and in such case the undistributed balance of the Pool's earnings for that month will be distributed in the following month. However, at no time will the Pool distribute cash in excess of the total amount of the as-yet-undistributed Pool earnings.

15.    Following the end of each month, ECo Ltd. will prepare and submit to Shipowner financial and operational reports showing, *inter alia*, the voyages performed by the Vessels, earnings therefrom, total Pool earnings, share thereof to be distributed to each Vessel, and related financial information. At the end of each calendar year, in addition to its own year-end reporting ECo Ltd. will arrange for an audit

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION
AGREEMENT 2002 :thorgull.doc
Page 7 of 9

# ECO
## SHIPPING

of the Pool's performance and results to be performed at the Pool's expense by a competent internationally recognized auditing firm, with a copy of the audit report to be furnished to Shipowner as soon as available. All of the foregoing information reported to Shipowner will be treated as confidential.

16.    Any notices under this agreement may be delivered by mail, electronic mail, telex, or facsimile:

a)    If to ECo Ltd. or the Pool, to

c/o Eastwind Transport Ltd.
444 Madison Avenue
Suite 200
New York, NY 10022
Facsimile:       (212) 838-8439
Telex:           420111 EWINDNY
E-Mail:          eastwind@eastwindgroup.com

(b)    If to Shipowner, to:

Tonnevold Reefer 7KS
c/- O.T. Tonnevold
Grimstad, Norway

Facsimile: +47 37 25 88 99
E-Mail: post@ott.no

17.    In case of any conflict between the provisions of this ECo Pool Vessel Contribution Agreement and the provisions of the ECoTime 99 charter party, the provisions of this Agreement will prevail. In case of any dispute between the parties, a good faith attempt to settle it shall be made by a meeting of the senior officials controlling the parties. Should such good faith attempt fail to achieve success, the parties shall each appoint a qualified arbitrator, and the two arbitrators so appointed shall jointly select a third, and the dispute shall be finally resolved by the panel of three so chosen by arbitration in New York City, New York. Any decision of the arbitrators shall be binding on both parties. The law of New York shall govern this Agreement.

DEC 20 2005  3:56 PM FR EASTWIND-ECO    212 838 3578 TO 90114737258899    P.13

# ECO
SHIPPING

**IN WITNESS WHEREOF,** the parties hereto have each executed this document below at the places and dates indicated.

ECO SHIPPING LTD.                           TONNEVOLD REEFER 7KS

By: _Charles T. Moors_                      By: _____
Name:                                       Name: JAN OLAF TONNEVOLD

Title: _Vice President_                     Title: _DIRECTOR_

Date: _20 December 2005_                     Date: _21. DECEMBER 2005_

                                            By: _____
                                            NAME: LEIF LAUVÅS

                                            TITLE: DIRECTOR

C:\Documents and Settings\toby\Local Settings\Temporary Internet Files\OLK4C72\ECo POOL VESSEL CONTRIBUTION
AGREEMENT 2002 -thorgull.doc
Page 9 of 9

# EXHIBIT 7B

# EXHIBIT 2

| 1. Shipbroker | BIMCO UNIFORM TIME-CHARTER |
|---|---|
| ORION SHIPPING AS | (AS REVISED 2001) |
| Strandveien 50 | CODE NAME: "BALTIME 1939" |
| N 1366 Lysaker | PART I |
| Norway | |

| | 2. Place and date of Charter |
| | Oslo 6th Dec. 2006 |

| 3. Owners/Place of business | 4. Charterers/Place of business |
|---|---|
| Tønnevold Reefer 7 KS | Eco Shipping Ltd |
| Grimstad, Norway | 80 Broad Street |
| | Monrovia, Liberia |

| 5. Vessel's Name | 6. GT/NT |
|---|---|
| MV "Thorgull" | See Clause 50 |

WORKING COPY

| 7. Class | 8. Indicated brake horse power (bhp) |
|---|---|
| See Clause 50 | |

| 9. Total tons d.w. (abt.) on summer freeboard | 10. Cubic feet grain/bale capacity |
|---|---|
| See Clause 50 | See Clause 50 |

| 11. Permanent bunkers (abt.) | 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of |
|---|---|
| See Clause 50 | See Clause 50 |

| 13. Present position | 14. Period of hire (Cl. 1) |
|---|---|
| Trading | About 60 days |

| 15. Port of delivery (Cl. 1) | 16. Time of delivery (Cl. 1) |
|---|---|
| Dop Buenavista, Colombia, ATDNSHINC | 15th December, 2006 or on completion present voyage |

17. (a) Trade limits (Cl. 2)

Always afloat always within IWL excluding Russia, Israel, Cuba and Turkey, Europe, Medit, USA and Canada. War and warlike zones and areas excluded by UN resolutions

(b) Cargo exclusions specially agreed

All cargoes ultimately destined to Iraq or other UN sanctioned countries. Fish that is caught illegally or illegal to trade.

Charterers and Shippers to provide sufficient fenders for transshipment

| 18. Bunkers on re-delivery (state min. and max. quantity)(Cl. 5) | 19. Charter hire (Cl. 6) |
|---|---|
| See Clause 40 | USC 87 pe cbft/30 days inclot, payable every 30 days in advance. |
| | Hire from 15th Feb to be USC 120 / 30 days. |

| 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6) |
|---|
| See Clause 47 |

| 21. Place or range of re-delivery (Cl. 7) | 22. Cancelling date (Cl. 21) |
|---|---|
| Redel dop 1 gsp Nigeria, ATDNSHINC | 15th December, 2006 (See box 16) |

WORKING COPY

| 23. Dispute resolution (state 22(A), 22(B) or 22(C) agreed; Place of Arbitration must be stated) (Cl. 22) | 24. Brokerage commission and to whom payable (Cl. 24) |
|---|---|
| | 1,25 % commission to Orion Shipping A/S |

| 25. Numbers of additional clauses covering special provisions, if agreed |
|---|
| Clauses 25 to 60 as attached |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include PART I as well as PART II. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II to the extent of such conflict.

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Issued 1909, Amended 1911, 1912, 1920, 1939, 1950, 1974 and 2001

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

| (continued) | "BALTIME 1939" (Revised 2001) UNIFORM TIME-CHARTER | PART I |
|---|---|---|
| Signature (Owners) | Signature (Charterers) | |

# WORKING COPY

# WORKING COPY

This document is a computer generated VOLCOA form, printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**PART II**

**"BALTIME 1939" Uniform Time-Charter (as revised 2001)**

It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 5 of the gross/net tonnage indicated in Box 6, classed as stated in Box 7 and of indicated brake horse power (bhp) as stated in Box 8, carrying about the number of tons deadweight indicated in Box 9 on summer freeboard inclusive of bunkers, stores and provisions, having as per builder's plan a cubic-feet grain/ bale capacity as stated in Box 10, exclusive of permanent bunkers, which contain about the number of tons stated in Box 11, and fully loaded capable of steaming about the number of knots indicated in Box 12 in good weather and smooth water on a consumption of about the number of tons fuel oil stated in Box 13, now in position as stated in Box 13 and the party mentioned as Charterers in Box 4, as follows:  1-15

**1.   Period/Port of Delivery/Time of Delivery**  16
The Owners let, and the Charterers hire the Vessel for a period of the number of calendar months indicated in Box 14 from the time (not a Sunday or a legal Holiday unless taken over) the Vessel is delivered and placed at the disposal of the Charterers between 9 a.m. and 6 p.m., or between 9 a.m. and 2 p.m. if on Saturday, at the port stated in Box 15 in such available berth where she can safely lie always afloat, as the Charterers may direct, the Vessel being in every way fitted for ordinary cargo service. The Vessel shall be delivered at the time indicated in Box 16.  17-27

**2.   Trade**  28
The Vessel shall be employed in lawful trades for the carriage of lawful merchandise only between safe ports or places where the Vessel can safely lie always afloat within the limits stated in Box 17. No live stock nor injurious, inflammable or dangerous goods (such as acids, explosives, calcium carbide, ferro silicon, naphtha, motor spirit, tar, or any of their products) shall be shipped.  29-36

**3.   Owners' Obligations See Clause 30**  37
The Owners shall provide and pay for all provisions and Wages, for insurance of the Vessel, for all deck and Engine-room stores and maintain her in a thoroughly efficient state in hull and machinery during service. The Owners shall provide winchmen from the crew to operate the Vessel's cargo handling gear, unless the crew's employment conditions or local union or port regulations prohibit this, in which case qualified shore-winchmen shall be provided and paid for by the Charterers.  38-47

**4.   Charterers' Obligations**  48
The Charterers shall provide and pay for all fuel oil, port charges, pilotages (whether compulsory or not), canal steersmen, boatage, lights, tug-assistance, consular charges (except those pertaining to the Master, officers and crew), canal, dock and other dues and charges, including any foreign general municipality or state taxes, also all dock, harbour and tonnage dues at the ports of delivery and re-delivery (unless incurred through cargo carried before delivery or after re-delivery), agencies, commissions, also shall arrange and pay for loading, trimming, stowing (including dunnage and shifting boards, excepting any already on board), unloading, weighing, tallying and delivery of cargoes, surveys on hatches, meals supplied to officials and men in their service and all other charges and expenses whatsoever including detention and expenses through quarantine (including cost of fumigation and disinfection). All ropes, slings and special runners actually used for loading and discharging and any special gear, including special  49-67

ropes and chains required by the custom of the port for mooring shall be for the Charterers' account. The Vessel shall be fitted with winches, derricks, wheels and ordinary runners capable of handling lifts up to 2.5 tons.  68-71

**5.   Bunkers See Clause 40**  72
The Charterers at port of delivery and the Owners at port of re-delivery shall take-over and pay for all fuel oil remaining in the Vessel's bunkers at current price at the respective ports. The Vessel shall be re-delivered with not less than the number of tons and not exceeding the number of tons of fuel oil in the Vessel's bunkers stated in Box 18.  73-79

**6.   Hire**  80
The Charterers shall pay as hire the rate stated in Box 19 per 30 days, commencing in accordance with Clause 1 until her re-delivery to the Owners.
Payment of hire shall be made in cash, in the currency stated in Box 20, without discount, every 30 days, in advance, and in the manner prescribed in Box 20. In default of payment the Owners shall have the right of withdrawing the Vessel from the service of the Charterers, without noting any protest and without interference by any court or any other formality whatsoever and without prejudice to any claim the Owners may otherwise have on the Charterers under the Charter.  81-92

**7.   Re-delivery**  93
The Vessel shall be re-delivered on the expiration of the Charter in the same good order as when delivered to the Charterers (fair wear and tear excepted) at an ice-free port in the Charterers' option at the place or within the range stated in Box 21, between 9 a.m. and 6 p.m., and 9 a.m. and 2 p.m. on Saturday, but the day of re-delivery shall not be a Sunday or a legal Holiday.
The Charterers shall give the Owners not less than ten five days' notice at which port and on about which day the Vessel will be re-delivered. Should the Vessel be ordered on a voyage by which the Charter period will be exceeded the Charterers shall have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that the voyage would allow redelivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers shall pay the market rate if higher than the rate stipulated herein.  94-111

**8.   Cargo Space**  112
The whole reach and burthen of the Vessel, including lawful deck-capacity shall be at the Charterers' disposal, reserving proper and sufficient space for the Vessel's Master, officers, crew, tackle, apparel, furniture, provisions and stores.  113-117

**9.   Master**  118
The Master shall prosecute all voyages with the utmost despatch and shall render customary assistance with the Vessel's crew. The Master shall be under the orders of the Charterers as regards employment, agency, or other arrangements. The Charterers shall indemnify the Owners against all consequences or liabilities arising from the Master, officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods. The Owners shall not be responsible for shortage, mixture, marks, nor for Number of pieces or packages, nor for damage to or claims on cargo caused by bad stowage or otherwise. If the Charterers have reason to be dissatisfied with the conduct of the Master or any officer, the Owners, on receiving particulars of the complaint, promptly to  119-134

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

investigate the matter, and, if necessary and practicable, to make a change in the appointments. 135 136

**10. Directions and Logs** 137
The Charterers shall furnish the Master with all instructions and sailing directions and the Master shall keep full and correct logs accessible to the Charterers or their Agents. 138 139 140 141

**11. Suspension of Hire etc.** 142
(A) In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than twenty-four four consecutive hours, 143 144 145 146 147 148
no hire shall be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance shall be adjusted accordingly. 149 150 151 152
(B) In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account even if such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by, the negligence of the Owners' servants. 153 154 155 156 157 158 159 160 161

**12. Responsibility and Exemption** 162
The Owners only shall be responsible for delay in delivery of the Vessel or for delay during the currency of the Charter and for loss or damage to goods onboard, if such delay or loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. The Owners shall not be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their servants. The Owners shall not be liable for loss or damage arising or resulting from strikes, lock-outs or stoppage or restraint of labour (including the Master, officers or crew) whether partial or general. The Charterers shall be responsible for loss or damage caused to the Vessel or to the Owners by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing or discharging of goods or any other improper or negligent act on their part or that of their servants. 163 164 165 166 167 168 169 170 171 172 173 174 175 176 177 178 179 180 181 182

**13. Advances** 183
The Charterers or their Agents shall advance to the Master, if required, necessary funds for ordinary disbursements for the Vessel's account at any port. The Charterers not to be responsible for application of such funds. 184 185 186
charging only interest at 6 2 per cent. p.a., such advances shall be deducted from hire. 187 188

**14. Excluded Ports** 189
The Vessel shall not be ordered to nor bound to enter: 190
(A) any place where fever or epidemics are prevalent or to which the Master, officers and crew by law are not bound to follow the Vessel; 191 192 193
(B) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out 194 195 196 197 198

after having completed loading or discharging. The Vessel shall not be obliged to force ice. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Unforeseen detention through any of above causes shall be for the Charterers' account. 199 200 201 202 203 204 205 206

**15. Loss of Vessel** 207
Should the Vessel be lost or missing, hire shall cease from the date when she was lost. If the date of loss cannot be ascertained half hire shall be paid from the date the Vessel was last reported until the calculated date of arrival at the destination. Any hire paid in advance shall be adjusted accordingly. 208 209 210 211 212 213

**16. Overtime** 214
The Vessel shall work day and night if required. The Charterers shall refund the Owners their outlays for all overtime paid to officers and crew according to the hours and rates stated in the Vessel's articles. Officers and Crews overtime always to be for Owners account. 215 216 217 218

**17. Lien** 219
The Owners shall have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers shall have a lien on the Vessel for all moneys paid in advance and not earned. 220 221 222 223 224

**18. Salvage** 225
All salvage and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's, officers' and crew's proportion and all legal and other expenses including hire paid under the charter for time lost in the salvage, also repairs of damage and fuel oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount. 226 227 228 229 230 231 232 233

**19. Sublet** 234
The Charterers shall have the option of subletting the Vessel, giving due notice to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter. 235 236 237 238

**20. War ("Conwartime 1993")** 239
(A) For the purpose of this Clause, the words: 240
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and 241 242 243 244
(ii) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel. 245 246 247 248 249 250 251 252 253 254 255 256 257 258
(B) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable 259 260 261 262 263 264

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion in the form must be clearly visible in event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

judgement of the Master and/or the Owners, may be, or | 265
are likely to be, exposed to War Risks. Should the Vessel | 266
be within any such place as aforesaid, which only | 267
becomes dangerous, or is likely to be or to become | 268
dangerous, after her entry into it, she shall be at liberty | 269
to leave it. | 270
(C) The Vessel shall not be required to load contraband | 271
cargo, or to pass through any blockade, whether such | 272
blockade be imposed on all vessels, or is imposed | 273
selectively in any way whatsoever against vessels of | 274
certain flags or ownership, or against certain cargoes | 275
or crews or otherwise howsoever, or to proceed to an | 276
area where she shall be subject, or is likely to be subject | 277
to a belligerent's right of search and/or confiscation. | 278
(D) (i) The Owners may effect war risks insurance in | 279
respect of the Hull and Machinery of the Vessel and their | 280
other interests (including, but not limited to, loss of | 281
earnings and detention, the crew and their Protection | 282
and Indemnity Risks), and the premiums and/or calls | 283
therefor shall be for their account. | 284
(ii) If the Underwriters of such insurance should require | 285
payment of premiums and/or calls because, pursuant | 286
to the Charterers' orders, the Vessel is within, or is due | 287
to enter and remain within, any area or areas which are | 288
specified by such Underwriters as being subject to | 289
additional premiums because of War Risks, then such | 290
premiums and/or calls shall be reimbursed by the | 291
Charterers to the Owners at the same time as the next | 292
payment of hire is due. | 293
(E) If the Owners become liable under the terms of | 294
employment to pay to the crew any bonus or additional | 295
wages in respect of sailing into an area which is | 296
dangerous in the manner defined by the said terms, | 297
then such bonus or additional wages shall be re- | 298
imbursed to the Owners by the Charterers at the same | 299
time as the next payment of hire is due. | 300
(F) The Vessel shall have liberty:- | 301
(i) to comply with all orders, directions, recom- | 302
mendations or advice as to departure, arrival, routes, | 303
sailing in convoy, ports of call, stoppages, destinations, | 304
discharge of cargo, delivery, or in any other way | 305
whatsoever, which are given by the Government of the | 306
Nation under whose flag the Vessel sails, or other | 307
Government to whose laws the Owners are subject, or | 308
any other Government, body or group whatsoever acting | 309
with the power to compel compliance with their orders | 310
or directions; | 311
(ii) to comply with the order, directions or recom- | 312
mendations of any war risks underwriters who have the | 313
authority to give the same under the terms of the war | 314
risks insurance; | 315
(iii) to comply with the terms of any resolution of the | 316
Security Council of the United Nations, any directives of | 317
the European Community, the effective orders of any | 318
other Supranational body which has the right to issue | 319
and give the same, and with national laws aimed at | 320
enforcing the same to which the Owners are subject, | 321
and to obey the orders and directions of those who are | 322
charged with their enforcement; | 323
(iv) to divert and discharge at any other port any cargo or | 324
part thereof which may render the Vessel liable to | 325
confiscation as a contraband carrier; | 326
(v) to divert and call at any other port to change the crew | 327
or any part thereof or other persons on board the Vessel | 328
when there is reason to believe that they may be subject | 329
to internment, imprisonment or other sanctions. | 330
(G) If in accordance with their rights under the foregoing | 331
provisions of this Clause, the Owners shall refuse to | 332
proceed to the loading or discharging ports, or any one | 333

or more of them, they shall immediately inform the | 334
Charterers. No cargo shall be discharged at any | 335
alternative port without first giving the Charterers notice | 336
of the Owners' intention to do so and requesting them | 337
to nominate a safe port for such discharge. Failing such | 338
nomination by the Charterers within 48 hours of the | 339
receipt of such notice and request, the Owners may | 340
discharge the cargo at any safe port of their own choice. | 341
(H) If in compliance with any of the provisions of sub- | 342
clauses (B) to (G) of this Clause anything is done or not | 343
done, such shall not be deemed a deviation, but shall | 344
be considered as due fulfilment of this Charter. | 345

**21. Cancelling** | 346
Should the Vessel not be delivered by the date indicated | 347
in Box 22, the Charterers shall have the option of | 348
cancelling. If the Vessel cannot be delivered by the | 349
cancelling date, the Charterers, if required, shall declare | 350
within 48 hours after receiving notice thereof whether | 351
they cancel or will take delivery of the Vessel. | 352

**22. Dispute Resolution** | 353
*) (A) This Charter shall be governed by and construed in | 354
accordance with English law and any dispute arising | 355
out of or in connection with this Charter shall be referred | 356
to arbitration in London in accordance with the Arbitration | 357
Act 1996 or any statutory modification or re-enactment | 358
thereof save to the extent necessary to give effect to the | 359
provisions of this Clause. | 360
The arbitration shall be conducted in accordance with | 361
the London Maritime Arbitrators Association (LMAA) | 362
Terms current at the time when the arbitration | 363
proceedings are commenced. | 364
The reference shall be to three arbitrators. A party | 365
wishing to refer a dispute to arbitration shall appoint its | 366
arbitrator and send notice of such appointment in writing | 367
to the other party requiring the other party to appoint its | 368
own arbitrator within 14 calendar days of that notice and | 369
stating that it will appoint its arbitrator as sole arbitrator | 370
unless the other party appoints its own arbitrator and | 371
gives notice that it has done so within the 14 days | 372
specified. If the other party does not appoint its own | 373
arbitrator and give notice that it has done so within the | 374
14 days specified, the party referring a dispute to | 375
arbitration may, without the requirement of any further | 376
prior notice to the other party, appoint its arbitrator as | 377
sole arbitrator and shall advise the other party | 378
accordingly. The award of a sole arbitrator shall be | 379
binding on both parties as if he had been appointed by | 380
agreement. | 381
Nothing herein shall prevent the parties agreeing in | 382
writing to vary these provisions to provide for the | 383
appointment of a sole arbitrator. | 384
In cases where neither the claim nor any counterclaim | 385
exceeds the sum of US$50,000 (or such other sum as | 386
the parties may agree) the arbitration shall be conducted | 387
in accordance with the LMAA Small Claims Procedure | 388
current at the time when the arbitration proceedings are | 389
commenced. | 390
*) (B) This Charter shall be governed by and construed in | 391
accordance with Title 9 of the United States Code and | 392
the Maritime Law of the United States and any dispute | 393
arising out of or in connection with this Contract shall | 394
be referred to three persons at New York, one to be | 395
appointed by each of the parties hereto, and the third by | 396
the two so chosen; their decision or that of any two of | 397
them shall be final, and for the purposes of enforcing | 398
any award, judgement may be entered on an award by | 399
any court of competent jurisdiction. The proceedings | 400
shall be conducted in accordance with the rules of the | 401

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"BALTIME 1939" Uniform Time-Charter (as revised 2001)

~~Society of Maritime Arbitrators, Inc.~~ 402
~~In cases where neither the claim nor any counterclaim~~ 403
~~exceeds the sum of US$50,000 (or such other sum as~~ 404
~~the parties may agree) the arbitration shall be conducted~~ 405
~~in accordance with the Shortened Arbitration Procedure~~ 406
~~of the Society of Maritime Arbitrators, Inc. current at the~~ 407
~~time when the arbitration proceedings are commenced.~~ 408
~~(C) This Charter shall be governed by and construed in~~ 409
~~accordance with the laws of the place mutually agreed~~ 410
~~by the parties and any dispute arising out of or in~~ 411
~~connection with this Charter shall be referred to~~ 412
~~arbitration at a mutually agreed place, subject to the~~ 413
~~procedures applicable there.~~ 414
(D) Notwithstanding (A), (B) or (C) above, the parties 415
may agree at any time to refer to mediation any difference 416
and/or dispute arising out of or in connection with this 417
Charter. 418
In the case of a dispute in respect of which arbitration 419
has been commenced under (A), (B) or (C) above, the 420
following shall apply:- 421
(i) Either party may at any time and from time to time 422
elect to refer the dispute or part of the dispute to 423
mediation by service on the other party of a written notice 424
(the "Mediation Notice") calling on the other party to agree 425
to mediation. 426
(ii) The other party shall thereupon within 14 calendar 427
days of receipt of the Mediation Notice confirm that they 428
agree to mediation, in which case the parties shall 429
thereafter agree a mediator within a further 14 calendar 430
days, failing which on the application of either party a 431
mediator will be appointed promptly by the Arbitration 432
Tribunal ("the Tribunal") or such person as the Tribunal 433
may designate for that purpose. The mediation shall 434
be conducted in such place and in accordance with such 435
procedure and on such terms as the parties may agree 436
or, in the event of disagreement, as may be set by the 437
mediator. 438
(iii) If the other party does not agree to mediate, that fact 439
may be brought to the attention of the Tribunal and may 440
be taken into account by the Tribunal when allocating 441
the costs of the arbitration as between the parties. 442
(iv) The mediation shall not affect the right of either party 443

to seek such relief or take such steps as it considers 444
necessary to protect its interest. 445
(v) Either party may advise the Tribunal that they have 446
agreed to mediation. The arbitration procedure shall 447
continue during the conduct of the mediation but the 448
Tribunal may take the mediation timetable into account 449
when setting the timetable for steps in the arbitration. 450
(vi) Unless otherwise agreed or specified in the 451
mediation terms, each party shall bear its own costs 452
incurred in the mediation and the parties shall share 453
equally the mediator's costs and expenses. 454
(vii) The mediation process shall be without prejudice 455
and confidential and no information or documents 456
disclosed during it shall be revealed to the Tribunal 457
except to the extent that they are disclosable under the 458
law and procedure governing the arbitration. 459
(Note: The parties should be aware that the mediation 460
process may not necessarily interrupt time limits.) 461
(E) If Box 23 in Part I is not appropriately filled in, sub- 462
clause (A) of this Clause shall apply. Sub-clause (D) 463
shall apply in all cases. 464
*  (A), (B) and (C) are alternatives; indicate alternative 465
agreed in Box 23. 466

**23. General Average** 467
General Average shall be settled according to York/ 468
Antwerp Rules, 1994 and any subsequent modification 469
thereof. Hire shall not contribute to General Average. 470

**24. Commission** 471
The Owners shall pay a commission at the rate stated 472
in Box 24 to the party mentioned in Box 24 on any hire 473
paid under the Charter, but in no case less than is 474
necessary to cover the actual expenses of the Brokers 475
and a reasonable fee for their work. If the full hire is not 476
paid owing to breach of Charter by either of the parties 477
the party liable therefor shall indemnify the Brokers 478
against their loss of commission. Should the parties 479
agree to cancel the Charter, the Owners shall indemnify 480
the Brokers against any loss of commission but in such 481
case the commission not to exceed the brokerage 482
on one year's hire. 483

WORKING COPY

This document is a computer generated BALTIME 1939 (revised 2001) form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being
made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense
caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

1       *Rider to M/V THORGULL, 6TH DEC. 2006*

## RIDER TO CHARTER PARTY
## FOR M/V "THORGULL" CP 6TH. DECEMBER 2006

### CL. 25 DRY DOCKING

No dry docking during time charter period except in case of emergency.

### CL.26 ITF

The officers and crew of the vessel are to be covered for the duration of this Charter Party by a bona fide trade union agreement.

Loss of time may be considered as off-hire and extra expenses incurred as a result of any action stemming from crew or union problems shall be for Owners account.

### CL.27 VESSEL INSURANCE

The Charteres to insure vessel for liability to hull and forward copy of the policy  to Owners.
**H & M value:  7,5 Mill.**

### CL.28 STEVEDORE DAMAGE

Stevedore damages caused to the vessel or her fittings to be settled directly between the Master/Owners and the Stevedores. Charteres to be kept immediately advised of ocurance of such event. Should the Master/Owners not be able to obtain agreement with the Stevedores causing the damage, Charteres to remain ultimately responsible, but only as far as they have been kept advised as above or as soon as practiable possible.

### CL.29 SUSPENSION  OF HIRE

Should the vessel be put back, whilst on voyage, by reason of an accident to ship or onboard injury or sickness to the crew, the hire shall be suspended from the time of the vessel's putting back until she is again in the same position and voyage resumed therefrom. Bunkers spent during that period to be for Owners account, as well as other extra expenses.

### CL.30 VESSEL'S CREW/MASTER INSTRUCTIONS:

Vessel's Crew/Master instructions:

- Raising and lowering derricks and preparation of loading / discharge and

2        *Rider to M/V THORGULLr 6TH DEC. 2006*

to operate derricks/cranes in loading resp. discharge - if permitted by
shore regulations - otherwise shore labour to be for Charteres account.
- Opening and closing of hatches in preparation for loading and discharging
  and intermediate ones for cargo protection, if necessary, proveded local
  regulation allow.
- Vessel's crew to lash/secure and tally
- Supervision of loading and/or discharging
- Maintaining power while loading/discharging and care of winches
- Shifting ship during loading/discharging and shifting berth
- Docking and undocking
- Assistance during bunkering
- Master to provide for Chrts daily tally and cargo plan
- Owners/Vessel to place atleast 1 representative for tallying during
  loading and discharging operations

## CL.31 LASHING MATERIALS

All lashing material, as onboard incl. airbags + pipes/pistols to be put at Charteres free
disposal.
Owners may invoice for airbags, etc that may be damaged during the period of the
charter.

## Cl.32 VESSEL'S HOLDS

The Owners agree that vessel on delivery shall have clean and dry holds,
and free from any smell to Charterers / Suveyors satisfaction. Charterers
to redeliver vessel in same condition, but have the option of redelivery the vessel before
cleaning of holds paying a lumpsum o USD 1.800 to the Owners.

Charterers to pay USD 1100,- for hold cleaning per discharge.

## CL.33  DISABLE GEAR

In the event of any disabled crane or running gear or insufficient power to drive same,
Charteres have the right to deduct hire for the period the vessel is unable to work on a
prorata basis, and to deduct standby charges, if any as per voucher.

## CL.34  VESSEL'S CERTIFICATES

The Owners confirm that the vessel has full certificates to operate within the trading
limits and warrant to maintain the in force during this charter.

3    *Rider to M/V THORGULLr 6TH DEC. 2006*

### CL.35  LIGHTERING APPARATURE

The vessel to supply lightering apparature for night work, whenever required by the Charteres or their port agents.

### CL.36  OPENING / CLOSING OF HATCHES

The crew to open and close hatches, whenever required by Charteres or their port agents, free of expence, provided permitted by local regulations.

### CL.37  VESSEL'S COMMUNICATION EQUIPMENT

The vessel's radiostation and communication equipment to be at Charteres disposal day and night, Sundays and holidays. Charteres to pay **USD 700/30** days for communication and representation.

### CL.38 WAR RISK INSURANCE

Basis war risk for Owners account, any additional war risk on vessel/crew to be for Charterers account.

### CL.39  MASTER'S SUPERVISION AND REPORTING

The Master shall supervise stowage of the cargo thoroughly and let one of his officers control all loading, handling, stowage, and discharging operation, and he shall furnish the Charteres, when required, with stowageplan. The Master also to fill in vouage reports and other ordinary reports, as may be required by the Charteres.

### CL.40 BUNKERS

Bunkers basis same/same.
On redelivery Charterers have the option to redeliver the vessel with the same quantity as on delivery. Any differences in quantity on redelivery to be paid basis the price ruling at the closest bunker port to redelivery.

Vessel to be delivered with full bunkers.

Owners agree to arrange for bunkering on Charteres behalf during the t/c contract if required. Bunkering to be closely coordinated between Owners/Charters and Master . Bunker requirements always in Masters descretion/judgement.

4       *Rider to M/V THORGULLr 6TH DEC. 2006*

## CL.41 TRADING TO USA

When USA as a trading area following clauses are included (as attached): C-TPAT clause, US Custom 24 HRS clause, US Security clause, USA bunker clause

## CL.42 TRANSHIPMENT CLAUSE

Charteres have the right to perform transhipment of cargo at the open sea and/or in the roads of ports, alongside motherships and/or ( at Charteres option) alongside fishing trawlers, always in close cooperation between Master of the reefer vessel and Master of the mothershio/fishing trawler , and always weather and conditions permitting, whereas:

A: if transhipment performed alongside mothership:

aa)Master of the reefer vessel is obliged to agree with Master of the mothership the time and manner of mooring operation.

ab)The mothership is to carry a sufficient number of pneumatic rubber fenders enabling safe mooring of the reefer vessel alongside the mothership.

ac)If,in the judgement of the Master of the reefer vessel . the weather/sea conditions have become, or are threatening to become within a short time dangerous for the safety of the reefer vessel , Master of the reefer vessel may, and is obliged to, always in mutual agreement with Master of the mothership, unmoor alongside the mothership as quickly as compatible with safety, and in such event Master of the mothership is to render all necessary assistance.

B: if transipment performed alongside fishing trawler :

ba) The time and manner of mooring/unmooring operation shall be decided upon by Master of the reefer vessel.

bb)Charteres are to furnish the reefer vessel (against Master's receipt in writing) with a sufficient number of pneumatic rubber fenders enabling the reefer vessel and the fishing trawler to safely moor and lie alongside each other.
Master of the reefer vessel is to exercise utmost diligence in protecting the feners from Loss. All fenders as supplied by Charteres to the reefer vessel shall remain the Property of Charteres and shall be returned to the at any time during the currency of this Charter Party (on demand) but latest on redelivery of the reefer vessel from this Charter. Owners not to be held responsible for fair and tear of the fenders.

bc)The reefer vessel is to carry on board mooring ropes necessary for safe mooring of trawlers alongside the reefer vessel at open sea. Charteres shall have free use of such ropes, and shall not be held responsible for fair wear and tear thereof.

bd)If, in the judgement of the Master of the reefer vessel, the weather/sea conditions have become, or are threatening to become within a short time dangerous for the safety, of the reefer vessel and or fishing trawler, Master of the reefer vessel is to order the trawler to inmoor from alongside the reefer vessel as quickly as compatible with

5        *Rider to M/V THORGULLr 6TH DEC. 2006*

safety and in such event the crew of the reefer vessel is to render all necessary assistance in unmooring the trawler.

be) The reefer vessel is to provide her own crew for handling onboard the reefer vessel mooring ropes for the fishing trawler.
Each party bears under all circumstances their own damages, incl. consequential Damages suffered by the vessel and crew during the period of such transhipment incl. movement for approaching, holding together and detaching of two vessels, and shall not make any claim against the other party. It is however understood such damages of the vessel should be covered by their own hull insurance respectively. Any additional insurance premium, if required for such transhipment operation to be for Charters account .

## CL.43  INSTRUCTIONS

The Master to follow Charters instructions as far as these are not in contradiction to the law, failing which, Charters have the right to keep Owners responsible for the eventual fault of the Master

## CL.44 REPRESENTATION

Charterers to pay USD 10,00/ day for victualling for Charteres    representative. Representation on Charteres behalf see Clause 37.

## CL.45 SUPERCARGO

The Charters have the right to place a representative onboard during the charter. Charteres to arrange for necessary insurance and no claim to be passed to Owners.

## CL.46 HIRE PAYMENT

The hire is payable every 30 days in advance, less Charters outlays for Owners account ( as approved by Owners) and commission to Owners' bankers, however last payment of hire to be adjusted to expected date of redelivery.

## CL.47 OWNERS BANKING DETAILS

Tønnevold Reefer 7 KS
Postbox 115
4891 Grimstad

6        *Rider to M/V THORGULLr 6TH DEC. 2006*

Bank:
Sparebank 1 Sr-Bank
Postbox 114
4065 Stavanger
Norway
Account Nr: 3185.05.33922
Swift: SPRONO22

### CL.48 CLAIMS & ARREST

Should the vessel by any reason of cargo claim, be arrested or otherwise detained, it is
clearly agreed between the Owners and the Charteres, that the Owners in the first
instance and without delay, directly or via their P and I Club must arrange, as soon as
possible, circumstances permitting , the release of the vessel by putting up sufficient
required guarantees.

### CL.49 VESSEL P&I

The Owners confirm that the vessel is covered by a first class P and I Club for the
duration of this Charterparty.
P&I club:. Gard

### CL.50 VESSEL DESCRIPTION

As per attachement.

### CL.51 TEMPERATURE

Temperature – as per vessels description – above

### CL.52 SCHEDULE

Charterers to keep Owners currently informed of vessel's schedule and name of agents
each port, who also to attend to Owners/vessel's matter at no additional cost.
Any extraordinary agency function to be agreed directly between Owners and agents or
Owners option to appoint a husbandry agent.

### CL.53 ADDITIONAL CLAUSES

It is understood that the New Jason Clause, New Both-to-Blame Collision Clause,
London Reefer Clause are to form part of this C/P

7    *Rider to M/V THORGULLr 6TH DEC. 2006*

## CL.54 WATCHMEN

Compulsory watchmen to be for Charterers account.


## CL.55 BUNKER QUALITY

Bunker quality cl. – as per vessel's description


## CL.56 OPTIONS

Deleted.


## CL.57 P & C CLAUSE

This contract to be kept strictly private and confidential


## CL.58 HATCH SEALING CLAUSE

Charterers have the right to order the master to seal the hatches and access
ways to the cargo compartments. Master of the vessel to report the seal
numbers to Charterers along with the load report and or discharge report.

In case master or crew need to gain access to the cargo spaces and or any of
the sealed spaces the master is to report to Charterers the time, date and
reason for this access. The master is then to report to Charterers the time
and date that the seals were replaced.

Access ways/point to the reefer equipment are for practical reasons not to
be sealed - since the crew need to have regular access to these spaces.

Charterers are to supply owners with suitable sealing equipment -
suitability in master's discretion - or owners will supply sealing equipment
at Charterers expense.


## CL. 59 Fuel Sulphur Content Clause for Time Charter Parties

Notwithstanding anything else contained in this Charter Party, the Charterers shall
supply fuels of such specifications and grades to permit the vessel, at all times, to meet
the maximum sulphur content requirements of any emission control zone when the
vessel is trading within that zone. The Charterers shall indemnify, defend and hold

8          *Rider to M/V THORGULLr 6TH DEC. 2006*

harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.

For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## CL. 60 ISPS/MTSA CLAUSE FOR TIMECHARTER AND OTHER ADDITIONAL CLAUSES.

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

> "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

9          *Rider to M/V THORGULLr 6TH DEC. 2006*

## U.S. Customs 24 Hours Rule Clause for Time Charter Parties

(a)  If loading cargo destined for the US or passing
     through US ports in transit, the Charterers shall:

      (i) Provide all necessary information, upon request by the Owners, to the
      Owners and/or their agents to enable them to submit a timely and accurate
      cargo declaration directly to the US Customs; or

      (ii) If permitted by US Customs Regulations (19 CFR 4.7) or any subsequent
      amendments thereto, submit a cargo declaration directly to the US Customs and
      provide the Owners with a copy thereof.

    In all circumstances, the cargo declaration must be
    submitted to the US Customs latest 24 hours in
    advance of loading.

(b)  The Charterers assume liability for and shall
     indemnify, defend and hold harmless the Owners
     against any loss and/or damage whatsoever
     (including consequential loss and/or damage) and
     any expenses, fines, penalties and all other claims
     of whatsoever nature, including but not limited to
     legal costs, arising from the Charterers' failure to
     comply with the provisions of sub-clause (a).

(c)  If the Vessel is detained, attached, seized or
     arrested as a result of the Charterers' failure to
     comply with the provisions of sub-clause (a), the
     Charterers shall provide a bond or other security to
     ensure the prompt release of the Vessel.
     Notwithstanding any other provision in this Charter
     Party to the contrary, the Vessel shall remain on
     hire.

## USA Bunkering Clause

Owners certify that the vessel is and will remain so throughout the duration of this
charter, eligible for bunkering privileges in the United States of America and its
territories and possessions, under all present and United States Laws and/or
regulations and is not, nor will be restricted, as to bunkering at any other countries or
port of call during this charter.

10      *Rider to M/V THORGULLr 6TH DEC. 2006*

### U.S. Security Clause for Voyage Chartering

If the Vessel calls in the United States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:

*Reporting*
The Vessel or its agents shall report and send all notices as required to obtain entry and exit clearances from the relevant U.S. authorities.
Any delay caused by the failure to so report shall be for the Owners' account, unless such failure to report is caused by or attributable to the Charterers or their representatives or agents including but not limited to the shipper and/or receiver of the cargo.

*Clearances*
Unless caused by the Owners' negligence, any delay suffered or time lost in obtaining the entry and exit clearances from the relevant U.S. authorities shall count as laytime or time on demurrage.

*Expenses*
Any expenses or additional fees relating to the cargo, even if levied against the Vessel, that arise out of security measures imposed at the loading and/or discharging port and/or any other port to which the Charterers order the Vessel, shall be for the Charterers' account.

*Notice of Readiness*
Notwithstanding anything to the contrary contained in this Charter Party the Vessel shall be entitled to tender Notice of Readiness whether cleared for entry or not by any relevant U.S. authority.

### U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause

The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service.
The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.
The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

11        *Rider to M/V THORGULLr 6ᵀᴴ DEC. 2006*

**VESSEL'S DETAILS**

*********

# EXHIBIT 3

-----Original Message-----
From: reefer@orion-shipping.com [mailto:reefer@orion-shipping.com]
Sent: 25. januar 2007 14:41
To: OTT Ship
Subject: thorunn + thorgull - eco

TO..: "O.T.TØNNEVOLD AS"
FROM: ORION SHIPPING AS
DATE: 25-JAN-2007 14:41
MSG.: 96719

pål/morten

fyg foll sent toby today:

re. thorunn/thorgull - closing of eco pool
--
understand you are putting the last work into the final accounts and
the statements which hope will include a summary of the last 6 months
and the pool earnings. last one rcvd by tonnevold is from july last
year.

the results from decmber was a little dissapointing. throunn made a
trip to klaipeda and she and thorgull were at that time the only
vessels in the pool right?), so would excpect more to be credited to
owners during december than what they rcvd.

pls comment

thks + rgds

------------------------------------------------------------------------
---
Email: reefer@orion-shipping.com
web: http://www.orion-shipping.com
Phone: +47 67 83 89 89 - Fax: +47 67 10 88 52

Espen C. Harr    Mob: +47 901 23 305
Morten Saetre    Mob: +47 995 13 000
Peter Oeyen      Mob: +47 907 75 739

**From:** Moors, Toby [mailto:tmoors@eastwindgroup.com]
**Sent:** 19. april 2006 14:32
**To:** Pål Aimar Sørensen
**Cc:** Jan Walle
**Subject:** RE: ECo pool furure??

Jan - Paul / Toby

I have the spreadsheets - I will send them shortly - needed to review them last night

The offhire for Thorgull is correct - vessel lost time in Moin waiting for the Deck generator

Working on the format for a revised Pool - it is complex as I intend to bring in all our smaller ships, including those outside the current pool (we have charterered some more ships on period and bought 3 more in last 12 months).

On t/c , as advised as few weeks ago, the rate we would 'safely' want to charter in order to not risk losing money would probably be lower than 'acceptable' to the various Owners in your K/s - especially as the Dec / Jan / Feb months were pretty poor in the market. So, I prefer the pool idea as it spreads risk and the entire group of ships gain from the 12 month charters and the COAs we have inhouse (which may not involve ships like Thorgull / Thorunn.

I hope to have the skeleton together by the end of the week - when is your next Board meeting as a deadline ?

Thanks
T

Toby Moors
Eastwind New York

**From:** Jan Walle
**Sent:** 31. mai 2006 14:17
**To:** 'Moors, Toby'
**Cc:** OTT Ship
**Subject:** Eco pool future

Hi Toby,

We are still missing promised input from you regarding future pool opportunities.
I need latest next week what you can offer regarding future deployment for Thorgull and Thorunn.

Please let this mail be my last remainder.

**Best Regards**

**Jan Walle**
**Senior Vice President**
**Shipping Division**
**O.T.Tønnevold AS**
**Direct line: +47 37 25 88 72**
**Mobile: +47 90 03 18 95**
**Fax: +47 37 25 88 99**
**E-Mail: jw@ott.no**

**From:** Moors, Toby [mailto:tmoors@eastwindgroup.com]
**Sent:** 24. februar 2006 21:34
**To:** Jan Walle
**Subject:** RE: Thorunn, Thorgull

Jan / Toby

Sorry for slow reply, basically been traveling since we met in our office.

1. I am trying to keep and ECO model running, either in it's current form (which is quite a lot of work here for just two remaining 3rd party ships)
2. Small pool (honestly) may not work from your perspective - a group of C class ships running without any period charter support means they are extremely exposed to spot market and bunker exposures.
3. T/c option - discussing further .

Will get back to you over next week.

Brgds
Toby

Toby Moors
EW / RS New York

---

**From:** Jan Walle [mailto:jw@ott.no]
**Sent:** Wednesday, February 22, 2006 9:51 AM
**To:** Moors, Toby
**Subject:** Thorunn, Thorgull

Hi Toby,

Thank you very much for your hospitality , discussions and the reefer introduction you did for me.
I hope the snow situasjon is under control in New York. I saw a picture of a man skiing on Manhatten, do you still have a lot of snow ?

Regarding business, I am waiting for your proposal for the possible future deployment of our reefers.

-    Is ECO still a possibility ?
-    How would a small pool look like ?
-    Is the 68 cent plus profit split still an option ?

At last, if you can indicate what type of business we can propose that is not in competition with Knut, that would be great.

Best Regards

Jan Walle
Senior Vice President
Shipping Division
O.T.Tønnevold AS
Direct line: +47 37 25 88 72
Mobile: +47 90 03 18 95
Fax: +47 37 25 88 99

# EXHIBIT 4



| Eastwind Home | Eastwind Group | Eastwind Fleet | About Us | Contacts | Photo Gallery |



# Eastwind Group

- Founded in 1987
- Own/Operate 119 Ships (Dec 2007)

## Operating Segments:

- **Containers**

- **Dry Bulkers**

- **Reefers/Freezers**

- **Tankers**

News:

- **October 2007:** EWB orders four new 35,000 Dwt bulkers from Shanghaiguan

- **September 2007:**  Eastwind purchases Silver Wind, 17,000 Dwt tanker

- **August 2007:** Eastwind contracts Cosco for tanker conversions.

- **August 2007:** EWB orders four new Lakers from Shanghaiguan

- **July 2007:** Eastwind affiliate EWB buys four containerships from Maersk

- **May 2007:**  Chiquita sells Great White Fleet to Eastwind/NYKLauCool

- **May 2007:**   Eastwind orders four new Lakers from Shanghaiguan

Principal Operating Companies/Affiliates

- **Atlantic Wind Pool Ltd.**

- **Eastwind Maritime S.A.**

- **Eastwind Transport Ltd.**

- **Eastwind (Hellas) S.A.**

- **EWB Ltd.**

- **Eastwind Ltd.**

- **Eurus Containers Carriers Ltd.**

- **EW Carriers (UK) Ltd.**

- **EW Shipmanagent  Ltd.**

- **Eystrasalt LLC.**

- **Kura Shipping Ltd.**

## Eastwind Management Offices

### Eastwind Maritime Inc.
444 Madison Avenue, Suite 200
New York, NY 10022
Phone: +1-212-838-1113
Fax: +1-212-838-8439
Eastwind@eastwindgroup.com



### Eastwind Ltd.
Nippon Press Center Bldg, 6th Fl
2-2-1 Uchisaiwaicho
Chiyoda-ku, Tokyo 100-0011, Japan
Phone: +81-3-5511-7071
Fax: +81-3-5511-7081
ewl@ewltokyo.co.jp



## Eastwind Commercial Offices

**Eastwind Carriers (UK) Ltd.**
Third Floor
3 Southwark Street
London SE1 1RQ
England
Phone: +44-0-207-403-5986
Fax: +1-866-767-1761
tankers@eastwindgroup.com

**Eastwind Agency Ltd**
Nippon PressCenter Bldg. 6thFL
2-2-1- Uchisaiwaicho
100-0011 Tokyo, Japan
Phone: +81-3-5251-5188
Fax: +81-3-5251-5088
sam_shirai@eastwind-agency.co.jp

**Eastwind AB**
PO Box 10055
100 55 Stockholm, Sweden
Phone: +46-8-753-6720
Fax: +46-8-622-6624
reefers@eastwindgroup.com

**Eurus Container Carriers Ltd.**
444 Madison Avenue, Suite 200
New York, NY 10022
Phone: +1-212-838-1113
Fax: +1-212-838-8439
Eastwind@eastwindgroup.com

**Eastwind Transport Ltd.**
Suite 904, East Wing,
ZhongRongHengRui International Plaza,
No.620 ZhangYang Road, PuDong,
Shanghai, China 200122
Phone: +86-21-5062-0011
Fax: +86-21-5836-2448

**ProBulk Carriers Ltd.**
444 Madison Avenue
New York, NY 10022
Phone: +1-212-980-1150
Fax: +1-212-486-0123
procarriers@eastwindgroup.com

| | ew-china@hotmail.com | |
|---|---|---|
| **Eastwind Joint Venture Offices** | | |

| | | |
|---|---|---|
| **Smart Crewing Ltd.**<br>Kaliningrad, Russia, 236000<br>20, Ozerova Street, 3rd Floor<br>Phone: +44-012-916-864<br>smartcrewing@qazinter.net | **Multiship Agencia Maritima**<br>Rua Dr. Sampaio Viana, 253<br>Suite 64<br>04004-000 SÃO PAULO<br>BRAZIL.<br>Phone: +55-11-3884 5583<br>Fax: +55-11-3051 2085<br>ship@multiship.com.br | |

| **Eastwind Ship Managers' Offices** | | |
|---|---|---|
| **Eastwind Shipmanagement Pte. Ltd.**<br>1 Maritime Square<br>Hex10-21 Harbourfront Centre<br>Singapore 099253<br>Tel: +65-6-273-3100<br>Fax: +65-6-272-9497<br>corporate@ewsmplspore.com.sg | **Norbulk Shipping UK Ltd.**<br>Norbulk House<br>88 Glassford Street<br>Glasgow G1 1UP<br>Phone: +44-141-552-3000<br>Fax: +44-141-559-5250<br>mail@norbulkshipping.com | **Eastwind Hellas S.A.**<br>6 Skouze Street<br>Piraeus 18536 Greece<br>Phone: +30-1-42-92-465/9<br>Fax: +30-1-42-92-493<br>mail@eastwindhellas.gr |
| **Eastwind Shipmanagement Pte. Ltd.**<br>Shanghai Representative Office<br>Suite 904, East Wing, ZhongRongHengRui<br>International Plaza, No.620 ZhangYang Road,<br>PuDong, Shanghai, China 200122<br>Phone: +86-21-5062-0011<br>Fax: +86-21-5836-2448<br>ewsmshanghai@126.com | **Diamond Ship Management N.V**<br>The Lofthouse<br>Oude Leeuwennui 7-11<br>B-2000 Antwerp Belguim<br>Phone: +32-3-293 6167<br>Fax: +32-3-293 6576<br>Technical@DiamondShip.Be | **Korea Marine Ltd.**<br>Marine Bldg. 4th Floor<br>#84-5, 4-KA Chungang-Dong<br>Chung-Ku, Pusan 600-014,<br>Korea<br>Phone: +82-51-462-1746<br>Fax: +82-51-463-9041<br>kml@komarine.co.kr |

# NYS Department of State

## Division of Corporations

**Entity Information**

---

Selected Entity Name: ECO SHIPPING LTD.

Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | ECO SHIPPING LTD. |
| **Initial DOS Filing Date:** | APRIL 04, 2001 |
| **County:** | NEW YORK |
| **Jurisdiction:** | DELAWARE |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**

JOHN D KOUSI
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Principal Executive Office**

ECO SHIPPING LTD.
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Registered Agent**

C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# EXHIBIT 5

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: ECO SHIPPING LTD.

Selected Entity Status Information

**Current Entity Name:** ECO SHIPPING LTD.
**Initial DOS Filing Date:** APRIL 04, 2001
**County:** NEW YORK
**Jurisdiction:** DELAWARE
**Entity Type:** FOREIGN BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
JOHN D KOUSI
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Principal Executive Office**
ECO SHIPPING LTD.
444 MADISON AVE STE 200
NEW YORK, NEW YORK, 10022

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Home | About Us | myManta NEW | FAQ | View Cart

Login: [          ] [          ] 🔍
Not a member? Learn more.

Free Subscription to Media
& Marketing

**COMPANIES:** U.S., U.S. Public, Australia, Canada, U.K., Worldwide

**RESOURCES:** Jobs, Market Research, News , Vendor Quotes, Free Magazines

Enter U.S. Company Name        **Search**

**BUSINESS CENTERS:** Travel, Small Biz, Career

Company Profiles > Find Companies > New York, NY > Consumer Products & Services > Passenger Car Leasing > Water Transportation Services, NEC > Chartering of commercial boats > Eastwind Maritime S A Inc Company Profile

# Eastwind Maritime S A Inc

444 Madison Ave Ste 200, New York, NY 10022-6983, United States  (Map) (Add Company Info)

**Phone:**  (212) 838-1113

**SIC:** Water Transportation Services, NEC

**Line of Business:** Water Transport Services Oil/Gas Exploration Services Natural Gas Liquids Production

Ads by Google

Freight Forwarding Find Customs Brokers & Freight Forwarding Services on Business.com

Freight Shipping Compare rates on freight shipping from the world's leading providers.

Freight Forwarding Freight Forwarding list Guide to Freight Forwarding

The ads are not affiliated with Eastwind Maritime S A Inc

Add Company To List
Add/View Note
Add Contact
View Contacts
Edit Company Profile
Set Company Alert
>> go to myManta

**Find** Jobs in New York, NY

### Detailed Eastwind Maritime S A Inc Company Profile

This company profile is for the private company Eastwind Maritime S A Inc, located in New York, NY. Eastwind Maritime S A Inc's line of business is water transport services oil/gas exploration services natural gas liquids production.

### Company Profile: Eastwind Maritime S A Inc

**Year Started:** 1987
**State of Incorporation:** N/A
**URL:** N/A
**Location Type:** Single Location
**Stock Symbol:** N/A
**Stock Exchange:** N/A
**Also Does Business As:** N/A
**NAICS:** N/A
**SIC #Code:** 4499
**Est. Annual Sales:** $4,100,000
**Est. Employees:** 65
**Est. Employees at Location:** 50
**Contact Name:** John D Kousi
**Contact Title:** President

**Freight Forwarding**
Find Customs Brokers & Freight Forwarding Services on Business.com
www.business.com

**Freight Shipping**
Compare rates on freight shipping from the world's leading providers.
the-freightshipping.net

Ads by Google

*Data above provided by D&B.*

**Additional Eastwind Maritime S A Inc Company Information**

**Have some information to add about Eastwind Maritime S A Inc?**

Manta allows *you* to make additions and corrections to the information available for the *Eastwind Maritime S A Inc* company profile. »Learn More

Add Company Information

**Set Company Alert**

Stay in the know. Sign up to receive email alert notification when new information about Eastwind Maritime S A Inc is available.

Set Company Alert

**Looking for reports & articles on Eastwind Maritime S A Inc?**

Manta also provides financial reports, credit reports, news articles, and market research reports on Eastwind Maritime S A Inc.

View Reports & Articles

Copyright 2007 Dun and Bradstreet, Inc. All Rights Reserved.



www.rfpathways.com
Get control and reduce cost

RF Pathways™

WMS

Click here.

www.rfpathways.com
Ads by Google

**Find** reports and articles on Eastwind Maritime S A Inc

**Find other** Eastwind Maritime S A Inc **companies**

More Companies in:
This Industry
New York, NY

Privacy Policy | Refund Policy | Contact Us | Advertise | Local Ads | Terms & Conditions | Site Map | Manta Partners

Copyright © 2008, ECNext, Inc. All Rights Reserved.

# EXHIBIT 8



ADDENDUM NO. 1
to

Charter Party M/V "THORGULL" dated Oslo, 6th December, 2006

between

Eastwind Maritime S.A (as Charterers)

and

Tønnevold Reefer 7 KS (as Owners)

-----------------------------------------------------------------------

It has today been agreed between both parties that:

Vessl on completion Port Harcourt 11th February 1042 hours to continue on time charter under the following terms:

Vessel to load frozen fish in Dakhla area for w-Africa or in Chile back to w-Africa. Duration about 40-60 days without gurantee.

Hire
February USC 87,5
March USC 115
April USC 92,5

Otherwise terms as per above Charter Party, dated 6th December 2006

Oslo, 13th February, 2007


Eastwind Maritime S.A                    Tønnevold Reefer 7 KS


------------------                       ------------------------

# *Addendum No 2*

### to Charter Party covering M/V "Thorgull" dated Oslo, 6th December, 2006

### between

### Eastwind Maritime S.A (as Charterers)

### and

### Tønnevold Reefer 2 KS (as Owners)

------------------------------------------------------------------------------

It has today 19th April, 2007 been agreed that:

The vessel will continue on a timecharter trip in direct continuation via Falklands to load squid for Far-East to one or more, in Charterers option, gspb(s) Far-East, excluding Japan/Korea. (The latter until she is de-listed by NEAFC and Owners have confirmed vsl can call Japan/Korea).

Delivery dop 1 gsp port W-Afrcia 18th April (in direct continuation).

Hire April USC 92.5, May USC 80, June USC 65, July/August USC 50

Otherwise terms as per CP dated 6th December, 2006

Oslo, 19[h] April, 2007

**The Owners**                    **The Charterers**

----------------------------        ------------------------------------

### *Addendum No 3*

to Charter Party covering M/V "Thorgull" dated Oslo, 6th December, 2006

between

**Eastwind Maritime S.A (as Charterers)**

and

**Tønnevold Reefer 2 KS (as Owners)**

-------------------------------------------------------------------------------

It has today 19th July, 2007 been agreed that:

The vessel will continue on a timecharter trip in direct continuation from present time-charter, from DOP  Qingdao 18th July 1725 hours, via Indonesia to load cocoa for Colombia, duration about 45 days wog.

Hire from DOP Qingdao until DOP 1 GSP Colombia, USC 35 per cbft/30 days.

Eastwind to have last refusal to fix the vessel at market level for a new voyage, to be proposed/discussed.

Otherwise terms as per Charter Party dated 6th December, 2006

Oslo, 19[h] July, 2007

The Owners                              The Charterers

Senior Vice President                  S. V. President
O.T. Tønnevold AS                      Eastwind Maritime S.A.
Manager for
Tønnevold Reefer 2 KS